<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HELEN FORD,<br><br>               Plaintiff,<br><br>      v.<br><br>COUNTY OF HUDSON, et al.,<br><br>               Defendants. | Civil Action No. 07-5002<br>(SDW) (MCA)<br><br><br>**OPINION**<br><br><br>June 28, 2012 |

**WIGENTON**, District Judge.

Before the Court is defendants County of Hudson[1] ("County") and David Krusznis' ("Krusznis" or "Defendant Krusznis") motion for partial summary judgment ("County's Motion") and defendant Oscar Aviles' ("Aviles" or "Defendant Aviles") motion for summary judgment ("Aviles' Motion") pursuant to Federal Rule of Civil Procedure 56 regarding plaintiff Helen Ford's ("Plaintiff" or "Ford") complaint.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper under 28 U.S.C. § 1391(b).

This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, this Court **DENIES** the County's Motion and the Aviles' Motion.

**FACTUAL AND PROCEDURAL HISTORY**

Plaintiff, a black female, was hired as an officer with the Hudson County Department of Corrections ("HCDC") on August 29, 1989. (Defs.' Br. Supp. Mot. Summ. J. ("Defs.' Br.") ¶ 1,

---

[1] Improperly pled as Hudson County Department of Corrections.

at vii; Pl.'s Resp. to Defs.' Joint Statement, 1-2; Complaint ("Compl.")[2] ¶¶ 11-12, at 3.) Plaintiff became a permanent officer as of March 1990. (Compl. ¶ 12, at 3.) In 1993-94, she was assigned to the Training Unit of HCDC, then operating out of Secaucus, New Jersey, to work as a training officer. (*Id.*) On or about December 13, 2002, Plaintiff was promoted to Sergeant of Corrections. (*Id.* ¶ 13, at 3.) Plaintiff remained in the Training Unit through September 11, 2003,[3] where her duties included class instruction, drills, discipline of recruits, and supervision of recruit physical conditioning. (*Id.* ¶ 13-14, at 3.) Plaintiff's time was evenly divided between the performance of administrative obligations and the conducting of training activities. (*Id.* ¶ 14, at 3.) Plaintiff was assisted in the performance of her duties by two subordinate training officers. (*See id.*)

In August 2003, counsel from the County Law Department interviewed Plaintiff as a potential witness for a suit in which the County was a defendant. (*Id.* ¶ 15, at 3-4.) At that time, Plaintiff provided information to the County Law Department regarding various allegations of misconduct by the Director of HCDC, Ralph Green ("Green" or "Director Green").[4] (*Id.*) These assertions of misconduct included alleged sexual relationships between Director Green and other employees, as well as preferential treatment given by Director Green to certain female corrections officers. (*Id.*) Plaintiff also reported to the County Law Department instances of threatening behavior by Director Green directed at Plaintiff due to her claimed knowledge of his alleged misconduct. (*Id.*) This included Director Green's alleged efforts to have Plaintiff "lie

---

[2] On November 15, 2010, Plaintiff filed a Supplemental Complaint, herein referred to as "Supplemental Complaint."
[3] The Court notes that in her Statement of Disputed Material Facts, Plaintiff alleges she was transferred on a different date, September 15, 2003. (Pl.'s Statement of Disputed Material Facts, ¶ 4.)
[4] Green is no longer Director of HCDC, having retired in 2003. (Def. Oscar Aviles' Legal Br. Supp. Mot. Summ. J. ("Def. Aviles' Br.") 3.) Defendant Aviles replaced Green as Director of HCDC in 2003. (*Id* at 1, 3.) The Director of HCDC was responsible for, *inter alia*, supervising and managing the Plaintiff's work environment, implementing and initiating discipline of officers within the HCDC, compelling training of employees within the HCDC, determining if areas of training were to be provided to employees, and otherwise controlling the work atmosphere of the Plaintiff. (Compl. ¶ 38, at 9.) The Director has the authority to establish policy within the HCDC and to delegate this authority, regarding decisions to discipline and terminate employees or subordinate Captains. (*See id.* ¶ 68, at 15.).

2

and/or 'cover up' negative information involving" Director Green's ex-wife, who had applied for County employment. (*Id.*)

Plaintiff alleges that within two weeks of the interview with the County Law Department, she was transferred from her training position to the cell blocks of the Kearny, New Jersey jail facility. (*Id.* ¶ 16, at 4.)   At the Kearny facility, Plaintiff alleges that adverse actions were repeatedly taken against her. (*Id.*) These actions included several work schedule changes, which resulted in Plaintiff having no days off for several weeks. (*Id.*)  On September 15, 2003, Plaintiff filed a complaint with the County Department of Personnel and a separate grievance with her Union (collectively, "Personnel Complaints") regarding these actions. (*Id.* ¶ 17, at 4.)  On March 9, 2004, Plaintiff filed a petition ("Workers' Compensation Petition") with the New Jersey Division of Workers' Compensation alleging physical and psychological injuries from the stress imposed by the retaliatory actions by Director Green and Thomas Fricchione ("Fricchione"), a County-appointed aide assigned to HCDC by the County officials. (*Id.* ¶ 19, at 5.)   Plaintiff claims that as a result of these physical and psychological stressors she stopped working on January 6, 2004. (*Id.*)

Plaintiff alleges that on April 5, 2004, the County answered the Workers' Compensation Petition "with an admission that Plaintiff's injuries did arise out of and in the course of her employment, provided her medical treatment, and noted the total sum of disability benefits paid her up to that time totaled $6,964.28." (*Id.* ¶ 21, at 5.)  On April 15, 2005, Plaintiff executed a Release and Settlement Agreement with the County of Hudson, concerning the actions and hostile work environment created by Director Green, Fricchione, and Kelvin Roberts (a prior Director of HCDC). (*Id.* ¶ 28, at 7.)   The Release and Settlement Agreement specifically excluded the Workers' Competition Petition and its allegations. (*Id.*)  In return, in April 2005,

the County paid Plaintiff a sum of money and transferred her back to her position within the HCDC's training unit in Secaucus, New Jersey. (*Id.* ¶ 30, at 7).

Plaintiff alleges that the Personnel Complaints were motivating factors for the County to initiate a Department of Personnel investigation conducted by an outside law firm. (*Id.* ¶ 22, at 5.) On May 11, 2004, Plaintiff was interviewed in connection with a Department of Personnel investigation. (*Id.* ¶ 23, at 6.) The interview concerned the information provided in the August 2003 interview, in addition to topics such as systemic sexual harassment, discrimination, and disparate treatment in HCDC. (*Id.*) In response, Plaintiff provided information regarding other male employees and supervisors, including Aviles, who allegedly engaged in discriminatory and harassing actions directed toward Plaintiff. (*See id.* ¶¶ 23, 25-26, 31, at 6-7.) Plaintiff previously had filed complaints concerning Aviles' behavior in the workplace directed towards her. (*Id.* ¶¶ 26, 30, 31, at 6-7.) Plaintiff alleges that upon her return to work in April 2005, a supervisory county employee advised that Aviles harbored animus toward her for filing complaints against him and providing information involving him in the interview conducted on May 11, 2004. (*See id.* ¶ 31, at 7.) Plaintiff further asserts that, as a result of his animus, Aviles opposed her return to the training unit, and "wanted a male to remain in charge of the training unit." (*Id.*)

Upon Plaintiff's April 2005 return to the Training Unit, she was not provided any subordinate training officers to assist with her duties, where previously two subordinate officers assisted Plaintiff. (*Id.* ¶¶ 14, 32, at 3, 7.) Additionally, Plaintiff alleges that during her absence, other Training Unit officers were either suspended, removed and re-assigned, or out on injury. (*Id.* ¶ 33, at 8.) Plaintiff alleges that between her return in April 2005 and March 29, 2006, little to no support was provided to her in the performance of her duties.[5] (*See id.* ¶ 34, at 8.) Plaintiff

---

[5] The court notes that from July 6, 2005, to October 5, 2005, Plaintiff maintains that she was assisted with her duties by the injured training unit officer who returned to work. (*See id.* ¶ 34, at 8.)

alleges that Defendant Krusznis, her direct supervising officer,[6] responded to her objections and inquiries regarding the lack of assistance by stating that Plaintiff "can handle it." (*Id.* ¶¶ 35, 39, at 8-9.)  As a result of Krusznis' response, Plaintiff maintains that "she was left to process, train, and supervise the recruit classes that ranged from a group of approximately 30 to one of approximately 77 recruits." (*Id.* ¶ 35, at 8.)  Defendants maintain that during the time Plaintiff worked alone, a total of seven recruits were trained by the training unit. (*See* Defs.' Br. ¶¶ 64-67, at xviii; *see also* Joint Appendix ("J.A.") Ex. 18 ¶ 17, Dkt No. 82(5).)

Plaintiff alleges that after her return to the training unit, she acted in a manner consistent with her various job duties and submitted reports, as required by HCDC, through her chain of command concerning various issues that arose. (Compl. ¶ 43, 48, at 10.)  The following are examples of Plaintiff's reporting activities.   In May 2005, Plaintiff reported the untreated, seizure-inducing medical condition of her ex-boyfriend and fellow correctional officer. (*Id.* ¶ 44, at 10.)  In June 2005, Plaintiff reported that she recently found out an acquaintance working at her home was on parole. (*Id.*)  In August 2005, Plaintiff provided information regarding contact with a municipal court to obtain a restraining order against her ex-boyfriend. (*Id.*)  In December 2005, Plaintiff reported derogatory comments allegedly made by Plaintiff's superiors about Plaintiff. (*Id.*)

Plaintiff alleges that in June 2005, when she notified Krusznis that an acquaintance working at her home was a parolee, Krusznis instructed her to verify with the HCDC records room that the parolee had not been incarcerated at HCDC. (*Id.* ¶¶ 44, 50, at 10-11.)  Plaintiff alleges that she followed Krusznis's instruction and included in her report information relayed to her that her acquaintance had not been incarcerated in HCDC. (*Id.*)  Plaintiff maintains that she

---

[6] Plaintiff maintains that Krusznis was a ranking supervisory officer over the Internal Affairs Department and by nature of this position "had a responsibility to insure that complaints and reports made by the Plaintiff were properly investigated by properly trained Internal Affairs officers who were free of bias against Plaintiff." (*Id.* ¶ 49, at 11.)

received no further instruction regarding this incident. (*Id.* ¶ 51, at 12.)   In February 2006, Plaintiff was questioned concerning her association with the parolee and "various other reports that she had submitted up [to] that point." (*Id.* ¶ 52, at 12.)   Plaintiff maintains that Krusznis assigned the two investigators who questioned Plaintiff. (*Id.* ¶ 53, at 12.)   Plaintiff objected to the assignment of the two investigators because one investigator had a close personal relationship with Director Green and his current wife, who was an Internal Affairs Department employee. (*Id.* ¶ 54, at 12.)   Plaintiff objected to the assignment of the second investigator because Plaintiff alleges this investigator was known to have hostility toward black females who associated with white males. (*Id.*)  The parolee with whom Plaintiff associated was a white male. (*Id.* ¶52, at 12.) Plaintiff maintains that Krusznis failed to respond to her objections (*Id.* ¶ 55, at 12.)

Plaintiff alleges that on March 26, 2006, she received an anonymous phone call advising that the Deputy Director was coaching her ex-boyfriend in an attempt to have Plaintiff charged with fraud. (*Id.* ¶ 45, at 10.)  In addition, Plaintiff alleges that the anonymous caller advised that a letter written by the ex-boyfriend to the Internal Affairs Department of HCDC "would be under her office door when she arrived at work the next morning." (*Id.*)  Plaintiff maintains that she found such a letter on March 27, 2006, and reported the call and the document to Krusznis. (*Id.* ¶¶ 46-47, at 11.)  Plaintiff alleges that Krusznis responded to her by instructing her to leave a report with the Internal Affairs Department by the end of her shift. (*Id.* ¶ 47, at 11.)  Plaintiff complied with Krusznis's instruction. (*Id.* ¶ 57, at 13.)  On March 29, 2006, Plaintiff was served with disciplinary charges, signed by Krusznis, alleging that she was a hazard to others if permitted to remain on the job and that immediate suspension was necessary. (*Id.* ¶ 58, at 13.) As a result of these charges, Plaintiff was suspended immediately without pay. (*Id.*)  After a

Loudermill hearing[7] held on April 5, 2006, the County-appointed hearing officer continued Plaintiff's suspension. (*Id.* ¶ 61, at 13.)

Plaintiff maintains that on April 28, 2006, "Krusznis issued a second Preliminary Notice of Disciplinary Action regarding Plaintiff." (*Id.* ¶ 63, at 14.)  Plaintiff alleges that this second notice included the following charges: (1) in December 2005, Plaintiff made false reports of information regarding derogatory comments allegedly made by Plaintiff's superiors; and (2) Plaintiff's association with the parolee working at her home violated County Fraternization Policy. (*Id.*)  Additionally, Plaintiff maintains that this second notice addressed "issues relating to a letter written by the" Fraternal Order of Police President to her ex-boyfriend in July 2005. (*Id.*)

Defendants assert that the March 29, 2006 and April 28, 2006 Preliminary Notices of Disciplinary Action also contain allegations that Plaintiff "instructed a subordinate officer to conduct an unauthorized computer inquiry" to assess whether the parolee was incarcerated in the HCDC and that Plaintiff "prepared a false report in an attempt to mislead a fellow officer into [signing] a false and misleading document to establish alleged harassment by her former boyfriend." (Defs.' Br. ¶ 37, at xiii; *see also* J.A. Exs. 15-17.)  Subsequently, on May 11, 2006, Plaintiff was notified that the County terminated her.[8]  (Compl. ¶ 64, at 14; J.A. Ex. 21.) Plaintiff appealed the suspension and termination to the State Merit System Board. (*Id.* ¶ 65, at 14.)  In September 2009, Plaintiff was reinstated to her previous rank of Sergeant at the HCDC. (Supplemental Compl. ¶ 6, at 2; Defs.' Br. ¶ 82, at xx.)  However, Plaintiff was not returned to

---

[7] This is the name for the process a government entity must provide a public employee prior to terminating his or her employment pursuant to the Supreme Court's decision in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). *See Livingston v. Borough of Edgewood*, 430 F. App'x 172, 173 n.3 (3d Cir. 2011); *Montanye v. Wissahickon School Dist.*, 218 F. App'x 126, 128 n.2 (3d Cir. 2007).
[8] In a disciplinary decision dated May 8, 2006, Plaintiff was terminated effective May 5, 2006. (J.A. Ex. 21, at 5.)

the training unit and was instead assigned to Unit 4 which included disciplinary and maximum security prisoners. (Supplemental Compl. ¶ 11, at 3.)

Since her reinstatement, Plaintiff has filed numerous complaints regarding her treatment by supervisors. (*Id.* ¶ 13, at 3.)  Plaintiff complained of an unwarranted denial of her vacation days by the Operations Lieutenant.[9] (*Id.*)  Plaintiff also filed a grievance stating that the Operations Lieutenant failed to approve her vacation day usage that might have required utilization of time available as of January 2011, but approved in advance the same "usage for an employee(s) who had not filed or made complaints against the County and the Defendants named herein." (*Id.* ¶ 13, at 4.)  Plaintiff filed a complaint alleging that her Operations Lieutenant refused to permit her to attend mandatory classes on unlawful harassment and discrimination. Allegedly, her Operations Lieutenant also refused to permit her to attend offered Microsoft training classes, but permitted a white male sergeant to attend. (*Id.* ¶ 13, at 3.)  Plaintiff alleges that she attended the firearms qualification range on October 5, 2009, and that a County jail personnel officer informed her "that she presented no problem to reassignment to active duty posts." (*Id.* ¶ 9, at 2-3.)  Despite this encounter, Plaintiff filed a grievance stating that she was placed "on a 'do not arm' list allegedly based upon her failure to earlier qualify with a firearm while not providing her with any remedial training, advising her of failure, or providing any opportunity for one-on-one correction. (*Id.* ¶ 13, at 3.)  Plaintiff alleges that one-on-one correction training was provided to a white male officer who also returned to duty after a long absence. (*Id.*)  Plaintiff filed a grievance alleging that her Operations Lieutenant failed to notify her of a training course cancellation which was known by the Operations Lieutenant in advance and caused Plaintiff to be unable to report for her normal work hours. (*Id.* ¶ 13 at 4.)

---

[9] The Operations Lieutenant reported directly to Krusznis during the time prior to Krusznis's retirement, which was effective July 1, 2010. (Supplemental Compl. ¶ 14, at 4.)

Plaintiff alleges that she has received responses to her numerous complaints only in the form of acknowledgements of receipt and notification of transfer from the County Department of Personnel to the Department of Corrections. (*Id.* ¶ 15, at 4.)   Plaintiff alleges she has not received a response to any of her post-reinstatement complaints from the Department of Corrections. (*Id.* ¶ 16, at 4.)

Plaintiff alleges that Krusznis testified on May 1, 2007, that he, Aviles, and County counsel reached the decision to issue the charges and seek Plaintiff's termination. (Compl. ¶ 67, at 15.)   Plaintiff also maintains that Krusznis testified on the same date in the Office of Administrative law that "he made a mistake on the form that indicated Plaintiff was a hazard, but never notified either the State Merit System Board or Plaintiff that he made a mistake on the form." (*Id.* ¶ 62, at 14.)   On August 24, 2010, Krusznis testified that he made the decision to issue the charges at the recommendation of County counsel. (J.A. Ex. 5, pp. 177-80, Dkt. No. 82(4).)   At that time, Krusznis could not recall if he discussed the decision with Aviles, and if he did, Krusznis could not recall the content of his conversation. (*Id.* at 181-83.)

Plaintiff maintains that on July 11, 2007, Aviles testified that he delegated the decision to charge and seek Plaintiff's termination to Krusznis and that Krusznis reached this decision on his own. (*Id.* ¶ 69, at 15.)   However, on May 11, 2010, Aviles testified that he might not have learned of the decision to suspend Plaintiff until after it occurred. (J.A. Ex. 3 at 222, Dkt. No. 82(3).) Plaintiff alleges that also on July 11, 2007, the Personnel Officer who drafted the HCDC policy on fraternization testified that this policy "required only that [Plaintiff] notify the facility of the facts of the association and that there be verification that her job would not cause her to have contact with the parolee." (Compl. ¶ 70, at 15.)

On October 17, 2007, Plaintiff commenced this action against Defendants by filing a complaint alleging a violation of the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 ("Count One"). (*Id.* ¶¶ 71-78, at 15-17.)  Plaintiff also alleges violations of the New Jersey Constitution; the New Jersey Civil Rights Act ("NJCRA") ("Count Two") (*Id.* ¶¶ 1-4. at 18.); the New Jersey Law Against Discrimination ("NJLAD") ("Count Three") (*Id.* ¶¶ 1-7, at 19-20); and Title VII of the Civil Rights Act of 1964 ("Title VII") ("Count Four") (*Id.* ¶¶ 1-2, 8-11, at 21-22.).[10]  Plaintiff seeks compensatory damages, back pay with interest and costs of suit, punitive damages, and counsel fees. (*Id.* at 17-22.)

On November 21, 2011, Defendants filed the instant motions for summary judgment, and on March 3, 2012, Plaintiff filed opposition.

**LEGAL STANDARD**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 327 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and who may not rest upon the

---

[10] The Court notes that Plaintiff specifically stated that she does not plead any causes of action against Defendant Aviles under NJLAD (Count Three) or Title VII (Count Four).  (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. ("Pl.'s Br.") 28.)

mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The court may not weigh the evidence and determine the truth of the matter; it must instead determine whether there is a genuine issue as to a material fact. *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in a light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (internal citation omitted). The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

**DISCUSSION**

Plaintiff asserts that beginning in September 2003, she was subject to retaliation for statements she made to the County Law Department in August 2003 and grievances she filed in connection with her employment at HCDC. (*See* Compl. ¶¶ 16-17, 23, 25-26, 31-32, 34-35, 44-50, 58, 64 at pp. 4, 6-11, 13-14; Supplemental Compl. ¶ 13, at pp. 3-4.) Plaintiff claims that after she engaged in conduct protected under the Speech and Petition Clauses of the First Amendment, Defendants repeatedly retaliated. (Pl.'s Br. 6-7.) Plaintiff alleges that Defendants' retaliatory acts include the following: (1) assigning Plaintiff to work in the Training Unit without support staff after October 2005; and (2) service of two multi-part disciplinary charges that "resulted in her suspension and *de facto* termination on March 29, 200[6]." (*Id.* 8.)

Defendant Aviles asserts that Plaintiff violated County policy by "maintaining an improper relationship with a parolee[,]and [] creati[ng] and manipulati[ng] . . . false documents."

11

(Def. Aviles' Br. 2.)  Further, Defendant Aviles asserts the following: (1) Plaintiff abandoned her claims for gender and race discrimination under NJLAD (*Id.* 8-10); (2) Defendant Aviles is entitled to qualified immunity from the federal claims asserted against him (*Id.* 11-16); (3) Plaintiff failed to support her First Amendment retaliation claim against Defendant Aviles (*Id.* at 17-25); (4) Plaintiff failed to allege facts consistent with a claims of retaliation or Equal Protection (*Id.* at 26); (5) Plaintiff failed to state facts supporting a claim of retaliation under NJLAD (*Id.* 27-33); (6) Plaintiff failed to state a claim under the NJCRA (*Id.* at 36); and (7) Plaintiff is not entitled to punitive damages. (*Id.* at 37-38.)

Defendants County and Krusznis argue the following: (1) Plaintiff's claims prior to October 17, 2005 are precluded by the relevant statute of limitations (Defs.' Br. 7); (2) Plaintiff failed to establish a *prima facie* case of race and sexual harassment (*Id.* at14);[11] (3) Defendant Krusznis's conduct does not impute liability to the County (*Id.* at 25); (4) Plaintiff fails to establish a *prima facie* case for retaliation (*Id.* at 27); and (5) Defendant Krusznis is entitled to qualified immunity (*Id.* at 38.)

As discussed below, when the record before this Court is viewed in its entirety, it is evident that the issues presented require the assessment of credibility and conflicting assertions. As such, this Court finds that there are genuine issues as to material facts that preclude summary judgment.

I.  Statute of Limitations

For claims arising under 42 U.S.C. § 1983, the statute of limitations "is the state statute which limits actions for personal injuries." *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir 1989) (citing *Wilson v. Garcia,* 471 U.S. 261 (1985)).  In New Jersey, the applicable

---

[11] The Court notes that Plaintiff conceded that she is not basing her claims on race. (*See* Pl.'s Br. 6 ("[Plaintiff'] acknowledges that the issue of race as a basis for any allegation of retaliation is abandoned.")

statute of limitations is for two years. N.J. Stat. Ann. 2A: 14-2 (West 2012).   This same limitations period applies to claims arising under NJLAD. *See Rivera v. Cont'l Airlines*, 56 F. App'x 567, 571 (3d Cir. 2003) (citing *Ali v. Rutgers*, 166 N.J. 280, 282 (2000)).  The NJCRA has no express statute of limitations. *See Owens v. Feigin*, 194 N.J. 607, 611 (2008) (per curiam) (observing the NJCRA's lack of procedural requirements).  However, other courts have found that the same limitations period applies, in large part because the NJCRA is modeled after § 1983. *See Citta v. Borough of Seaside Park*, No. 09-865, 2010 WL 3862561, at *10 n.3 (Sept. 27, 2010); *Gracia-Brown v. City of Newark*, No. 09-3752 2010 WL 1704748, at  *4 (Apr. 26, 2010); *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, No. 02-5470, 2007 WL 1038920, at *3 (D.N.J. Mar. 29, 2007).

Plaintiff filed her Complaint on October 17, 2007. (Compl. ¶ 22.)   Accordingly, Plaintiff's claims arising under § 1983, the NJLAD, and NJCRA must be based on actions that occurred as of October 17, 2005.  Defendants object to the evidence of alleged retaliation and discrimination prior to that date proffered by Plaintiff in her Complaint.  However, to the extent that the events prior to October 17 2005, inform the finder of fact of evidence that may create liability, they will be considered. *See Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 109 (3d Cir. 1999) (upholding a district court's decision to allow prior evidence because it "permit[ted] the jury to more intelligently evaluate the evidence that did create liability.").

The statute of limitations for claims arising under Title VII is 180 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1); *See Burgh v. Borough Council of Montrose*, 251 F.3d 465, 472 (3d Cir. 2001).  Plaintiff filed her claim with the EEOC on October 24, 2006.  Therefore, allegations in the Complaint were actionable if they occurred on or after April 27, 2006.  At least one Preliminary Notice of Disciplinary Action was issued

after that date. (*See* Compl. ¶ 63, at 14; J.A. Exs. 15-17).  Plaintiff also claims that other retaliatory actions took place after this date that further demonstrate a pattern of retaliation. (*See* Supplemental Compl. ¶¶ 11-13, 18, at 3-4.)

Plaintiff has shown that the actions alleged to support her claims have occurred within the timeframes allowed by the appropriate statutes of limitations.  Accordingly, Plaintiff's claims are not precluded under the appropriate statutes of limitations.  Evidence of any actions prior to October 17, 2005, falls outside the permitted time period.  To the extent that they inform those actions for which Defendants could be found liable, such evidence is permissible although on their own they may not form the basis for liability.

II.  Retaliation Claims[12]

a.  *First Amendment*:

To establish a First Amendment retaliation claim, Plaintiff must "demonstrate (1) [her] speech was protected by the First Amendment because it addressed a matter of public concern; and (2) the protected speech was a substantial or motivating factor in the alleged retaliation against the plaintiff."  *Thomas v. Newark Police Dep't*, No. 3-08-cv-02452 (PGS), 2011 WL 5526325 at \*6 (D.N.J. Nov. 10, 2011) (citing *Reilly v. City of Atlantic City*, 532 F.3d 216, 224 (3d Cir. 2008).  Whether plaintiff's speech addressed a matter of public concern is a question of law. *See Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)).  Whether plaintiff's speech was a substantial or motivating factor in the alleged retaliation against the plaintiff is a question of fact. *Id.*

Even if a plaintiff demonstrates both elements, her interest in protected speech must outweigh the government employer's countervailing interest in promoting the efficiency of

---

[12] The Court notes that Defendants County and Krusznis provided in their moving papers that "[f]or the purposes of this Motion, the County Defendants acknowledge that Plaintiff may have viable retaliation claims in her Complaint, which are not addressed by [their] Motion."  (Defs.' Br. 2.)

public services it performs through its employees. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  If a plaintiff demonstrates these elements, the burden of proof shifts to the employer to prove that the employer would have disciplined the plaintiff even absent the protected speech. *Reilly*, 532 F.3d at 224.  "The plaintiff may then rebut the employer's rationale by arguing that the discipline imposed was a pretext for retaliation." *Thomas*, 2011 WL 5526325, at *6 (internal citation omitted).

First, to establish a claim for retaliation under the First Amendment, plaintiff must establish that her speech was protected because it was a matter of public concern.  *Thomas*, 2011 WL 5526325 at *6.  In *Connick v. Meyers,* the Supreme Court considered the private communication of a public employee regarding racial discrimination to be "a matter inherently of public concern." 461 U.S. 138, 148 n.8 (1983) (referring to the facts of *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979)).

In *Azzaro v. Cnty. of Allegheny*, the Third Circuit expanded the protection to speech that included a plaintiff's private report to the County Commissioner of an incident of sexual harassment by an executive assistant. 110 F.3d 968, 978 (3d Cir. 1997).   However, the Third Circuit framed its application, explaining that the alleged conduct was a matter of public concern because it was not that of "non-supervisory co-worker" and was "relevant to the electorate's evaluation of the performance of the office of an elected official." *Id.* at 978, 978 n.4; *see also Zelinski v. Pa. State Police*, 108 F. App'x 700, 708 (3d Cir. 2004) (noting that the speech of public employee to be protected must be 'instrumental value to the community in enabling self-governance.'" (quoting *Azzaro*, 110 F.3d at 977); *but see Hartley v. Pocono Mountain Reg'l Police Dep't*, No. 3:cv04-2045, 2006 WL 4389589, at *17 (M.D. Pa. May 17, 2006) (concluding that such speech was on a matter of public concern where the plaintiff, a police officer,

15

"informed her supervisors and representatives of [the Police Department], who were considered public employees and who held positions of trust"); *McCartney v. Pa. State Police*, No. 1:09-CV-01817, 2011 WL 3418381, at *31 (M.D. Pa. Mar. 9, 2011) (noting that "in both *Hartley* and *Azzaro*, a key component of the courts' conclusions was that the complaints in question were 'relevant to the public's perception of an elected official's job performance.'"). Where plaintiff's only concern is her own perceived harassment, some courts have not found the speech to be a matter of public concern; however, "[i]n certain instances, 'a complaint by an employee about sexual harassment can constitute a matter of public concern,' such as where the complaint raises 'implications about public performance or 'the process of self-governance.'" *Miles v. City of Phila.*, No. 11-4040, 2011 WL 4389601, at *4 (E.D. Pa. Sept. 21, 2011)).

In the instant matter, Plaintiff brings her claims under both the Speech and Petition clauses, which are analyzed under the same standard. *See Borough of Duryea, Pa. v. Guarnieri*, 131 S.Ct. 2488, 2495 (2011) (holding that "claims of retaliation by public employees do not call for" divergence between claims brought under the Speech and Petition clauses). Plaintiff alleges systemic gender discrimination at HCDC, and that this discrimination personally affected her. Further, the main stimulus alleged with regard to Plaintiff's retaliation claim is that as a result of providing information regarding systemic gender discrimination for an internal investigation, which clearly is a matter of public concern, she was retaliated against. Thus, Plaintiff has met the first prong to establish a claim for retaliation under the First Amendment.[13]

---

[13] Plaintiff must also demonstrate that her interest in the alleged protected speech outweighs Defendants' interest in promoting efficiency. *Pickering*, 391 U.S. at 568. In *Baldassare v. State of N.J.*, the Third Circuit recognized that "[a]n employee who exposes corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office." 250 F.3d 188, 200 (3d Cir. 2001) (internal citations omitted).

Further, Plaintiff has also raised genuine issues of material fact related to whether her speech was a substantial motivating factor in the alleged retaliation. The timing and sequence of events are not determinative, but do frame the issue of whether Plaintiff's protected activity led to the employer's alleged adverse actions.[14]

Next, the burden of proof shifts to Defendants to show that Plaintiff would be disciplined even absent the protected activities. *Reilly*, 532 F.3d at 224.   In support, Defendants have proffered the Preliminary Notices of Disciplinary Action, as well as explanations regarding Plaintiff's reassignment from the Training Unit, treatment of vacation days and denial of training and scheduling issues. (*See* J.A. Exs. 15-17).   However, this Court finds that Plaintiff has demonstrated a genuine issue of material fact exists as to whether the reasons proffered by Defendants are pretext for retaliation.  Plaintiff has presented evidence that at least part of the reason proffered by Defendants were considered and rejected by the Office of Administrative Law,[15] and that there are conflicts in testimony. (Compl. ¶¶ 67-69, at 15; Supplemental Compl. ¶ 6, at 2; Defs.' Br. ¶ 82.)  In addition, Plaintiff has provided evidence that when considered by a reasonable fact-finder may result in different outcomes and require credibility determinations.

With regard to Defendant Aviles, Plaintiff has established that Aviles had authority over her assignment.  Hearing Officer Anthony Staltari ("Staltari") issued the May 8, 2006 decision terminating Plaintiff.   (Defs.' Br. ¶ 39.)   While Staltari testified that he did not recall a conversation with Defendant Aviles in which Aviles said he did not want Plaintiff back in the Training Unit, Staltari testified that he did have discussions with Aviles about assignments to the

---

[14] Whether the actions on which Plaintiff's claims are based meet the requirements to be considered adverse employment actions is discussed in a subsequent section.

[15] For example, the fraternization policy and Krusznis' understanding of it were addressed.  As Defendants have indicated that they intend to address the issues that were before the Office of Administrative Law in a later in limine motion, this Court will not directly address those points herein. (Defs.' Reply Br. Supp. Mot. Summ. J. ("Defs.' Reply Br.") 7, n.3).

Training Unit.  (*See* Joint Cert., Ex. 7, Tr. of Anthony Staltari, May 20, 2010 76:6-15.)  Further, there are inconsistencies in the testimony regarding discussions between Krusznis and Aviles concerning Plaintiff and employment actions.  (*See* Compl. ¶ 67, at 15, J.A. Ex. 5 at 181-83.)  As such, this Court finds these issues are not appropriate for summary judgement.

> b.  *Title VII and NJLAD*[16]

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  NJLAD has similar requirements.[17]

Title VII protects two categories of activity: (1) participation in certain Title VII proceedings and (2) opposition of discrimination made unlawful by Title VII.  *Id* at 341. (citing *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)).   In either case, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Id.* (internal citations omitted).

For the first element of a *prima facie* case under Title VII retaliation, protected activities include when the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a); *see also*

---

[16] "Plaintiff does not plead any cause of action against Defendant Aviles under either Title VII (Count Four) or NJLAD (Count Three)." (Pl.'s Br. 28.)

[17]       To advance a prima facie case of retaliation under Title VII and the NJLAD, a plaintiff must show that: (1) the employee engaged in a protected employee activity;  (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action.

   *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001)

*Zelinski*, 108 F. App'x at 705.  In addition, both formal letters of complaint to an employer and the EEOC "'as well as informal protests of discriminatory employment practices, including making complaints to management . . . .'" are protected activities. *Zelinski*, 108 F. App'x at 705 (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

The second element of a *prima facie* retaliation claim requires an "adverse employment action."  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006).  Under Title VII's retaliation provision, an "adverse employment action" is defined as an action that is "materially adverse."  *See id.*  In other words, that "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

To determine the third element, the Third Circuit "has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) (internal citations omitted).  "'[T]emporal proximity . . . is sufficient to establish the causal link . . . . [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.'" *Id.* (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997)) (alterations in original).[18]

In the instant matter, Defendants County and Krusznis concede that it is undisputed that "Plaintiff's filing of a Complaint in the current action constitutes protected employee activity." (Defs' Br. 29.)  Next, while Defendants argue otherwise, Plaintiff can be considered to have suffered an adverse employment action (*e.g.*, Plaintiff's suspension and subsequent

---

[18] The Supplemental Complaint supports Plaintiff's Title VII claims of retaliation.

termination).[19]   Finally, Plaintiff has established a causal connection between her protected activity and adverse employment actions.  Temporal proximity alone may not be determinative; however timing can support the causal nexus supplied by Plaintiff.  *See generally, Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

Based on the entirety of the record, and reviewing in the light most favorable to Plaintiff, this Court finds that Plaintiff has raised issues of fact that are sufficient for the claims to proceed to trial for a reasonable fact finder to consider.  *See Abramson*, 260 F.3d at 285. "'In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury . . . would be entitled to view the evidence as a whole.'" *Id.* (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir.2000)).

III. Gender Discrimination and Sexual Harassment

In Count One, Plaintiff alleges gender discrimination and sexual harassment in violation of her First and Fourth Amendment constitutional rights pursuant to 42 U.S.C. § 1983.  The court analyzes Plaintiff's claim for gender discrimination under a burden shifting analysis similar to that described above for Plaintiff's First Amendment retaliation claim. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  First, Plaintiff must prove a *prima facie* case of employment discrimination. *See id.* at 802.  "The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the Court." *Sarullo v. U.S. Postal Serv*, 352 F.3d 789, 797 (3d Cir. 2003).  In order to establish a *prima facie* case of employment discrimination here, Plaintiff must demonstrate that (1) she is a female; (2) she was qualified for the position; (3) she was subject to an adverse employment action despite being qualified; and

---

[19] Plaintiff also asserts that her transfer from the Training Unit, lack of support, denied request to convert vacation days to sick days, denied request for training, and failure to notify about a class cancellation are all examples of the retaliation she experienced and adverse employment actions.  (*See* Compl. and Supplemental Compl.)

(4) the adverse employment action could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (internal citations omitted).   At the summary judgment stage, Plaintiff's "evidentiary burden is 'rather modest' as the [P]laintiff only needs to demonstrate that 'discrimination could be a reason for the employer's action.'" *White v. Clearly*, No. 09-4234, 2012 WL  924338, at *6 (D.N.J. March 19, 2012) (quoting *Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 508 (3d Cir. 1996)).

If plaintiff establishes a *prima facie* case, the burden of proof shifts to the employer to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *Makky*, 541 F.3d at 214 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993)).   Plaintiff may then show that the employer's proffered reason is merely pretext for intentional discrimination. *Id.*   The same standard applies to claims brought under Title VII, 42 U.S.C. § 1983, NJCRA, and NJLAD. *See Waiters v. Aviles*, 418 F. App'x 68, 72 (3d Cir. 2011) (citing *Gerety v. Atl. City Hilton Casino Resort*, 184 N.J. 391 (2005)); *see also Chen v. Newark Public Schools*, No. 07-CV-16182009, 2009 WL 3756872 at *2 n.2 (D.N.J. Nov 6, 2009) (internal citations omitted).

The parties do not dispute that Plaintiff is a female and was qualified for her position as Sergeant, thus the first two prongs are satisfied.   Next, the Court must determine if Plaintiff suffered an adverse employment action.   Under the discrimination provision of Title VII, an "adverse employment action" carries a different meaning than under the retaliation provision. *Moore*, 461 F.3d at 341.   In this context, an "adverse employment action" is defined as an action that "alters [an] employee's compensation, terms, conditions, or privileges of employment." *Id.* (internal quotations omitted).   As discussed above, Plaintiff's suspension and subsequent termination meet this requirement, and thus qualify as adverse employment actions.   In addition,

21

Plaintiff's lack of assistance in her position could be viewed as an adverse employment action that varied the terms or conditions of her employment by increasing her responsibilities and making the workload difficult to manage. *See e.g.*, *Homel v. Centennial Sch. Dist.*, No. 11-1996, 2011 WL 6412227, at *14 (E.D. Pa. Dec. 21, 2011) ("[T]he assignment of additional, burdensome responsibilities is an adverse employment action, particularly when those responsibilities do not come with additional pay."); *see also*, *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) ("[A]ssigning more, or more burdensome, work responsibilities, is an adverse employment action.").

Finally, Plaintiff filed complaints and provided information on an alleged pattern of intentional discrimination and disparate treatment of women corrections officers as compared to their male counterparts at HCDC.[20] (*See* Compl. ¶ 23, 25-27, at 6; Supplement Compl ¶ 13, at 3 This is sufficient to give rise to an inference of intentional discrimination. *See Ullrich v. U.S. Sec'y of Veterans Affairs*, 457 F. App'x 132, 138 n.3 (3d Cir. 2012) ("Discrimination might be inferred, for example, from the fact that a similarly situated employee who was not within the protected class was treated more favorably.") (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999). Once a plaintiff establishes a *prima facie* case of gender discrimination, defendants' burden to "articulate a legitimate, non-discriminatory reason for the adverse employment action" is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* (internal citation omitted). Similar to the First Amendment retaliation claim above, Defendants have proffered the Preliminary Notices of

---

[20] Defendants County and Krusznis argue that Dr. Paludi's opinion should be excluded; however, at this juncture Dr. Paludi's report does not form the basis of this Court's denial of summary judgment and its exclusion will not be addressed herein. (*See* Defs.' Br. 8-14.)

Disciplinary Action and their content as legitimate, non-discriminatory reasons. (*See* J.A. Exs. 15-17).  These reasons in the notices included violation the fraternization policy and giving false reports.  (*Id.*)

However, this Court finds that Plaintiff has demonstrated a genuine issue of material fact exists as to whether the reasons proffered by Defendants are pretext for gender discrimination. Plaintiff has presented evidence that the reasons proffered by Defendants were considered and rejected by the Office of Administrative Law and that there are conflicts in testimony. (Compl. ¶¶ 67-69, at 15.)  Plaintiff relies on logs referencing complaints made against the HCDC, and while not all of the complaints reference gender discrimination and harassment, when viewed in the light most favorable to Plaintiff they support Plaintiff's position.  (*See* Pl.'s Br. 18.)  After review of the record in its entirety, the Court finds Plaintiff has raised genuine issues of material fact that when considered by a reasonable fact-finder may result in different outcomes and require credibility determinations.[21]

IV. Qualified Immunity and Imputation

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).  It applies to the "discretionary functions" of government officials whose actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*,

---

[21] The Court notes Defendants raised several issues regarding the admissibility of Plaintiff's evidence.  While this Court does not address each of these determinations individually within this opinion, this Court notes that as the Supreme Court has directed, "We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred."  *Celotex*, 477 U.S. at 324.  "In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."  *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 at n. 2 (3d Cir.2000).  For double hearsay statements to be considered on summary judgment both layers of hearsay would need to be admissible at trial. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (citing Fed.R.Evid. 805).  Here, Defendants point to statements they label as "double hearsay"; however, even without these statements Plaintiff has met her burden based on the record in its entirety.

457 U.S. 800, 818 (1982) (internal citations omitted).  The purpose of qualified immunity is "hold public officials accountable when they exercise power irresponsibly," and to shield them from "harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citation omitted).  It is meant to protect "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In the instant matter, the material facts in dispute would impact this qualified immunity analysis.  Defendant Krusznis signed the charges that led to Plaintiff's suspension.  Plaintiff alleges Defendant Aviles' direct involvement and discriminatory actions. Plaintiff essentially claims that the Defendants used their power and positions "irresponsibly" and violated her constitutional rights.[22]  Given the allegations, if proven, qualified immunity would not apply.

This Court does not determine the success of Plaintiff's claims, but rather finds that these questions and issues cannot properly be decided at summary judgment and should proceed to trial. *See Abramson*, 260 F.3d at 289, n. 22. [23]

**CONCLUSION**

For the reasons set forth above, this Court **DENIES** the motions of Defendants Aviles, Krusznis, and the County.

<u>s/Susan D. Wigenton, U.S.D.J.</u>

Orig:   Clerk
Cc:     Madeline Cox Arleo, U.S.M.J.
        Parties

---

[22] Plaintiff also argues that the HCDC "policies are facially designed to insulate Defendant Aviles against claims of personal involvement or direction."  (Pl.'s Br. 26.)
[23] For the reasons discussed herein, Plaintiff's §1983 and NJCRA claims remain.