## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

HELEN FORD,

                   **Plaintiff,**

v.

COUNTY OF HUDSON, HUDSON
COUNTY DEPARTMENT OF
CORRECTIONS, OSCAR AVILES,
and DAVID KRUSZNIS,

                   **Defendants.**

Civ. No. 07-5002 (KM)(MCA)

**MEMORANDUM OPINION ON
MOTIONS *IN LIMINE***

There are fourteen motions *in limine*, many of which contain multiple parts, pending in this matter. Two were filed by Plaintiff Helen Ford, six were filed by Defendant Oscar Aviles, and six were filed by Defendants County of Hudson ("County"), Hudson County Department of Corrections ("DOC"), and David Krusznis. In lieu of oral rulings, I file this informal, unpublished opinion for the guidance of the parties, who are familiar with the facts and allegations in the case. Suffice it to say that this is a 42 U.S.C. § 1983 claim (with pendent state law claims) brought by Ford, a corrections officer, against her superiors, the DOC, and the County. She alleges, *inter alia,* that defendants tok unfounded disciplinary action against her on retaliatory and discriminatory grounds, in breach of the First and Fourteenth Amendments.

In general, the most useful of these motions *in limine* concern the permissible scope of expert testimony.

### Motions *in limine* filed by Defendant Oscar Aviles ("Aviles") [ECF No. 121]

#### 1) Motion to Dismiss Plaintiff's Claims for Punitive Damages

This motion pertains to the various grounds on which Plaintiff is seeking punitive damages. Ms. Ford seeks them against the individual defendants based on both § 1983 and the New Jersey Law Against Discrimination (LAD), and against the County of Hudson in conjunction with her theory of municipal liability under § 1983. Aviles argues that all of these punitive damages demands must be thrown out.

As to the claims against individuals, Aviles essentially argues that there is no evidence of "evil motive or intent," "or of reckless or callous indifference to federally protected rights," or of "especially egregious" behavior. Aviles cites no threshold legal bar to such claims; rather, his argument is based on uncited assertions about the sufficiency of the evidence. In essence, then, this is a belated motion for summary judgment or a premature motion for a directed verdict. At trial, based on a fully developed record, I will decide whether there is sufficient evidence of evil motive, callous indifference, or egregiousness to submit the punitive damages issue to the jury.

As to the § 1983 claim against the County, Aviles has a better legal argument. "[A] municipality is immune from punitive damages under 42 U.S.C. § 1983." *Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981). Plaintiff says little or nothing in response.

Accordingly, I will **DENY** this motion without prejudice to renewal at trial as it pertains to the claims against the individual defendants, but **GRANT** this motion as to the County.

### 2) Motion for a Bifurcated Trial Concerning Punitive Damages

Aviles contends and Plaintiff concedes that punitive damages issues should be tried separately, after the jury has returned its verdict on liability and compensatory damages. I agree, and will **GRANT** this motion. Any evidence going solely to the issue of punitive damages should not be offered in the initial phase of the trial.

### 3) Motion to Preclude Evidence Containing "Baseless, Irrelevant, and Prejudicial Hearsay Testimony Premised on Rumor or Conjecture or Which is Merely Designed to Improperly Undermine the Character of Any Witness."

Aviles brings what amounts to a blanket motion to enforce the Rules of Evidence. As formulated, it cannot be denied, but for the most part it is too general to be useful.

Aviles gives two examples of the kind of evidence he would like to bar. First, he states that Ms. Ford might testify that a jail personnel officer told her that that he "heard" that Aviles "opposed Plaintiff's return to the Training Unit," even though "Plaintiff has no proof that these statements were ever made." Second, he worries that Ms. Ford might testify, as she did at her deposition, that one officer told another officer that "Aviles hit the window and said 'we are going to appeal. She is not coming back here'" when he heard of the OAL decision overturning Ms. Ford's dismissal and reinstating her. Aviles complains that this is triple hearsay.

Ms. Ford argues that this motion seeks an unnecessary blanket ruling, and she also hints at potential grounds to admit, or at least to argue for admission of, the evidence in the two cited examples.

These are routine evidentiary objections of the kind ordinarily addressed in the context of the evidence at trial. As to the two particular statements, Plaintiff's counsel will signal the court before eliciting them in the hearing of the jury.

I will therefore **DENY** this motion subject to appropriate renewal(s) at trial.

### 4) Motion to Preclude Plaintiff and Her Witnesses from Testifying as to the Ultimate Issues in the Case

Aviles seeks a ruling barring any testimony concerning whether someone was, for example, "discriminated against," "harassed," or "retaliated against," because of the legal significance of these terms. He contends that, under Fed. R. Evid. 403, any such testimony would have little substantive value, which would be outweighed by undue prejudice, confusion of issues, and/or misleading of the jury.

Ms. Ford points to FRE 704, which permits opinion testimony which reaches the ultimate issue in a case, subject to the requirements of FRE 701, 702, and the balancing test of FRE 403. Plaintiff contends, properly I believe, that a blanket pretrial ruling applying FRE 403 to all potential ultimate issue testimony would be improper. Ms. Ford asserts that her contemplated testimony is based on her personal knowledge and will go to the heart of this case. If that is so—and that remains to be seen—such testimony might well satisfy FRE 701 (requiring that opinion testimony be "rationally based on the witness's perception...[and] helpful to clearly understand[] the witness's testimony or to determining a fact in issue...").

I think this motion is unduly broad and general. I certainly reject the notion that witnesses cannot, if otherwise appropriate, opine on the ultimate issue, *see* FRE 704(a), but I acknowledge that objections to particular proffers of evidence, based on FRE 701 or 702, and 403, could be appropriate and will be assessed as raised at trial. I will therefore **DENY** this motion subject to appropriate renewal(s) at trial.

### 5) Motion to Preclude Specific Opinion Testimony of Ms. Ford

Aviles' fifth motion is closely related to his fourth. Here, he cites specific lines of deposition testimony of Ms. Ford and seeks a ruling barring similar testimony at trial on FRE 701 grounds. He contends, for example, that Ms. Ford should not be able to testify that:

"There is systemic discrimination against women in the Hudson County Department of Corrections."

In particular, Aviles argues that Ms. Ford cannot make such an assertion because she is not being offered as an expert on discrimination or retaliation. In effect, then, Aviles' objection is based on R. 701(c). The issue is whether a general statement about the "systemic" existence of discrimination requires scientific, technical, or other specialized knowledge and thus may only be made via expert opinion.

This issue highlights the difference between lay opinion testimony and expert testimony, embodied in FRE 701(c). Lay opinion testimony is based on things perceived by the witness, while expert opinion requires specialized knowledge and cannot be derived from mere "common knowledge." *See* FRE 701(a), (c). I find that discrimination can be perceived, or inferred from one's perception, without specialized training or knowledge. Likewise, I find that one may comment on the whether discrimination is isolated or "systemic" based on observations and personal knowledge alone. Thus, I see no FRE 701(c) issue here.

I will require, however, that Ms. Ford state a sufficient foundation before offering such an opinion. I will police such testimony for a showing that it is "rationally based on" her knowledge and perceptions. FRE 701(a). It must also be "helpful" to the jury's understanding of her other testimony or its resolution of a fact in issue. FRE 701(b). I will not permit mere statements of negative opinion, untethered to specific factual examples.

I believe that the same analysis— that no expert is required, but that the foundation and helpfulness requirements of FRE 701(a)-(b) must be demonstrated— applies to the other potential testimony of Ms. Ford that Aviles is trying to preclude, concerning her:

> Belief that she was discriminated against because she was a woman.

> Belief that her affiliation with white males was part of the reason she was retaliated against

> Belief that since she had filed complaints in the past about men, she was retaliated against in 2006 by being terminated

> Belief that the Hudson County Law Department was motivated by retaliation to terminate her from her employment

> Belief that 'complaints filed by men against Aviles that were not treated the same way as the Plaintiff['s]'

4

Belief that men are not disciplined in a similar fashion as women at the Correctional Facility...

Belief that Kirk Eady retaliated against her because she previously filed complaints against him

Belief that the history of Hudson County leads her to believe that prior complaints filed against supervisors resulted in her ultimate termination

Belief that Defendant Aviles was involved in the retaliation alleged in the Amended Pleading because he was Defendant Krusznis' boss

If any such testimony is actually proffered, I will hear any objection to foundation or helpfulness as appropriate at trial. I cannot prudently weigh these factors based on the limited pretrial record.

I discuss separately the proffer that an investigator, Jesse Brown, "is a racist." Such a statement is unduly prejudicial in that it really is intended to prove that the person acted in conformity with an inflammatory accusation about his general character. Factual testimony is, of course, another matter.

The same holds for two other lines of potential testimony about which Aviles specifically complains that FRE 701(a) and (b) (but not 701(c)) are violated:

Ms. Ford's potential reference to an incident between Defendant Aviles and Lieutenant Stout, and her belief regarding the findings of an investigation into same, about which she allegedly has no personal knowledge, and

Ms. Ford's opinions and beliefs concerning the circumstances of a certain March 2006 letter.

In sum, what Plaintiff knows and does not know, and which of her opinions are rooted in her own perceptions, observations, or knowledge, will not be clear until the parties adduce testimony at trial. Only then can any issues under FRE 701 (and FRE 403, if raised) be profitably addressed. The briefing before me does not permit me to assess a) the foundation and b) the probativeness/prejudice of Ms. Ford's opinions. Accordingly, I **DENY** this motion at this time, but invite its renewal as warranted at trial.

### 6) <u>Motion to Exclude Testimony by Plaintiff's Expert William Toms</u>

According to Aviles, Mr. William Toms a) is not qualified to testify as to charges and investigation against Ms. Ford and b) offers an unreliable opinion comprised of "merely his subjective belief" and "unsupported speculation." In

particular, Aviles contends that Toms' opinion is not "based on sufficient facts or data." *See* FRE 702(b). Aviles also appears to argue under FRE 702(a), as he contends that "it is unclear what value Mr. Toms' testimony adds since he is offering no link between the investigation and any bias and/or retaliation engaged in by the Defendants." (Br. Supp. Aviles Motions at 30). I also discern an argument contending a lack of reliable principles or methods in Toms' analysis, *see* FRE 702(c), inasmuch as Aviles complains that "Toms acknowledged...there are no firm, strict guidelines or rules as to how to conduct an internal investigation...Toms['] own findings make it very difficult to determine what the 'standard' conduct would be in conducting an investigation." (*Id.* at 26).

Plaintiff defends her expert's qualifications by noting his PhD in Human Resource Development, 25 years in law enforcement, and leadership in the field as Superintendent of Investigations for the New Jersey State Police. He has also been published in the field of risk management and internal investigations. As to the factual basis for his opinion, Plaintiff says that Toms thoroughly examined documents associated with this case, including transcripts of the testimony before the ALJ and deposition testimony.

The stated purpose of Toms' report is to address "the objectivity and thoroughness of the internal affairs practices associated with these circumstances, as well as the subsequent charges of April 28, 2006." (Report at 2). He states that his opinions are based upon his experience, research, best practices in law enforcement, and his review and analysis of the materials and documents in the case, providing by Plaintiff's attorney. (*Id.*).

Toms summarizes the New Jersey Attorney General's Internal Affairs Policy and Procedures—guidelines and directives for law enforcement agencies—and notes that the goal of the procedures is the provision of "meaningful and objective" internal affairs processes." (*Id.* at 3-4). He observes that the DOC adopted these guidelines, and that its internal affairs protocols promise a "thorough and impartial" examination of factual information related to allegations of officer misconduct.

Toms then outlines the basic facts concerning the issuance of charges against Ms. Ford, describing the evidence he reviewed. The purpose of this review, he said, was to "examine the thorough and objective manner in which investigative efforts were pursued in support of the charges." (*Id.* at 6-7). Applying his expertise, Toms then identifies what he believes to be specific procedural missteps in defendants' investigation of Ms. Ford, that is, ways in which they did not comply with the DOC's internal affairs procedure and its promise of a thorough, objective inquiry preceding formal charges. (*Id.* at 9-16).

6

Mr. Toms appears qualified to testify on this subject, given his familiarity with law enforcement internal affairs and investigatory best practices, derived from experience in the field, study and publications. It also appears that his expertise in internal affairs and investigatory best practices would be helpful to the factfinder here. Whether the DOC carried on a legitimate investigation of Ms. Ford and followed protocol in bringing charges is certainly probative of the main factual issue in this case: whether the investigation and charges against Ford were retaliatory. Certainly, departure from proper procedure, or a failure to interview and investigate allegations (a theme of Toms' report), could be construed as evidence of improper motive. Thus, I believe that Toms' report and proposed testimony satisfy FRE 702(a).

I also think that Toms' review of the record—exemplified by the facts and assertions which he writes out in considerable detail in his report (so that we know what he is basing his opinion on)—meets the requirements of FRE 702(b). Aviles does not specify in detail what Toms should have reviewed but did not. Rather, he argues in conclusory fashion that Toms relies solely on his subjective opinion and experience. Toms' report belies this assertion, as it lays out his understanding of voluminous facts. Without question, much of the material Toms reviewed contains disputed facts, but that is material for cross-examination, not exclusion of his testimony.

Toms analyzes whether the defendants' investigation and bringing of charges against Ms. Ford complied with key internal guidelines which it adopted from the Attorney General. This strikes me as a reliable methodology for assessing the propriety of the investigation, satisfying FRE 702(c) and (d).

In sum, I think that Toms' proposed testimony satisfies FRE 702 and that he should be allowed to proceed as Plaintiff's expert, subject to voir dire at trial. I will therefore **DENY** this motion.

**Motion _in limine_ filed by the other Defendants [ECF No. 122]**

**7)  Motion to a) exclude the OAL decision as irrelevant to Plaintiff's claims of retaliation, harassment, and/or race/gender discrimination, and to b) preclude plaintiff's claims for economic losses and back pay, in light of the OAL decision.**

Defendants County, DOC, and Krusznis make this two-part motion concerning the role of the ALJ determination that reinstated Ms. Ford and overturned the disciplinary charges that are at the center of this dispute.

### (a) Motion to Exclude the OAL Decision

Defendants fear that Ms. Ford "will argue that the CSC [Civil Service Commission] determined that Plaintiff was subjected to retaliation, sexual harassment, gender discrimination and/or race discrimination" even though the ALJ/CSC never made any finding or decision, or heard any evidence, regarding these claims. Indeed, the written decisions of the ALJ and CSC simply overturned the DOC's disciplinary charges[1] against Ms. Ford as unfounded, and ordered Ms. Ford's reinstatement.

Plaintiff responds that the ALJ/CSC rulings "are binding in this matter as they related to facts pertaining to the validity of the basis for the alleged disciplinary actions," (Br. Opp. at 2), and that the ALJ "ruled that the disciplinary charges brought against the Plaintiff were unfounded and pretextual" (*id.* at 3). That is true to some degree, although I do not see any finding of pretext. Plaintiff then states: "despite the Defendants' argument, the CSC's ruling goes directly to the heart of the Plaintiff's current complaint," inasmuch as the CSC found the charges/termination unfounded and "the Defendants' motivation and its relevance to the within matter are questions of fact that a jury must determine." (*Id.* at 4).

Here, I draw the familiar line between what can be asserted as fact and what can be properly argued. The ALJ/CSC did not address whether any of the Defendants retaliated or discriminated against Ms. Ford, and did not address their motive. Any assertion that the ALJ or CSC ruled on these issues would be without foundation. Nevertheless, Ms. Ford is at liberty to argue that the disciplinary actions against her were pretextual and retaliatory, and to cite the ALJ's findings overturning Defendants' charges against her as evidence of that. The ALJ's findings as to the charges' lack of merit are relevant and at least somewhat probative of the fact in issue—retaliation/discrimination in the bringing of those very charges. Ms. Ford's counsel may make arguments and draw warranted inferences from this evidence, but counsel and witnesses will not be permitted to mischaracterize the actual content of the ALJ/CSC ruling. Thus, while I will **DENY** this part of the motion as presented, at trial I will patrol the border between fact and argument.

### (b) Motion to Preclude Further Award of Back Pay

This part of Defendants' motion presents an interesting dilemma. Defendants argue that the CSC's award of back pay and ruling concerning various deductions from the award and Plaintiff's failure to mitigate precludes

---

[1] Based on alleged violations of policies governing fraternization, disclosure of confidential information received, incompetence, insubordination, and unbecoming conduct.

further litigation of any claim for back pay here. Defendants contend in particular that the CSC resolved that issue by applying N.J.A.C. 4A:2-2.10 (governing the award of back pay in civil service positions). This court, Defendants urge, would apply the same state law to determine the effect of plaintiff's failure to mitigate.

Plaintiff responds that the criteria used by the CSC (constrained by NJAC 4A:2-2.10(d)) differ from the standards used in § 1983 and Title VII actions. Applicable federal law, she says, "allows for a broader interpretation of the Plaintiff's attempts." (Opp. Br. at 7-8). Because the standards here in federal court are different, she argues, the CSC determination is not preclusive as to back pay.

As a general matter, the courts reject arguments of issue preclusion where administrative proceedings are followed by § 1983 claims. *See Swineford v. Snyder County*, 15 F.3d 1258, 1267-1269 (3d Cir. 1994). Focusing on the first element of issue preclusion—identity of issues—the Third Circuit has stated that "courts must look beyond the superficial similarities between the two issues," considering instead the policies vindicated by the separate actions. *Id.* at 1267. In *Swineford*, the Court of Appeals rejected the argument that an unemployment compensation review board's decision regarding an employee's willful misconduct precluded a § 1983 claim in federal court claiming that the underlying firing violated plaintiff's free speech rights. The court reasoned that the issues were different, and that § 1983 claims need not be raised before the administrative court because "we do not think that an administrative agency consisting of lay persons has the expertise to issue binding pronouncements in the area of federal constitutional law," *id.* at 1268 (citing *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 193 (3d Cir. 1993)). The Court was concerned that such a "broad rule of collateral estoppel might generate undue pressure to litigate to the utmost" before the administrative court, unduly frustrating the narrower purposes of such administrative proceedings and generating undue costs by forcing litigants to raise any and all issues in that initial proceeding. *Id.* at 1269.

The present circumstances are more nuanced. Plaintiff specifically seeks back pay via her § 1983 claim. She did not make that § 1983 claim before the ALJ, and was not required to, but she did seek and receive some back pay in her successful appeal. The question comes down to whether the law pertinent to the award of back pay (and mitigation thereof) in the administrative appeal is different from that which governs here.

The CSC reduced Ms. Ford's back pay award in the following ways: (a) denying back pay for four time periods during which it was found that Ms. Ford failed to mitigate, pursuant to NJAC 4A:2-2.10(d)(4)(i)-(iv); (b) subtracting unemployment insurance benefits she received, pursuant to NJAC 4A:2-

2:10(d)(3), and (c) withholding back pay for a three week period in April-May 2006 during which Ms. Ford was hospitalized and unable to work, pursuant to NJAC 4A:2-2.10(d)(9). (*See* Final Admin. Action of the Civil Service Commission at 3-7, D'Elia Cert. at Ex. 12 (ECF No. 122-2)).

Defendants argue that, in the Third Circuit, a district court must "apply state law to determine the effect of [a] Plaintiff's failure to mitigate." Though the case they cite involves reductions of back pay for failure to mitigate, it was in the context of a NJLAD verdict. It was only after the court noted that the jury's verdict was based on state law, not the federal ADEA statute, that it then stated that it must apply state law concerning mitigation. *Abrams v. Lightolier, Inc.*, 841 F. Supp. 584, 595 (D.N.J. 1994). The authority cited does not establish that this Court is bound to apply state law regarding mitigation to an award of back pay in a federal Section 1983 action.

I now briefly compare the New Jersey administrative code sections applied by the CSC to the federal law which would be used to determine a back pay award in a case like this. My object is to determine whether the substantive standards are so similar that it can be said that the issues here have already been decided by the CSC.

New Jersey's mitigation principles pertinent to the CSC's decision are contained in NJAC 4A:2-2.10(d)(4). Plaintiff contends that the federal criteria "allow for a broader interpretation of the Plaintiff's attempts [to mitigate]." Frankly, none of the propositions concerning federal standards on mitigation cited by Plaintiff (*see* bottom of page 7 and top of page 8 of Plf's br. opp. Dfd's motions), reveal a discrepancy with N.J.A.C. 4A:2-2.10(d)(4). At the same time, I am not convinced that the parties' briefing has gotten to the bottom of the issue.

When it comes to deducting unemployment insurance benefits from a back pay award, the discrepancy between federal and New Jersey law is more clear. *Compare* NJAC 4A:2-2:10(d)(3) *with Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 82 (3d Cir. 1983) (holding that awards of back pay in civil rights cases are *not* reduced by the amount of unemployment insurance benefits received).

Finally, the parties' briefs do not give me any indication as to whether there is any federal law mirroring NJAC 4A:2-2.10(d)(9), on which the CSC based its reduction of the back pay award accounting for the time during which Ms. Ford was hospitalized and unable to work.

In sum, I find that at least one aspect of the CSC's back pay deductions was rooted in state law inconsistent with federal law, but that the lion's share of the deductions (based on state law mitigation principles), may be generally consistent with federal principles that would apply here. Throwing out Ms.

Ford's claim for back pay before trial would therefore be imprudent and I will **DENY** this aspect of Defendants' motion, too.

That said, Plaintiff will not be permitted to receive a double recovery. Moreover, an actual award of damages by the jury may focus the preclusion issues. It may be necessary to mold any such verdict to the law, as to which I will accept further argument if warranted.

### 8) <u>Motion to Exclude Evidence of Sexual Harassment Complaints Filed by Other Employees Regarding Former Supervisors and Employees, based on FRE 403.</u>

Defendants seek a ruling excluding, pursuant to FRE 403, evidence of prior internal complaints lodged by other employees against former supervisors and employees of the County and DOC. They argue that these complaints are factually different from and not relevant or probative of the issues here, in that they pertain to former employees and complainants other than Plaintiff at a time preceding the period relevant to this action. Further, say Defendants, the complaints all sound in sexual harassment, while Plaintiff here claims retaliation and discrimination. Meanwhile, Defendants say that the evidence would cast them in an unduly negative light and confuse the jury.

Plaintiff says that evidence of these prior incidents is relevant and in fact probative because they "demonstrate motive," in that Plaintiff spoke out about these complaints and allegedly suffered retaliation in response, "and the existence of a work environment hostile to women."

I find that evidence of this nature is generally probative of the issues in this case. In *Hurley v. Atlantic City Police Department,* a 1999 Third Circuit decision penned by then-Chief Judge Becker, plaintiff, a female police officer, faced harassment, which she reported in a memo. She was then transferred to an undesirable position, allegedly in retaliation for her reporting. A jury found that the Police Department and one of its captains discriminated on the basis of sex in violation of NJLAD, and that the police department discriminated on the basis of sex in violation of Title VII. On appeal, the Police Department argued that the trial court erred by allowing inflammatory and irrelevant evidence regard alleged misconduct directed to other non-parties under FRE 403. The District Court had allowed testimony by other women regarding separate incidents of harassment; by male officers regarding the nature of 'locker room' conversations; and by plaintiff regarding prior incidents of harassment. The Court instructed the jury that such evidence should be considered in finding liability during the relevant time period, but could not, of itself, create liability. *See Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 102-112 (3d Cir. 1999)

The Third Circuit reviewed the evidence under FRE 401 and 403. It first found such evidence admissible to show a hostile work environment suffered by plaintiff. *Id.* at 110. It further found that "[e]vidence of other acts of harassment is extremely probative as to whether the harassment was sexually discriminatory and whether the ACPD knew or should have known that sexual harassment was occurring despite the formal existence of an anti-harassment policy. Neither of these questions depends on the plaintiff's knowledge of incidents; instead, they go to the motive behind the harassment, which may help the jury interpret otherwise ambiguous acts, and to the employer's liability." *Id.* at 111 (internal citations omitted).

Further, "[a]side from its relevance to the issue of whether the ACPD is liable for the hostile environment Hurley encountered, the evidence is also relevant to her intentional sex discrimination, quid pro quo, and retaliation claims. The general atmosphere of sexism reflected by the challenged evidence is quite probative of whether decisionmakers at the ACPD felt free to take sex into account when making employment decisions, when deciding whether to abuse their positions by asking for sexual favors, and when responding to sexual harassment complaints. As *Glass* held, evidence of pervasive sexual harassment makes retaliation claims more credible, because harassers may be expected to resent attempts to curb their male prerogatives." *Id.* (citing *Glass v. Philadelphia Elec. Co.*, 34 F.3d 188, 195 (3d Cir. 1994)).

Though *Hurley* instructs that the proposed testimony is probative, I am not satisfied that the probativeness of all the evidence proffered here necessarily outweighs the prejudice to the Defendants, or that the jury (even after a limiting instruction) would not make inappropriate inferences as to whether aspects of a hostile work environment, present in the past, occurred in the relevant period.

To balance all of these considerations, I will permit testimony of the type contemplated, but only insofar as is necessary to establish 1) the who, what, when, and how of the prior complaint; 2) the Defendants' response to the complaint, if any; 3) whether the complaint was among those that Plaintiff informed her superiors about; and 4) the Defendants' view as to whether or not the complaint was founded. I will not permit description of these past complaints with unnecessary levels of detail, and I may preclude testimony regarding past complaints when such evidence clearly becomes cumulative in its effect. Moreover, while permitting testimony regarding the Defendants' reaction to the complaints as a general matter, I will not permit testimony that tends to probe the underlying basis of the past complaints. This trial cannot devolve into a series of mini trials on past events. Finally, as in *Hurley*, I will caution the jury that all of these complaints are from a time period preceding the relevant period here, and though germane to Ms. Ford's version of the facts,

cannot in themselves constitute the basis of any liability against any of the Defendants.

A final concern. Certain complaints may be so old that their probativeness is diminished, and they may be unduly cumulative of other, more probative evidence. *See* FRE 403. I will consider imposing a cutoff date with respect to this evidence. Thus I will accept letters, not to exceed two pages, on that issue. I request that Defendants submit their letter proposing and justifying a cutoff date for past incidents, submitted not later than May 20, 2014. Plaintiff may respond by letter no later than May 22, 2014.

### 9) **Motion to Exclude the Investigative Report of St. John and Wayne, per FRE 403, as the retaliatory conduct described therein preceded the acts on which this matter is based.**

Defendants argue that the investigative report by the firm of St. John and Wayne pertaining to alleged harassment and retaliation by the former director of the DOC and certain of his deputies, which culminated in various settlements (including one with Ms. Ford), should be barred from evidence since it pertains to a prior incident(s) (in 2003) which was settled and with persons no longer employed by the County/DOC. Defendants contend that the report's contents are irrelevant, or at least lacking in probative value relative to their prejudicial effect. They say that the report would cause the jury to "judge the Defendants in this matter based upon the prior actions of Director Green, Fricchione and Roberts." (Dfd's Br. at 24).

Plaintiff responds that the report and its findings are probative of Defendants' "long standing" utilization of retaliation, in that it shows a prior example and makes findings regarding someone (Kelvin Roberts) who continued to be employed at the time of the incident here, having never been disciplined by defendant Aviles. In other words, the report contains evidence that goes to the existence of a policy or custom of retaliation, which would seemingly be evidence of a § 1983 violation by the County. Plaintiff also seems to suggest that the report illustrates a hostile work environment and the fact that Aviles did not prevent the retaliation she would later suffer.

I perceive two main hazards with this evidence. First, given that it addresses the facts underlying the past employee complaints of harassment (the subject of the previous motion), the report contains information that is both probative and prejudicial to the extent it talks about the past sins (or at least alleged past sins) of DOC officials. Second, given that it finds retaliation by DOC officials, it indirectly invites the forbidden inference under FRE 404(b) by suggesting that retaliation also occurred here. At the same time, however, Plaintiff is trying to prove, for purposes of establishing municipal liability

against County, that retaliation of the type she allegedly faced during the relevant period was the "custom and policy" of the County and its subdivisions.

This presents a dilemma. I am unwilling to place the entire report, with all of the underlying detail about past complaints, before the jury. Many of the concerns discussed in Section 9, above, are relevant here as well. I will bar the document itself from evidence but permit testimony a) regarding the fact that such a report exists (b) regarding its general nature, and c) regarding its findings that certain officials retaliated and/or discriminated against certain employees. I will deliver a limiting instruction that the evidence is not relevant to whether the individual defendants retaliated against Ms. Ford for purposes of this case, and may only be considered in assessing whether the County has any liability. I will also consider admitting limited excerpts from the report if particularly relevant. More particularized objections will be addressed at trial.

### 10) Motion to Exclude, per FRE 403, the April 2005 Release and Settlement Agreement in Which the County of Hudson paid Ford $52,500 in connection with her claims of retaliation against former Director Green, and Roberts and Fricchione.

Defendants move that the exact amount of the 2005 settlement between Ms. Ford and the County (and DOC) be excluded from evidence, though they say that they have no objection to the jury being advised that Ms. Ford brought a complaint against the County, the DOC, and its former director Green (and Kelvin Roberts and Thomas Fricchione) that was settled.

Plaintiff "has no objection," but argues that the jury learn of the nature of her complaint that was settled (i.e. its relation to the facts set forth in the St. John & Wayne report) and that she be permitted to inform the jury as to *when* the settlement was agreed to and signed.

I rule that contents of the settlement, including its amount, are barred from evidence, but that Ms. Ford be permitted to introduce evidence concerning the general nature of the claim she asserted and the fact that it was settled. Like the evidence of retaliation contained in the St. John and Wayne report, this evidence appears to also go to the question of municipal policy or custom liability, but also requires a similar limiting instruction. Ms. Ford may also be permitted to describe when the settlement was reached and when it was finalized, as there appears no appropriate reason for excluding such testimony.

**11) <u>Motion to Dismiss Plaintiff's Claims for Aggravation of Her Pre-Existing Emotional/Mental Illness Because She Cannot Prove the Extent of That Exacerbation</u>**

Defendants argue that I should now dismiss Plaintiff's claim for damages based on mental illness because she "cannot satisfy her burden of proof as to her claim for aggravated mental illness in this matter." (Dfd's Br. at 31). They characterize Ms. Ford as having a preexisting condition and say that her burden entails showing the amount this was aggravated, and doing so by means of an expert.

Plaintiff opposes this motion on several fronts. First, she contends that her prior condition had wholly resolved itself before this incident, so that this is not actually an aggravation case. Second, she contends that she will in fact be able to show how her condition worsened. And third, she contends that expert testimony is not actually required.

While Defendants are correct that Plaintiff will need to prove the extent of the aggravation to any preexisting condition that she suffered as a result of their alleged wrongs, *see Moreau v. Walgreen Co.*, 387 Fed. Appx. 202, 204 (3d Cir. 2010); *Tisdale v. Fields*, 183 N.J. Super. 8, 12 (App. Div. 1982), they cite no law to support their assertion that expert testimony is required. To the contrary, the Third Circuit has held that emotional distress damages in a Section 1983 claim need not necessarily be shown by way of expert testimony. *Bolden v. Southeastern Pa. Transp. Auth.*, 21 F.3d 29, 34 (3d Cir. 1994). That is not to say that plaintiff's burden will be an easy one; I will not, for example, permit non-expert opinion about medical matters.

This motion, however, is really about the sufficiency of the evidence. I see no basis to take this question away from the jury, which will be asked to decide whether Plaintiff has met the appropriate burden of proof in connection with proving her damages. I will therefore **DENY** this motion.

**12) <u>Motion to Exclude the Testimony of Dr. Michele Paludi for failure to satisfy FRE 702</u>**

Defendants move to exclude the testimony of Plaintiff's expert Dr. Michele Paludi, a professor of psychology at Union College who proposes to testify regarding two opinions. Her first opinion is that "[t]he County of Hudson and HCDOC failed to (a) take 'reasonable care' in preventing sexual harassment and race/color discrimination and retaliation through enforcement of an effective policy and procedures and training programs for employees and managers and (b) enforce effective investigative procedures for complaints of discrimination and harassment." The second states that "[a]s a result of the lack of reasonable care exercised, the HCDOC engaged in acts of work

15

retaliation victimization and social retaliation victimization toward Sgt. Ford. This retaliation was in response to Sgt. Ford exercising her right to provide information in a proceeding about discriminatory practices of sexual harassment and gender discrimination against employees in the Department of Corrections." (Paludi Report at 6-7 (D'Elia Cert. at Ex. 19)).

Initially, I reject Defendants' argument that Paludi is not qualified to testify about the quality of their human resources policies and procedures. At this stage, I find her extensive academic and experiential knowledge to be more than sufficient for qualification.

I turn now to Defendants' FRE 702(b) arguments: that both of Paludi's proposed opinions are not based on sufficient facts or data.

As to Dr. Paludi's first opinion (that the County and DOC failed to take reasonable care to prevent sexual harassment, discrimination, and retaliation through enforcement of effective policies, procedures, and training programs, and through enforcement of effective investigative processes), I disagree with Defendants.

Paludi applies the EEOC's "reasonable care" standard for the minimum responsibilities of an employer to prevent harassment. When she summarizes the "components of effective policy statements" that come from "the literature," she offers citations in her footnotes, many of which are to her own publications in the field. She explicitly lists what those components are, and then offers an analysis based on the evidence she reviewed in the record. In short, I am satisfied, based on the contents of Paludi's report, that her proposed testimony regarding her first opinion meets FRE 702(b)'s standard and should not be barred. Defendants may feel they have good grounds on which to cross-examine Paludi or make piecemeal objections at trial, but her report, at this point, appears sound in this regard.

As to Dr. Paludi's second opinion (that Ms. Ford suffered actual retaliation as a result of the above-described lack of reasonable care), however, I think the defendants have a point. In support of this opinion, she sets forth a six-part explication. First, Paludi quotes general EEOC definitions and prohibitions of retaliation. Second, she quotes pertinent literature defining "work retaliation victimization" (*i.e.*, various adverse actions targeted at an employee as retribution) and "social retaliation victimization," (*i.e.*, actions which have the purpose or effect of altering the target's interpersonal relations with other organizational members). Third, she asserts that "workplaces use retaliation of its employees in order to maintain social control over those dissidents...in my expert opinion, this is illustrated in the present case." She goes on to cite evidence, mostly from Ms. Ford's own words and the complaint, and from the St. John and Wayne report concerning the 2003-2004 incident,

as well as some limited deposition testimony, to support her conclusion. Fourth, she says "there has been a history or retaliatory behavior in the County of Hudson," citing evidence of prior bad acts and Ms. Ford's words to her. Fifth, she speaks about empirical research regarding the negative effects of retaliation and harassment. Sixth, she addresses the actual impact of the retaliation on Ford, based on evidence from Ford, and addresses the findings of other experts.

The second opinion, as well as the first four points in support thereof, lack sufficient facts and data and are not the product of the application of reliable methods or principles. Dr. Paludi's opinion is really just a characterization of the evidence, and all that it really adds is a jargon-y definition of retaliation. Basically, she says that retaliation occurred here, basing her conclusion on the same allegations that are in the complaint. This is problematic, as it proposes that I stamp the 'expert' label upon what is essentially summation argument. Paludi merely collects all of the damning record evidence, and deems it "actual retaliation." The fairly garden-variety definition of retaliation does not seem to add anything beyond the ken of a lay juror (or at least a lay juror properly instructed as to the law). The proposed testimony is not helpful to the jury. In addition, I do not detect any accepted, "reliable principle or method" or "reliabl[e] appli[cation]" of such a method. The use of jargon here does not add value or supply any "reliable methodology." And the conclusion that actual retaliation *resulted* from Defendants' defective policies and procedures is not supported by sufficient facts or a reliable methodology.

In short, Ms. Ford is free to make this argument through her attorney, but her expert may not deliver her jury summation for her. As to this proffered testimony, I see no rigorous analysis rooted in specialized knowledge which would confer some sort of benefit on the jury. This component of the proposed testimony fails the test of FRE 702(b, (c), and (d).

The two concluding subparts of Paludi's second opinion—in which she discusses the usual effects of retaliation and the actual effects reported by Ms. Ford—I view a bit differently. This analysis goes to potential damages and, to some extent, proof of actual retaliation, and I will allow it to an appropriate extent. Dr. Paludi, as a psychologist, is qualified to analyze the ill effects complained of by Ms. Ford and place them in the context of what a psychologist would expect to see. This expertise might be helpful to the jury, since it illuminates the issues of Ford's alleged suffering and whether the effects complained of by Ford are consistent with clinically-documented effects of retaliation.

Thus, I will **GRANT IN PART** this motion in limine and exclude most of Dr. Paludi's second opinion. I will, however, **DENY** the motion and permit

testimony as to Dr. Paludi's first opinion and the components of the second opinion that pertain to the psychological ill effects of the alleged retaliation upon Ford.

### Motions *in limine* filed by Plaintiff [ECF No. 123]

#### 13) Motion to Exclude Three Defense Experts

Plaintiff objects to the opinion testimony of three experts who submitted reports on behalf of Defendant: A. Elizabeth Gramigna, Esq., an employment law attorney; B. Lisa Robbins, M.D., a psychiatrist; and C. Scott Faunce, a Corrections Management Consultant.

#### A. Gramigna

The County hired Ms. Gramigna "to render an opinion as to whether the County of Hudson undertook reasonable care to prevent retaliation from occurring in connection with Ms. Ford's employment in 2005 to 2006." (Report at p. 1). She asserts in her report that, although the jury's question is "whether any of the defendants actually retaliated against Ms. Ford," "information about acceptable standards of care in preventing harassment and retaliation by an employer is information that a jury may find useful in determining the propriety of an employer's conduct. Thus, the proper standard of care in implementing effective harassment and retaliation policies is a proper topic for testimony from an expert." (*Id.* at 1-2).

Gramigna concludes <u>first</u>, that "it is my opinion that in 2005 and 2006 the County of Hudson took reasonable steps to prevent retaliation from occurring through enforcement of effective policies, procedures and training programs"; <u>second</u>, that "Defendant Dave Krusznis's efforts were reasonable in connection with his duty of care pursuant to those policies as it related to Helen Ford," (*Id.* at 2); and <u>third</u>, that "Ms. Ford had knowledge of the County policies regarding harassment and retaliation, and of her obligations to report conduct which may violate those policies."

Plaintiff argues that Gramigna is unqualified because she never has testified as an expert in court, produced empirical research, or published a peer-reviewed paper. (Br. at 8-9) She adds that Gramigna lacks a sufficient factual basis for her opinions, that she fails to set forth or explain her methodology, and that she never analyzes whether the Defendants followed their policies in *this* case (*id.* at 10).

Defendants respond that Gramigna is highly qualified by both training and practical experience (24 years in practice, 75 neutral internal

investigations on behalf of businesses and governments). Gramigna, they say, employs a sound methodology in that she has reviewed the Defendants' actions for conformity with the standards of the EEOC and Division on Civil Rights. Further, she supports her conclusion regarding Krusznis by noting his attendance at relevant training regarding retaliation and harassment and his correct treatment of Ford when disciplinary charges were brought against her.

I find that Gramigna is qualified based on a combination of training, experience, and academic preparation. The thrust of her analysis and methodology is simply to compare the County's preventive measures with legal guidelines for preventing harassment and retaliation for complaints of harassment, and to comment on compliance. As an attorney experienced in the field, she is capable of this.

*Gramigna's First Conclusion*

As to this conclusion, I find that Gramigna's methodology—measuring the County's policy and training against the EEOC guidance on such preventive measures—is an acceptable one. It is relevant to the issue of whether the County and DOC were trying, in a legally significant way, to prevent harassment and retaliation. I also find this conclusion to be adequately supported. I except only the comment that the Department's procedures and training are "effective"; that conclusion is not supported by anything in the report. The report notes that a policy and training exist, but there is no effectiveness analysis, or even any factual backup, for the statement, for example, that 'such policies/training have been shown to prevent harassment.' This portion of Gramigna's conclusion fails the tests of FRE 702(b) and (c), but otherwise the first conclusion is well supported.

The other issue to be analyzed is whether the first conclusion is useful to the jury, and whether it 'fits' an issue in the case. *See* FRE 702(a). The issues most relevant here are two: (1) Did any of the defendants retaliate against Ford?; and (2) Did the County have a policy and custom which would permit such retaliation by its employees? I find that Gramigna's proposed testimony fits only the *second* issue, which bears exclusively on the Section 1983 liability of the County. Gramigna's opinion about the County's "reasonable" prevention measures could help the jury determine whether the County had a policy and custom of tolerating retaliation. On the other hand, it would not help the jury decide whether or not there was retaliation in fact. The proffered connection to that factual issue—that because the County had a strict policy, its agents would not have engaged in retaliation against Ford—is tenuous, and in my view fails the fit test. As to the issue of factual retaliation, then, this proposed expert testimony is not helpful and does not fit. *See* FRE 702(a); *Habecker v. Clark Equip. Co.*, 36 F.3d 278, 289-290 (3d Cir. 1994)(applying *Daubert* and finding that expert's simulation "does not 'fit' the facts of this case and would not

19

assist the trier of fact in determining how the accident occurred."); *Dymnioski v. Crown Equip. Corp.*, 2013 U.S. Dist. LEXIS 73667 (D.N.J. May 24, 2013)("When considering fitness, the court must conclude that the expert's testimony assists the trier of fact and 'is relevant to the task at hand[.]' Admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and <u>particular disputed factual issues</u> in the case.'" (internal citations to *Daubert, inter alia,* omitted)).

Accordingly I will permit Gramigna's proposed testimony on the first conclusion. I will however, instruct the jury that it is relevant only to the County's potential liability for the alleged acts of its officials, and not relevant to the factual issue of whether those officials may have actually retaliated against Ms. Ford. I will also bar any testimony of Gramigna to the effect that the County/DOC policies were effective.

*Gramigna's Second Conclusion*

Gramigna's second conclusion is problematic. She states that defendant Krusznis' efforts with respect to Ms. Ford were 'reasonable,' *i.e.*, that Krusznis followed the established procedures or ensured that they were followed. I do not see how her methodology—assessing whether the County's policy and training programs are legally reasonable in light of EEOC guidance—could plausibly support that conclusion. Here again, the jury is asked to infer that Krusznis did not in fact retaliate because he was aware of the anti-retaliation policy. This conclusion, if not a total *non sequitur,* certainly requires a huge leap of faith. Gramigna's report contains not a single fact regarding Krusznis's conduct or apparent motive before or at the time he brought the disciplinary charges, and does not discuss how he allegedly conformed his conduct to the anti-retaliation policy at the time of the alleged retaliation. Gramigna states only that Krusznis attended certain training sessions in 1996 (on sexual harassment), 1997 (on liabilities), 1999 (on sexual harassment and cultural diversity) and 2003 (on mitigating liabilities. The report also alleges that, *after* the allegedly retaliatory disciplinary investigations were already underway against Ms. Ford, Kruzsnis "listened to her concerns and empathetically told her that he would not permit bias in the process." (Report at 14).

Setting aside the weak connection between these facts and Gramigna's conclusions, I observe that this has little to do with the application of her expertise; it reads more like a factual inference argued in summation. Gramigna's reasonableness analysis, while appropriate for her first conclusion, is inapt as to her second conclusion. I will bar testimony regarding this second conclusion because the report displays a lack of sufficient facts or data regarding Krusznis' actions in relation to Ms. Ford (*see* 702(b)); a methodology which cannot reliably yield conclusions regarding Krusznis' actions or the reasonableness thereof (*see* 702(c-d)); and an analysis which does not help the

jury determine whether Krusznis retaliated against Ms. Ford, the proposition for which it is offered. (*see* FRE 702(a)).

*Gramigna's Third Conclusion*

Gramigna's third conclusion is that "Ms. Ford had knowledge of the County policies regarding harassment and retaliation, and of her obligations to report conduct which may violate those policies." Simply stated, this is fact testimony, not expert testimony. This statement is not the product of expertise, nor is it derived from any type of methodology described in the report (let alone a methodology that would satisfy FRE 702). Gramigna is apparently just repeating facts of which she was advised. Ms. Ford can be examined about her knowledge, and other fact witnesses can testify as to what, if anything, Ms. Ford said to indicate such knowledge. I will bar Gramigna's testimony as to this component of her opinion.

## B. Robbins

Dr. Lisa Robbins is an experienced physician practicing psychiatry. Retained by the Defendants, she examined Plaintiff Ford in July 2010 for two hours. Her report addresses whether Ms. Ford was suffering from any psychiatric or emotional distress attributable to her employment experience. After reporting what Ford said, Robbins reported her own extensive observations from a psychiatric standpoint (see p. 6-7 of report). She also reported her conclusions from various records that she reviewed. (*Id.* at 7-10).

Robbins' report states that she would diagnose Ford as having chronic adjustment disorder, with symptoms related to anxiety and depression. (This is to be contrasted with major depression, as diagnosed by one of Plaintiff's evaluating psychiatrists.) Robbins went through all of the DSM IV criteria for major depression, explaining why they were not present. Her report concludes that Ford has psychiatric symptoms—the most prominent being headaches and insomnia—but that "it seems highly likely that she could has had a lifelong pattern of depression and anxiety…[and] in my opinion it is unlikely that she suffers from these mental health issues secondary to her employment. It also appears unlikely that these symptoms are as disabling as Ms. Ford would like us to believe."

Plaintiff argues that Robbins has an insufficient factual basis for her opinion, because she failed to review key records. Plaintiff also argues that Robbins fails to explain her methodology, in that there is no explanation of what the DSM IV is (Diagnostic and Statistical Manual of Mental Disorders, 4th edition), what its diagnostic criteria are, and how she reached her diagnosis for Ford. (Pltf's Br. in Supp. of MiLs at 12-14). According to Plaintiff, the proposed

testimony violates R. 702 and *Daubert* because it is unreliable and speculative for being based on incomplete facts, as well as an unknown methodology.

I find that Robbins is clearly qualified and her skill—psychiatric diagnosis—is useful to a jury that must address the cause and quantum of plaintiff's alleged emotional and physical damages. *See* FRE 702(a). Next, Robbins appears to base her testimony on her personal examination and interview of Ford in addition to her review of documents and psychiatric history. Between the interview and her review of Ford's deposition, I am satisfied that Robbins has a sufficient grasp on Ms. Ford's background. *See* FRE 702(b). Robbins' approach to diagnosing Ms. Ford and assessing causation appears to be the product of a reliable and acceptable diagnostic method. She conducted an exam and reviewed other facts, both medical and non-medical. She then turned to a diagnosis manual, and applied the listed criteria for adjustment disorder and major depression, which she looked for in Ms. Ford, finding the former but not the latter. She stated the basis for these findings.

To the extent Plaintiff desires additional explanation, or believes Robbins failed to consider important facts, she may cross-examine. These alleged deficiencies, however, do not take Robbins' beneath the threshold of admissibility. Robbins is qualified to testify and her expert opinions are based on sufficient facts and reliable methods. The rest is for trial.

**C. Faunce**

Mr. Scott Faunce spent 34 years in the corrections field, rising to Director of Corrections in Essex County. He is now a self-employed consultant. He states that he reviewed DOC's policies and procedures, as well as the facts and events surrounding the investigation and disciplinary charges against Ms. Ford. (Report at p.3). The issue he addressed is "whether or not the HCDOC acted reasonably and with sufficient cause in putting forth charges against Ford. The findings of the OAL do not mean that the charges levied by the HCDOC against Ford were without merit or were unwarranted....I will therefore focus my examination on the objectivity of the investigative process that led to the filing of charges, the reasonableness of the proffering of those accusations, and the actions taken by the HCDOC subsequent thereto." (*Id.* at 4-5).

I stop here to note that the statement of purpose for this report promises, by and large, a fairly good 'fit' between the promised opinion and the jury's issue—which is, *inter alia*, whether defendants' disciplinary action against Ms. Ford was retaliatory. Evidence that defendants had good cause to investigate and charge Ms. Ford would make it less likely that retaliation was their motivation (although, of course, both factors could be present).

Plaintiff complains that Faunce's conclusions are based on a simple review of the record without any methodology or application of expertise. Defendants respond that Faunce applied a clear methodology: he reviewed and analyzed case materials, and researched and applied law enforcement and correctional policies and best practices (including the AG's internal affairs guidelines).

I accept that Faunce's expertise is in corrections. His report is wandering and difficult to read. His methodology is not always clearly expressed. He offers several opinions, some of which seem acceptable and based on a reliable methodology, while others are mere commentary on disputed facts. Within a single section of his report, he offers everything from legitimate expert opinion ("It would also follow prudent managerial practice..." (p. 8); "The initiation of disciplinary action was for just cause. The investigators gave reasonable weight to the facts uncovered and had cause to believe that Sergeant Ford did in fact violate internal management procedures of the HCDOC...(p. 10-11)); to pure fact testimony ("Upon reviewing further documents in this matter, I attempted to determine if any person hindered, prevented or dissuaded, or tried to influence Sgt. Ford from filing the discrimination complaint." (p.9)). Finally, he confusingly includes both a "summation" section and an "opinions" section. The "summation" contains mostly acceptable opinion testimony, with the exception of a problematic portion that tends to undermine the ALJ decision (*see* p. 14 ("There is nothing in this record that indicates the rudimentary fact pattern established was untrue.")). The "opinions" section, however, is almost entirely unacceptable, being best characterized as fact testimony (failing all prongs of FRE 702) or disguised summation (lacking any application of helpful expertise (FRE 702(a), (d))).

Rather than parse Faunce's report, which mixes acceptable and unacceptable testimony, I will affirmatively identify the proper subject of Mr. Faunce's testimony, ruling as follows: Faunce's testimony must conform to my ruling barring testimony that tends to undermine the ALJ's ruling (see Part 14, *infra*). He may assess the procedural quality of the Defendants' investigation into Ms. Ford, but may not opine about whether the Defendants' knowledge or beliefs about Ford were in fact true. Aside from potentially conflicting with ALJ findings, any such testimony would be factual and not expert in nature.

Thus Faunce may testify as to his opinion(s) concerning, in his own words, "the objectivity of the investigative <u>process</u> that led to the filing of charges [and] the reasonableness of the proffering of those accusations," based on, and only on, an <u>application of his expertise in correctional policy and procedures</u> to the facts of this case. He may <u>not</u> opine on the quality of the evidence, the truth or falsity of the matters investigated, or the correctness of the ALJ's decision. Just as importantly, he may not testify on any opinion that

is not based on his expert knowledge of corrections policy and procedures. He may not opine on what Aviles or Krusznis believed, on whether they discriminated or acted maliciously, or on whether/why the ALJ could have decided differently.

In sum, I will **GRANT IN PART** and **DENY IN PART** Plaintiff's Motion to Bar Defendants' experts, in accord with the rulings set out above. I caution Defendants that I will not countenance the blurting of inadmissible material. The admixture of proper and improper opinion in the report suggests that this particular witness should be carefully prepared before testifying.

### 14) <u>Motion to preclude any testimony suggesting that disciplinary charges brought against Plaintiff in 2006 were in any way justified or proper, in light of ALJ's ruling.</u>

Plaintiff argues that because the issues decided by the ALJ cannot be relitigated, evidence tending to undermine the ALJ's findings would violate Rule 403, confusing and misleading the jury while unfairly prejudicing plaintiff. (Br. Supp. Pltf's Mots. at 17-19). As a general proposition, I agree.

In response, however, Defendants argue that the issue is narrower. They do not seek to relitigate any issue, but only to introduce evidence regarding Defendants' benign, non-retaliatory motivation for the disciplinary actions they took against Ford. Their beliefs as to the rightness of their actions, they say, go to the core issue of whether they wrongfully retaliated against Plaintiff. And the issue of whether the defendants subsequently retaliated against Ms. Ford in the filing of their disciplinary action was not litigated before the ALJ. (See Ltr. of Anthony D'Elia Opp. Pltf's Mots. (ECF No. 126)).

Defendants' motives, beliefs, and state of mind at the time they initiated allegedly retaliatory disciplinary action against Plaintiff are at issue here. Plaintiff cannot expect to bring a lawsuit like this and then exclude evidence going to these matters. Witnesses may appropriately be asked, as to certain matters, to state what they believed about Ms. Ford, even regarding matters on which the ALJ made a finding. So long as it is very clear that they are stating their personal belief at the relevant time, such testimony would be probative and not unduly prejudicial. The question-and-answer on these topics should be meticulously framed in terms of belief and knowledge at the time. For example: Q. 'At that time, what did you believe...,' A. 'I believed that...'

Such testimony might naturally set the stage for opinion and editorial concerning the correctness of the ALJ's decision. That is the line that should not be crossed, and I will therefore restrict the questioning on this topic. Once the knowledge and beliefs of a certain witness regarding Ford have been established, including any testimony regarding their motivation for approving

or pursuing disciplinary charges against Ford, there is no need to go further. More detailed testimony would decrease the probativeness, and increase the prejudice. When necessary, I will give a limiting instruction stating that the purpose of this testimony is to illustrate what the witness believed, and not to call the ALJ's findings into question.

Such witnesses can expect to be cross-examined as to the fact that their subjective opinions clash with binding findings of an ALJ. That, however, presents a question of trial strategy, not admissibility.

Plaintiff's Second Motion *in limine*, seeking exclusion of all evidence suggesting that disciplinary charges brought against Plaintiff in 2006 were in any way justified or proper, is **GRANTED IN PART.** The ALJ's findings are binding and will not be relitigated. Defendants will be permitted to introduce evidence establishing only the knowledge and motivation of those involved in investigating and pursuing disciplinary charges against Plaintiff, and the jury will be given limiting instructions as to the proper purpose of such evidence.

Dated:  Newark, New Jersey
         May 16, 2014

**KEVIN MCNULTY**
**United States District Judge**