UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

HELEN FORD,

                              Plaintiff,

v.

COUNTY OF HUDSON, HUDSON
COUNTY DEPARTMENT OF
CORRECTIONS, and in their
individual capacities, OSCAR
AVILES and DAVID KRUSZNIS,

                              Defendants.

Civ. No. 07-5002 (KM)

OPINION
(Post-Trial Motions)

## MCNULTY, U.S.D.J.

### I.    BACKGROUND

This matter comes before the court on post-trial motions following a jury verdict that awarded $39,000 in damages on a small sliver of the claims asserted. The plaintiff, Helen Ford, moves under Fed. R. Civ. P. 59(e) to amend the judgment to include a backpay award representing lost wages and vacation pay, or in the alternative under Fed. R. Civ. P. 59(a) for a new trial on damages only. (ECF no. 255) Defendants Oscar Aviles moves under Fed. R. Civ. P. 50 for judgment as a matter of law. Aviles and the County of Hudson also move under Fed. R. Civ. P. 59(a) for a partial new trial. (ECF no. 250) For the reasons stated herein, both sides' motions are denied.

Ford brings this action against her employer, the Hudson County Department of Corrections. Ford presented her case to the jury primarily as one of retaliation based on her complaints about her superiors' unfair or discriminatory practices. Ten acts of retaliation were identified; of these, two (denial of a request to attend a Microsoft training session, and denial of remedial firearms training) were alleged to have been discriminatory on the

basis of sex. The jury made a specific positive finding as to only one listed act of discrimination (relating to Microsoft training), although Ford maintains that certain of its more general findings are open to a broader interpretation.

The jury answered 22 interrogatories, but beyond that the reasons for its verdict cannot be known for certain. It is likely that the jury simply did not believe certain evidence; cross examination was effective, and certain of the plaintiff's contentions simply collapsed. Or the jury may have believed that defendants took certain employment actions, but for legitimate, not discriminatory or retaliatory, reasons. What is clear is that there was sufficient evidence to support the conclusions that the jury did reach, and that the verdict should be sustained as rendered.

## A. The Claims and the Trial

Because I write for the parties, I summarize the facts and history of the case only briefly. Ford, who was employed by the Hudson County Correctional Center, sued two supervisors and the County for retaliation and workplace gender discrimination under the federal Civil Rights Act, 42 U.S.C. § 1983; the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1); and the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1. The original complaint was based on Ford's March 2006 suspension and termination, based on disciplinary charges that were brought against her.

Ford appealed her suspension and termination within the Civil Service ("CSC") system. The Merit System Board scheduled the charges for a hearing before a state administrative law judge. The ALJ found that the 2006 disciplinary charges leading to Ford's suspension/termination were unsupported, awarded backpay, and required that Ford be restored to her position. (*See* Trial Ex. P-19, ECF no. 271-4 at 27) Ford returned to work in September 2009. Thereafter, Ford amended her allegations to include matters occurring in 2009–11, during the period of her reemployment. (ECF no. 47) Her supervisors and the County, she alleged, bore responsibility for a series of

discriminatory or retaliatory acts, including those of nonparties Lt. Ronald Edwards and Officer Brian Coyne.

This protracted case was thoroughly and vigorously litigated, through the discovery process and beyond. The allegations were both broad and detailed, covering a decade; they ranged from the weighty to the fairly minor. The plaintiff was given the necessary latitude to present her case to the jury fully and fairly.[1]

Trial commenced on January 19, 2016, and lasted over five weeks. As finally presented to the jury, the parties' factual contentions were as follows:

### I.I Claimed acts of discrimination and retaliation-review of allegations

The plaintiff alleges that the following acts are protected under the constitution or state law:

1. The March 2001 complaint regarding Oscar Aviles and Sgt. Thomas Green

2. The August 2003 interview of the Plaintiff with County attorneys

3. The May 11, 2004 provision in an Interview with outside County Investigators

4. The September 2003 Internal complaint and grievances & 2005 settlement of them.

5. The March 9, 2004 filing of a workers compensation claim petition.

6. Filing of a Charge of Discrimination with the EEOC on October 24, 2006.

7. The October 17, 2007 Complaint filed with this United States District Court; and

8. Filing of appeal of suspension/termination of Plaintiffs employment that took place on March 29, 2006.

The plaintiff alleges that the following were acts of retaliation and discrimination.

(a) inadequate support staffing in the Training Unit starting in April of 2005.

---

[1]    One example: Because Ford asserted *Monell* liability against the County, she was permitted to introduce "pattern and practice" evidence. With appropriate limiting instructions, I permitted Ford to introduce testimony of four employee victims of sexual harassment—one of them allegedly the victim of an actual rape—on the issue of whether the County had instituted and carried out adequate policies for dealing with gender-related complaints.

(b) bringing disciplinary charges against her in 2006, followed by her suspension and discharge, 2006-09.

And, after her return to work in 2009:

(c) a denial of her use of a vacation day by Lt. Ronald Edwards.

(d) Partial denial of her request to attend training classes by Edwards;

(e) Officer Brian Coyne's placement of her on a "do-not-arm" list.

(f) Edwards failure to notify of class cancellation.

(g) Coyne's failure to provide one on one firearms remediation training.

(h) Edwards' denial of request to convert vacation days to sick or furlough days.

(i) Denial of sick day.

(j) Failure to clarify chain of command.

The acts claimed to be discriminatory as distinct from retaliatory, are (d) and (g).

Defendants deny that they retaliated or discriminated against the Plaintiff. They say that Plaintiff's 2006 suspension and discharge, although ultimately reversed by the OLA, were not retaliatory, but based on evidence that the plaintiff had committed certain offenses and infractions:

(a) obtaining a "confidential" document sent to the Internal Affairs Unit and fabricating a story about how she came into possession of the document;

(b) filing a false report alleging harassment against Deputy Director Kirk Eady;

(c) fraternizing with Francis Corona, who was a prisoner in the custody of the State Department of Corrections;

(d) requesting, without authorization, a computer inquiry to determine if Corona was ever incarcerated in the Jail.

(e) Misleading an officer into signing a false document regarding the FOP shields.

(Jury Instructions, ECF no. 247 at 15–16)

The jury, after a day and a half of deliberations, returned its verdict on February 25, 2016. The result was no doubt disappointing to the plaintiff. Exercising its fact finding role to assess the credibility of evidence and witnesses, including plaintiff herself, the jury rejected outright most of Ford's

4

claims. As to Deputy Warden David Krusznis, the jury denied all claims. As to Director Oscar Aviles, the jury found only that he was liable as supervisor for Edwards's discriminatory denial of Ford's request to attend a Microsoft training seminar, while permitting a male officer to attend. As to the County, the jury imposed *Monell* liability for failure to train, supervise, or enforce policies. (The scope of that portion of the verdict is disputed; it is discussed further below.) The jury handed down a damages award totaling $ 39,338.75.

## B. The Verdict Sheet

Counsel do not object to the form of the verdict sheet, which comprises 22 questions. Here are the questions and answers essential to the verdict:[2]

### PART A – As to David Krusznis

1.      Did Helen Ford ("Plaintiff") prove by a preponderance of the evidence that defendant David Krusznis ("Krusznis") committed an Act of Retaliation that violated her First Amendment or state law right to free speech and the right to petition?

        No

2.      Did Plaintiff prove by a preponderance of the evidence that Krusznis committed an Act that violated her Fourteenth Amendment or state law right to be free from discrimination based on gender?

        No

        ...

5.      Did Plaintiff prove by a preponderance of the evidence that Krusznis is liable for any of the Acts of Retaliation or Discrimination committed by Ronald Edwards or Brian Coyne[3]?

        No

### PART B – As to Oscar Aviles

9.      Did Plaintiff prove by a preponderance of the evidence that Ronald Edwards and or Brian Coyne committed an Act that violated her Fourteenth Amendment or state law right to be free from gender discrimination?

        Edwards      Yes

        Coyne        No

---

[2]      Certain questions answered "no," or not required to be answered, are omitted. Also omitted are "roadmap" instructions to aid the jury in filling out the form.

[3]      Edwards and Coyne, Hudson County employees, were not defendants in the case, but Plaintiff sought to attribute their acts to one or more defendants.

10.    Did Plaintiff prove by a preponderance of the evidence that **Aviles** is liable for any of the Acts of Retaliation or Discrimination committed by Ronald Edwards and or Brian Coyne?

Yes

## PART C – as to the County of Hudson

12.    Did Plaintiff prove by a preponderance of the evidence that she was retaliated against (suspended and terminated in 2006 or for her complaints in 2009, 2010 and 2011) for the exercise of her right to be free from discrimination based upon gender under the Fourteenth Amendment or state law, and that the deprivation of that right resulted from the County's failure to adequately train, supervise and enforce its polices as to Krusznis, Aviles, and or their subordinates?

Yes

### TITLE VII CLAIMS

13.    Did Plaintiff prove by a preponderance of the evidence that she was discriminated against by the County by being subjected to any Act of Retaliation after October 2005[4] ... because of her gender?

Yes

14.    Did Plaintiff prove by a preponderance of the evidence that she was discriminated against by the County and subjected to any Act of Retaliation after October 2005 ... because she gave information about a superior(s)?

No

## PART D -DAMAGES

15.    Did Plaintiff prove by a preponderance of the evidence that she suffered from a new emotional or psychological condition after she was suspended and terminated?[5]

Yes

16.    Did Plaintiff prove by a preponderance of the evidence that the conduct of any of the Defendants was a substantial factor in causing her new emotional or psychological condition after she was suspended and terminated?

| | |
|---|---|
| Aviles | Yes |
| County | Yes |

---

[4]    The significance of October 2005 is that it was the date the prior director, Ralph Green, left and Aviles took over.

[5]    This question referred the jury to the instructions at pp. 48-49 (preexisting condition). (ECF no. 247)

17.   State in percentages the portion of Plaintiffs new emotional or psychological condition which was a result of the following:

b. Aviles's conduct   10 %

c. County's conduct  90 %

18.   What sum of money will fairly and reasonably compensate Plaintiff for her new emotional or psychological condition which resulted only from the conduct of ... Aviles and/or the County as you found in answer to Question 17 above?

$30,000

19.   Did Plaintiff prove by a preponderance of the evidence that she suffered economic damages?

Yes

20.   What economic damages has Plaintiff proven she suffered? List each item of damages and the monetary value of the damage.

| Type of Damage | Monetary Value |
| --- | --- |
| Insurance | $  455.00 |
| Personal Days | $2838.75 |
| Education | $6045.00 |

21.   Has Plaintiff proven by a preponderance of the evidence that the conduct or acts of ... Aviles and/or the County was a substantial factor in causing her economic damages?

County      Yes

22.   State in percentages the portion of Plaintiff's economic damages which was the result of:

Aviles       0%

County      100%

(Verdict Sheet, ECF no. 246)

On March 14, 2016, judgment was entered in accordance with the jury's verdict. (ECF no. 248) Because defendant David Krusznis was not found liable on any claim, a no-cause judgment was entered as to him. Because Aviles had been found liable only for 10% of the $30,000 in emotional damages, judgment was entered against him in the amount of $3000. Because the County was found liable for the remaining 90% of the emotional damages ($27,000), plus 100% of the economic damages ($9338.75), judgment was entered against the

County in a total amount of $36,338.75. The damages award thus totaled $39,338.75.

Both parties' motions for post-trial relief (ECF nos. 250, 255) will be denied for the reasons stated herein. The judgment therefore will not be vacated or amended. Still pending, however, are motions for costs and attorney's fees, which will be considered separately.

## II.   APPLICABLE STANDARDS

This opinion addresses the following motions:

Section III – Motion of Ford to amend judgment

Section IV – Motion of Aviles for judgment as a matter of law

Section V – Motion of Aviles and the County for new trial on liability

Section VI – Cross-Motions for new trial on damages

The general legal standards governing such motions are as follows.

### A.   Motion to Amend Judgment

A motion to alter or amend judgment is contemplated by the Federal Rules:

> Motion to Alter or Amend a Judgment. A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

Fed. R. Civ. P. 59(e). "[A] Rule 59(e) motion is a 'device to relitigate the original issue decided by the District Court, and used to allege legal error.'" *Reardon v. Reardon*, 465 F. App'x 90, 93 (3d Cir. 2012) (quoting *United States v. Fiorelli*, 337 F.3d 282, 287–88 (3d Cir. 2003)).

Where a Rule 59(e) motion seeks, *e.g.*, to conform a party's claims to the proofs as they emerged, it is akin to a Rule 15 motion to amend a complaint, and it is evaluated using similar factors: "undue delay, bad faith, prejudice, or futility." *Mu Sigma, Inc. v. Affine. Inc.*, No. CIV.A. 12-1323 FLW, 2014 WL 1217961, at *2–3 (D.N.J. Mar. 24, 2014) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 230–31 (3d Cir.2011)).[6]

---

[6]   One distinction, however, is that "the liberal standard of Rule 15(a) is not applicable after the judgment is entered because Rule 59(e) should not be employed in a manner contrary to 'favoring finality of judgments and the expeditious termination of

Ford's motion, however, does not really seek to alter the basis of the verdict, but rather to supplement the relief. Ford argues that the judgment should include a backpay award, an equitable remedy to be applied by the court, not the jury. In this regard, Ford says, the jury's verdict is "advisory" only. Such a motion is comparable to, *e.g.,* a motion to amend judgment to include an award of interest in that it does not require the court to go behind the face of the verdict. A court deciding such an application will ordinarily analyze the claimed legal entitlement to relief and apply it to the record compiled before judgment. *See, e.g., Ligand Trustees of Boston Univ. v. Ligand Pharm., Inc.,* 162 F. App'x 194, 197 (3d Cir. 2006).

**B.    JMOL**

A motion for judgment as a matter of law ("JMOL") is authorized by Fed. R. Civ. P. 50.

(a) Judgment as a Matter of Law.

(1) *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).

A JMOL motion may be renewed after trial. In ruling on such a renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b)

The applicable standard is a rigorous one. "[N]o fact tried by a jury shall otherwise be re-examined in any Court of the United States, than according to

litigation...." *Id.* (quoting *Burtch,* 662 F.3d at 231 (quoting *Ahmed v. Dragovich,* 291 F.3d 201, 208 (3d Cir.2002)).

the rules of the common law." U.S. Const. amend. VII; *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines*, Ltd., 369 U.S. 355, 359, 82 S. Ct. 780, 783 (1962). The common law of this Circuit requires the reviewing court to assess "whether, viewing the evidence in the light most favorable to sustaining the verdict, a reasonable jury could have found for the prevailing party." *Graboff v. Colleran Firm*, 744 F.3d 128, 134 (3d Cir. 2014) (quoting *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003)).

> The [JMOL] motion may be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." [quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)]. We "may not weigh the evidence, determine the credibility of witnesses, or substitute [our] version of the facts for the jury's version." *Id.*

*Mancini v. Northampton Cty.*, __ F.3d __, 2016 WL 4709108, at *4 (3d Cir. Sept. 9, 2016). Thus "a judgment notwithstanding the verdict may be granted under Fed. R. Civ. P. 50(b) only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (quoting *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (quotation marks and citations omitted)).

### C.    Motion for New Trial

A post-trial motion for a new trial is authorized by Fed. R. Civ. P. 59:

> The court may, on motion, grant a new trial on all or some of the issues—and to any party— (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court ...."

Fed. R. Civ. P. 59(a)(1). A new trial may be ordered where, for example, "the verdict is against the clear weight of the evidence; damages are excessive; the trial was unfair; and that substantial errors were made in the admission or rejection of evidence or the giving or refusal of instructions." *Lyles v. Flagship Resort Development Corp.*, 371 F. Supp. 2d 597, 602 (D.N.J. 2005) (internal quotations omitted). As a general matter, "[t]he decision whether to grant a new

trial pursuant to Federal Rule of Civil Procedure 59(a) lies within the district court's sound discretion." *Inter Med. Supplies v. EBI Med. Sys.*, 975 F. Supp. 681, 686 (D.N.J. 1997) (citing *Allied Chemical Corp. v. Daiflon*, Inc., 449 U.S. 33, 36, 101 S. Ct. 188, 191 (1980)).

That discretion is at its maximum where the trial court is presented with an error of law that resulted in prejudice:

> In evaluating a motion made on the basis of trial error, "the court must first determine whether an error was made in the course of the trial and then decide whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." [*Matos v. City of Camden*, 2010 WL 3199928, at *1 (D.N.J. Aug.12, 2010)] (citing *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989), *aff'd*, 922 F.2d 184 (3d Cir. 1990); *see also Wade v. Colaner*, 2010 WL 5479629, at * 18 (D.N.J. Dec.28, 2010).

*Ghee v. Marten Transp., Ltd.*, No. CIV.A. 11-03718, 2013 WL 4500333, at *2–3 (D.N.J. Aug. 21, 2013) (Wolfson, J.), *aff'd*, 570 F. App'x 228 (3d Cir. 2014).

However, "a court's discretion to order a new trial for a verdict contrary to the weight of the evidence is more limited." *Id.* (citing *Matos*, 2010 WL 3199928, at * 1). Such a motion should be granted

> only when "the great weight of the evidence cuts against the verdict and ... [ ] a miscarriage of justice would result if the verdict were to stand," *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006) (internal quotation marks omitted); *see Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352–53 (3d Cir. 1991) (new trial should be granted only where the verdict "cries out to be overturned" or "shocks [the] conscience"). A district court's power to grant a new trial is limited "to ensure that [it] does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." *Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 201 (3d Cir. 1996) (internal quotation marks omitted).

*Leonard v. Stemtech Int'l Inc*, __ F.3d __, 2016 WL 4446560, at *4 (3d Cir. Aug. 24, 2016).

A trial court that grants a motion for JMOL is not empowered to simply deny an accompanying motion for a new trial as moot. "When granting a motion for judgment as a matter of law, the district court also is required to rule conditionally on any motion for a new trial. Fed. R. Civ. P. 50(c)(1)." *Rhone*

*Poulenc Rorer Pharm. Inc. v. Newman Glass Works*, 112 F.3d 695, 698 (3d Cir. 1997). That rule is based on considerations of orderly appellate review, judicial economy, and avoidance of a needless remand if the Court of Appeals reverses the grant of JMOL. *See* 9B Wright & Miller, Federal Practice and Procedure: Civil 3d § 2539. Even where the district court denies JMOL, however, a separate, segregated ruling as to the new trial motion may assist appellate review. *See generally* Fed. R. Civ. P. 50(e).

## III.   FORD'S MOTION TO AMEND JUDGMENT

The plaintiff, Helen Ford, moves pursuant to Fed. R. Civ. P. 59(e) to amend the judgment to award backpay. (ECF no. 255) *See* discussion of applicable standard at Section II.A, *supra*. The judgment, in Ford's view, should be amended to include the following:

| | |
|---|---|
| Lost Wages - March 29, 2006, to September 11, 2009 - | $320,766.32 |
| Vacation Time Lost - | $ 13,947.81 |
| Less: Back Pay received (CSC Decision) - | <$ 78,454.20> |
| Less: Wages Earned (Staff Management) - | <$    521.33> |
| Total Back Pay Award    - | **$255,738.60** |

(*See* Pl. MTA Br. 14; Pl. MTA Reply Br. 6.)[7]

### A.   Contentions and Relief Sought

Ford's Rule 59(e) motion to amend judgment is to be distinguished from a motion for judgment as a matter of law, or for a new trial. She does not ask the court to set aside jury's findings as being contrary to the evidence; rather, she stresses that the jury's verdict denying her this component of damages is

---

[7]    References to the briefs on Ford's motions are abbreviated as follows:

Pl. MTA Br. = Plaintiff's Brief in support of motion to amend judgment (ECF no. 255-1)

Def. MTA Br. = Defendants' Brief in response (ECF no. 267)

Pl. MTA Reply Br. = Plaintiff's Reply Brief (ECF no. 275)

only advisory.[8] Given what the jury *did* find as to liability, says Ford, the court should exercise its discretion to award her backpay, an equitable remedy. I disagree, primarily because I do not think that Ford's interpretation of the jury's liability verdict is correct. Interpreting the verdict as I do, I would not subvert it in the manner suggested by Ford. And to the extent any portion of the verdict is "advisory," I see no sufficient basis to disregard the jury's advice.

Ford urges that the jury necessarily found that she was retaliatorily suspended/terminated for the period March 29, 2006 through September 12, 2009. The Court, she says, is therefore empowered to award her back pay as an equitable remedy for a § 1983 violation or a Title VII violation. (Pl. MTA Brf. at 7)[9] Backpay is, as Ford points out, an equitable remedy that is the presumptive remedy for unlawful discrimination. *See, e.g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S. Ct. 2362, 2373 (1975) (Title VII); *Montone v. City of Jersey City,* 709 F.3d 181, 198 (3d Cir. 2013) (§ 1983); *Spencer v. Wal-Mart Stores, Inc.,* 469 F.3d 311, 316 (3d Cir. 2006) (Title VII). When the court is wearing its equitable hat, says Ford, the jury's findings as to damages play a role that is only "advisory." (Pl. MTA Brf. at 9–10 (citing *Monroe v. Easton Area School District,* 2011 WL 781877 (E.D. Pa. March 3, 2011)).

But to say that the Court's discretion is equitable is not to say that it is "unfettered by meaningful standards." *Albemarle,* 422 U.S. at 416, 95 S. Ct. at 2371. Backpay is a remedy to be applied where a relevant violation is found to have occurred, and it is designed to compensate the worker for "lost wages."

---

[8]   Before trial, Ford stated clearly that, although she would be asking the court for the equitable remedy, she should be permitted to place evidence of the entire economic loss before the jury. *See* ECF no. 194 at 2.

[9]   Ford's motion is a request that the Court do what the jury did not: award backpay as an equivalent equitable remedy. It is for this reason, surely, that Ford postures her motion as one to amend the judgment, rather than as one for JMOL. If brought as a motion for JMOL, it might be seen as a claim that the jury's verdict, as embodied in the Verdict Form, is inconsistent. The court has an obligation to sustain a jury's verdict, however, if there exists any theory under which the jury's findings are consistent. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364 (1962); *Bolden v. SEPTA,* 21 F.3d 29, 32 (3d Cir. 1994). That is a heavier burden than the one Ford has taken on—*i.e.,* to persuade the court to exercise its discretion to award backpay.

13

*Id.*. If the worker has not been fired or suspended *as a result of a constitutional or Title VII violation*, then the worker has not suffered a compensable "loss" of wages. *See Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006) (affirming denial of backpay and stating that "if a hostile work environment does not rise to the level where one is forced to abandon the job, loss of pay is not an issue").

### B.    The Jury's Rejection of the 2006 Retaliatory Suspension Claim

Any equitable backpay award by the Court must be premised on whatever constitutional or Title VII violation was found by the jury. Thus Aviles and the County attack the very premise of Ford's motion when they deny that the jury found she had suffered a retaliatory suspension/termination in 2006. (Def. MTA Br. 1) Upon careful examination, I find that the defendants' view of the verdict is the correct one.

As to Aviles, the verdict sheet discloses a single finding of liability: that Lt. Ronald Edwards (not a defendant here) committed an act of gender discrimination for which Aviles, as supervisor, is liable. That act of discrimination was Edwards's denial of Ford's request to attend a Microsoft training class, while permitting a male co-worker to attend. It occurred in March-April 2010 (*i.e.,* six months after Ford's return to work). It therefore could not have caused Ford to lose wages during the 2006–09 hiatus. (*See* Section III.A, *supra*.)

As to defendant Krusznis, the jury found no wrongful act, whether of discrimination or retaliation. (Questions 1, 2) That obviously exonerates Krusznis, but it is also significant to the interpretation of the verdict against the County. Ford sued Krusznis as the individual primarily (though perhaps not solely) responsible for bringing about her retaliatory suspension/termination in 2006. If Aviles or the County were held liable for the 2006 termination, it would almost certainly have been *via* derivative liability for

Krusznis's acts of retaliation in bringing unfounded disciplinary charges. But the jury found that Krusznis had committed no such retaliatory act.[10]

As to the County, the picture is more complicated. The upshot, however, is this: The jury rejected Ford's claim that the 2006 suspension/termination constituted retaliation for her giving information about superiors. And that rejected claim of retaliatory termination was the only liability basis presented to the jury for a claim of lost wages or backpay in 2006–09.

Consider first the verdict sheet. The jury's liability findings as to the County, as reported in its answers to Questions 12, 13, and 14 (quoted above), were as follows:

Question 12 focused on the *Monell* constitutional claims against the County. It asked whether Ford was "retaliated against (suspended and terminated in 2006 **or** for her complaints in 2009, 2010 and 2011)" (emphasis added). To retaliation in 2006, 2009, 2010, **or** 2011, the jury answered "Yes."

Question 13 focused on the Title VII gender discrimination claim against the County. It asked whether Ford was "discriminated against by the County by being subject to **any** Act of Retaliation after October 2005 ... **because of her gender**" (emphasis added). To post-2005 gender discrimination, the jury answered "Yes."

Question 14 focused on the Title VII retaliation claim against the County. It asked whether Ford "was discriminated against by the County and subjected to **any** Act of Retaliation after October 2005 ... **because she gave information about a superior(s)**." To post-2005 retaliation based on complaints about superiors, the jury answered "No."

Ford asserts that the jury verdict included a finding that her termination/suspension in 2006 was retaliatory. In doing so, she is reading the

---

[10]   Now Ford says that Krusznis might have been an innocent "cat's paw," duped into carrying out the retaliatory agenda of other, non-party County personnel. (Pl. MTA Reply Br. 2) That was not the thrust of plaintiff's presentation at trial. At any rate, such stretching to find a theory is not appropriate where the jury did not accept, but rejected, the claim of retaliatory termination in 2006. *See infra.*

"or" in Question 12 as an "and."[11] She is reading "any Act" in Question 13 as if it must have meant the *particular* act of retaliatory termination in 2006. And she altogether ignores Question 14, the jury's explicit rejection of her theory that the County retaliated against her for giving information about her superiors.

True, the jury answered "yes" to the general question whether there had been any retaliation in 2006, 2009, 2010, *or* 2011. (Question 12) But there is no basis to pluck the 2006 suspension/retaliation from that disjunctive list. More to the point, that "yes" answer, in context, *could not* have meant the 2006 suspension/termination. I base that conclusion on both the County's alleged acts of retaliation and the alleged protected actions of Ford that gave rise to them.

First, approach the question from the perspective of the County's alleged acts of retaliation. Ford's sole theory as to the 2006 suspension/termination was that it was imposed in retaliation for her having given "information ... about a superior or superiors" on five occasions in 2001–04.[12] But to the question whether the County retaliated against Ford "because she gave information about a superior(s)," the jury answered "No." The jury was offered a

---

[11]    Literally. *See* ECF no. 271, Pl. JMOL Br. 23–24 ("However, the jury specifically found the County to be liable. [citing Questions 10, 12, and 13] That includes damages related to Plaintiff's wrongful suspension and termination in 2006 **and** for her complaints in 2009, 2010 and 2011.") (emphasis added).

[12]    *See* Jury Charge, ECF no. 247 at 36 (Title VII charge).

The *pre*-termination protected acts giving rise to retaliation were alleged to be

1. The March 2001 complaint regarding Oscar Aviles and Sgt. Thomas Green

2. The August 2003 interview of the Plaintiff with County attorneys

3. The May 11, 2004 provision in an Interview with outside County Investigators

4. The September 2003 Internal complaint and grievances & 2005 settlement of them.

5. The March 9, 2004 filing of a workers compensation claim petition.

(Jury Charge, ECF no. 247, quoted at pp. 2-4, *supra*.)

16

potpourri of *other* alleged acts of retaliation by the County.[13] All but one of those, however, occurred in 2009–11, years after the 2006 suspension. And the only act of retaliation definitively identified by the jury was the Microsoft training incident, which occurred in 2010.

Second, approach the question from the perspective of Ford's protected actions. Because the jury rejected the theory of retaliation based on giving information about superiors, Ford's protected acts must necessarily have consisted of something else. As to that "something else," the jury had three alternatives from which to choose.[14] But those three acts all took place *after* Ford's March 2006 suspension. The 2006 suspension could not have been

---

[13]     Additional alleged acts of retaliation or discrimination, aside from the 2006 suspension/termination, were:

> (a) inadequate support staffing in the Training Unit starting in April of 2005.
>
> …
>
> (c) a denial of her use of a vacation day by Lt. Ronald Edwards.
>
> (d) Partial denial of her request to attend training classes by Edwards;
>
> (e) Officer Brian Coyne's placement of her on a "do-not-arm" list.
>
> (f) Edwards failure to notify of class cancellation.
>
> (g) Coyne's failure to provide one on one firearms remediation training.
>
> (h) Edwards' denial of request to convert vacation days to sick or furlough days.
>
> (i) Denial of sick day.
>
> (j) Failure to clarify chain of command.

(Jury Charge, ECF no. 247, quoted at pp. 2-4, *supra*.)

[14]     The *post*-termination protected acts giving rise to retaliation (compare n. 11, supra), were alleged to be:

> 6. Filing of a Charge of Discrimination with the EEOC on October 24, 2006.
>
> 7. The October 17, 2007 Complaint filed with this United States District Court; and
>
> 8. Filing of appeal of suspension/termination of Plaintiffs employment that took place on March 29, 2006.

(Jury Charge, ECF no. 247, quoted at pp. 2-4, *supra*.) These post-termination acts, unlike the pre-termination acts, did *not* consist of "giving information about a superior(s)."

17

ordered in retaliation for those protected acts, because they had not yet happened.

In short, the jury's rejection of the proposition that Ford was retaliated against for giving information about superiors is fatal to her claim that the 2006 suspension/termination was retaliatory.

Ford next attempts to work backward from certain of the jury's answers to damages questions, finding within them an implied finding of liability for retaliatory termination/suspension in 2006. There is a threshold problem: The jury was asked that question directly, and it declined to make any such finding. Further, it rejected the component of damages (lost wages) that might naturally be expected to flow from such a finding.

I consider first the emotional damages. The evidence showed that Ford had an emotional or psychological condition that predated her 2006 suspension/termination. Thus the damages questions ask whether Ford developed "a new emotional or psychological condition after she was suspended and terminated." The jury answered "yes" and attributed it to the County (90%) and Aviles (10%). (Questions 15, 16)

The award of $30,000 in psychological damages states nonspecifically that they resulted "from the conduct of … Aviles and/or the County." (Question 18) Of course, the proofs related to the *period of time* after the 2006 termination/suspension. The jury's award does not find, however, that such emotional damages *resulted* from the 2006 termination/suspension.

As to Aviles, the jury found that there had been *no* act of retaliation in 2006 or at any other time, but only a single act of gender discrimination in 2010. Even as to the County, the jury found by implication that the 2006 suspension was not imposed in retaliation for Ford's "giving information" about superiors. The suspension, as emotionally distressing as it surely must have been, did not stem from a violation of § 1983 or Title VII.

Closer to the point is Ford's citation of the jury's award of $9338.75 in economic damages. These damages, she notes, relate to the 2006–09 period of

18

her termination/suspension. My instructions submitted the issue to the jury thus:

> For the time period between March 26, 2006, to September 11, 2009, the plaintiff has claimed the following economic damages:
>
> > a. Lost Wages in the amount of $320,766.32
> > b. For the same period of time, reimbursement for life insurance coverage premiums, in the amount of $455;
> > c. $13,947.81 in vacation time that she was not paid or granted;
> > d. $2,838.75 in unpaid personal days she was not paid or granted; and
> > e. $6,045 in educational incentives she was not paid....

(Jury Charges, ECF no. 247 at 45) The jury awarded (b), (d), and (e) [accrued insurance, personal days, and educational incentives, totaling $9338.75]. It did not award (a) and (c) [lost wages and vacation time].

This award cannot be read as an implied finding that the 2006 termination/suspension was retaliatory.

First, there was considerable evidence from which the jury could have permissibly found, as it did, that the termination/suspension itself was not retaliatory. (*See supra.*) And such retaliation, as noted above, was the sole theory under which the 2006 termination was alleged to be wrongful.

Second, Ford offered evidence of many protected acts, and evidence of many alleged acts of retaliation apart from the 2006 suspension itself. The jury might have considered, for example, that Ford engaged in protect assertions of her rights during the 2006–09 hiatus (for example, in the CSC proceedings or her post-suspension EEOC complaint). Retaliation for such assertions of rights could permissibly be found wrongful. And Ford alleged many adverse retaliatory actions after September 2009. (*See* pp. 2–4, supra.)

Whatever retaliation or discrimination the jury had in mind surely did not consist of the 2006 termination, but rather the employer's actions upon Ford's return. As to that, the jury's only concrete finding consisted of the Microsoft training incident. The jury's selection of the one allegation that most clearly involved disparate treatment of Ford and a male employee bespeaks

19

care, not recklessness. And it is likely that the jury viewed that incident in the context of the other alleged actions, even if it did not find that any of those other actions, standing alone, were discriminatory or retaliatory.

A jury could rationally have found that the 2006–09 hiatus (and interruption of Ford's salary) did not *result* from her 2001–04 complaints about superiors. Rather, it was an unfortunate by-product of the disciplinary charges, which were not sustained, but which were not retaliatory or discriminatory, either. The jury could nevertheless have determined that Ford should not lose accrued benefits as a result of the hiatus. Such a jury could rationally have found that Ford deserved to keep her insurance coverage, education credit, and accrued personal days, even if she was not entitled to be paid for work not performed. Indeed, it could even have found that the County's decision to deny those accrued benefits stemmed from a retaliatory motive, given Ford's adversarial relations with the County.[15]

For all of the foregoing reasons, I reject the premise of Ford's motion: that the jury found she was suspended/terminated in 2006 in retaliation for giving information about superiors. Backpay from March 2006 would not "return her to the position held prior to the violation of her rights" (Pl. MTA Br. 14), because the jury did not find that her rights were violated as of March 2006.

Finally, Ford attempts to circumvent the jury's failure to find that the 2006 suspension was retaliatory by stating that such a finding was rendered unnecessary by the ALJ's ruling vacating her disciplinary charges. That

---

[15]    Third, even a jury convinced that the dismissal was wrongful might have believed that Ford should have made greater efforts to find replacement work in 2006–09. Now it is true, as Ford states, that the jury found that 0% of the economic damages were attributable to Ford's conduct, or failure to mitigate. (Question 22) That question, however, followed the jury's finding of limited economic damages in the amount of $9338.75. Those damages consisted of vested fringe benefits and personal days, which would not naturally be subject to mitigation. The jury doubtless meant that *those* limited damages of $9338.75 should not be reduced based on Ford's own conduct. There is no reason to believe the jury took on the pointless task of determining whether Ford had mitigated the entire amount of damages originally claimed but rejected by the jury.

decision of the ALJ was relevant, and it was placed in evidence for the jury's consideration. (ECF no. 271-4 at 27) But the ALJ found only that the evidence underlying the disciplinary charges was insufficient; the ALJ did not consider or decide the issue here—*i.e.*, whether the suspension/dismissal was in retaliation for Ford's complaints about the actions of her superiors. The jury evaluated the evidence as to *that* issue—retaliation—and rejected it.[16]

I accept that the Court, while giving due regard to the "advisory" role of the jury, may award backpay as an equitable remedy for a successful employment-related § 1983 or Title VII claim. *See generally Montone, supra* (§ 1983); *Spencer, supra* (Title VII). The foundation of any such award, however, must be that a constitutional or Title VII violation caused the plaintiff to be terminated in 2006, giving rise to lost wages thereafter. Here, no such causative retaliatory discharge was established by the liability verdict.

Ford's motion to amend the judgment is therefore denied.

## IV.    MOTION OF AVILES FOR JMOL

Defendant Oscar Aviles is subject to a judgment in the amount of $3000. He moves under Fed. R. Civ. P. 50 for judgment as a matter of law.[17] *See* discussion of applicable standard at Section II.B, *supra*. Aviles stresses that he was not held liable for any act of his own. He was held derivatively liable as a supervisor for an act of gender discrimination by Lt. Edwards, a non-party subordinate.

---

[16]     The jury was not permitted to hear the dollar amount of the ALJ's award. It heard some of the evidence underlying the disciplinary charges, in order to assess whether, although ultimately reversed, the charges were brought for good faith business reasons, as opposed to retaliatory reasons. To this Court, the evidence appeared quite substantial; at the very least it seemed sufficient to support the bringing of the charges.

[17]     References to the briefs on the defendants' motions are abbreviated as follows:

Def. JMOL Br. = Defendants' Brief in support of motion for judgment as a matter of law (ECF no. 250-1)

Pl. JMOL Br. = Plaintiff's Brief in response (ECF no. 271)

Def. JMOL Reply Br. = Defendants' Reply Brief (ECF no. 273)

Section 1983 does not incorporate the concept of *respondeat superior*. A supervisor may be held liable, however, if that supervisor was "involved personally, meaning through personal direction or actual knowledge and acquiescence, in the wrongs alleged." *McKenna v. City of Philadelphia*, 582 F.3d 447, 460 (3d Cir. 2009) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). Aviles argues that, even conceding that Edwards's denial of Microsoft training gave rise to a legally sufficient claim of discrimination, there was insufficient evidence of Aviles's personal involvement.

### A.    The Scope of the Jury Verdict as to Aviles

Ford points out that that she is entitled to the benefit of reasonable inferences in support of the verdict. But that begs the question of what the verdict was. In this mixed-verdict scenario, Ford should not enjoy the benefit of facts or inferences that were rejected by the jury.

Step one of Aviles's argument is that he was not held liable for any alleged act of retaliation—only for gender discrimination. In this I believe he is correct. Question 6 asked whether Aviles personally committed any act of retaliation, and Question 7 asked whether he had committed any act of gender discrimination. To both, the jury answered "no." Question 8 asked whether Edwards or Coyne had committed any act of retaliation. The jury answered "no." Question 9 asked whether Edwards or Coyne had committed any act of gender discrimination; the jury answered "yes" as to Edwards, "no" as to Coyne.

At that point, then, only gender discrimination was on the table. Question 10 then addressed Aviles's supervisory liability: it asked whether Aviles was liable for any of the acts of retaliation or discrimination committed by Edwards and/or Coyne. The jury answered "yes." From these answers, the only possible conclusion is that Aviles, as a supervisor, was held derivatively liable for gender discrimination by Edwards.

Step two of Aviles's JMOL argument is that there was only one relevant act of gender discrimination by Edwards. The sole act of discrimination found by the jury is that in 2010 Edwards denied Ford permission to attend a

Microsoft training class, while permitting a male colleague to attend. Ford now lumps together the many retaliatory/discriminatory acts that she placed before the jury. *See* p. 3, *supra*. But the jury instructions identify just two acts of gender discrimination: "The acts claimed to be discriminatory as distinct from retaliatory, are (d) and (g)." *See* p. 4, *supra*. As to Aviles, the jury rejected the retaliation theory *in toto*, and explicitly rejected discriminatory act (g) (Coyne's failure to give Ford remedial firearms training). That leaves act (d): Edwards's discriminatory denial of Ford's request to attend the Microsoft training class.

### B. Supervisory Liability

Aviles does not dispute that the jury was properly instructed as to the legal standards governing § 1983 supervisor liability. (*See* Jury Charges, ECF no. 247 at 28 (§ II.H - "Liability of Supervisory Officials")) My instruction was closely patterned on Third Circuit Model Civil Jury Instruction 4.6.1 (2015). It informed the jury that Aviles was not liable simply by virtue of his status as a supervisor. Rather, the jury would be required to find (1) that Aviles directed the subordinate to commit discriminatory or retaliatory acts, or (2) that Aviles knew of the subordinate's acts and acquiesced in them.[18] As in the Model Instruction, these concepts were then explicated in accordance with relevant case law. (*Id.*, ECF no. 247 at 28–29)

In claiming that supervisory liability should not attach, Aviles has much evidence to work with. He primarily cites his counsel's cross examination of Ms. Ford. Ford admitted that she had "no facts" to support her allegation that Aviles knew about Edwards's discriminatory denial of the Microsoft training request. (2/4 Tr. 135:22–136:1 (ECF no. 250-2 at 17–18)) Later, Ford admitted that she had "no evidence" that Aviles told Edwards to deny her requests, that the two "even spoke about these actions that Edwards was taking," or that

---

[18]   There is a third route to supervisory liability: that Aviles, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the act to occur. As to Aviles, however, Ford asserted this theory only as to the 2006 suspension/termination. *See* Jury Instructions § II.H, ECF no. 247 at 29 ("Plaintiff alleges that the third alternative—'policy, practice or custom'—would apply to Aviles and the 2006 charges and suspension only.").

Aviles "even knew about any of these actions that Edwards took before he took them." She believed they were friendly and had golfed together. (2/8 Tr. 24 (ECF no. 250-2 at 21)) Aviles and Edwards testified that they had not spoken about the matter. (2/10 Tr. 132, 2/16 Tr. at 109 (ECF no. 250-2 at 24, 27))

Aviles's argument must be considered with care, however. Ford was perhaps not her own best advocate, but that is why she hired an attorney. The relevant inquiry here is whether the evidence amassed by counsel and placed before the jury contained evidence sufficient to support the jury's verdict as to Aviles. And that inquiry may take into account inferences from the evidence; liability is not confined to cases in which a supervisor admits fault.

Ford emphasizes the overall context. She had a long history of hard-fought disputes with management, and had prevailed on some of them. The trial evidence, she points out, included testimony that, on Aviles's watch, serious complaints of sexist behavior were not adequately followed up. There was expert testimony by Michelle Paludi that the procedures for dealing with complaints were inadequate, and that Aviles, as supervisor, bore responsibility. There was factual testimony of a long-standing pattern of behaviors that would have alerted a reasonable supervisor. The pervasiveness of such sexist actions, together with the friendly relations between Aviles and Edwards, in the context of Ford's history of disputes, might give rise to an inference of knowledge by someone at Aviles's level of authority. The jury did not have to accept this inference, of course, but it could. And such testimony might give rise to a permissible inference that Aviles as director was 10% responsible for "set[ting] in motion a series of acts by subordinates that the supervisor knows, or reasonably should know, would cause the subordinates to violate a person's rights." (Jury Instructions II.H, ECF no. 247 at 28–29)

The question is concededly a close one. But there is enough to sustain this partial, $3000 verdict against Aviles. His motion for JMOL is denied.[19]

---

[19]     I do not reach Aviles's alternative argument that the discriminatory denial of Microsoft training did not rise to the level of an "adverse employment action" under Title VII. Aviles is not a Title VII defendant. He cites general case law that § 1983 and NJLAD are the same or similar in this context, but he cites no case directly holding

## V.   MOTIONS OF AVILES AND THE COUNTY FOR NEW TRIAL

Aviles and the County of Hudson move under Fed. R. Civ. P. 59(a) for a partial new trial. (ECF no. 250)[20] *See* discussion of applicable standard at Section II.C, *supra.* Defendants would like to retry the following issues: "[W]as Plaintiff discriminated against as a result of being denied attendance at the Microsoft publisher class; were Aviles and/or the County liable for such discrimination; and, if so, did Plaintiff suffer any damages as a result of the denial?" (Def. JMOL Br. 10) (The portion of Defendants' motion for a new trial that relates solely to damages is discussed separately in Section VI, *infra.*)

### A.   Distinct and Separable Issues

This was a mixed verdict, in which Defendants prevailed on most but not all issues. Not surprisingly, they would like to bank the issues on which they won, but have a second crack at the others. The law, however, is not so naïve. Where a litigant moves for a partial new trial, the issue to be retried must be "so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co. v. Champlin Ref'g Co.,* 283 U.S. 494, 500, 51 S. Ct. 513, 515 (1931); *Simone v. Golden Nugget Hotel & Casino,* 844 F.2d 1031, 1040 (3d Cir. 1988).

Defendants' proposal for a partial new trial limited to the Microsoft issue is not one that could be carried out fairly. The Microsoft issue, one of many similar allegations of retaliation and discrimination, is not truly separate and distinct. What sets it apart is not the substance but the outcome: it is the issue

---

that § 1983 contains an "adverse employment action" threshold. The adverse employment action element is rooted in the explicit Title VII prohibition of discrimination as to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). I am skeptical of applying it as a limit on the scope of § 1983, a much broader statute which grants a cause of action for a State actor's "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.

[20]   In passing, the defendants' briefs seem to refer to JMOL in favor of both Aviles and the County. (*E.g,* Def. JMOL Br. 1) Point I of the moving brief, however, is entitled "Aviles is Entitled to Judgment as a Matter of Law," and the arguments are directed to Aviles alone. (Def. JMOL Br. 5) The County's motion is clearly one for a partial new trial.

on which defendants did not prevail. That circumstance alone does not imply that it can fairly be retried in isolation. It is inextricably intertwined with other issues. Retrying it alone would be like granting a bowler an extra roll without resetting the pins; all efforts may now be concentrated on those still standing, a much easier task. That approach is unfair to the plaintiff, and it smacks of an agenda to "mop up" the remaining issue and complete the job of absolving defendants.

This case presented a complex set of interlocking facts. There were no smoking-gun emails or the like. Rather, the jury was asked to infer discrimination and retaliation based on a pattern of interdependent acts and statements over a period of years. *See, e.g., Simone v. Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1040–41 (3d Cir. 1988) (partial new trial not appropriate in a "complex or tangled fact situation") (citing *Stanton v. Astra Pharmaceutical Products, Inc.*, 718 F.2d 553, 576 (3d Cir.1983); *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 761 (3d Cir. 1977)). This jury weighed and sifted all of the evidence in arriving at its limited verdict. There is no reason to think a second jury, faced by the same comprehensive task, would do better. And to simplify that task—to place only the Microsoft training issue before a second jury—would invite a verdict based on an incomplete view of the evidence.

For this preliminary reason, then, I am highly disinclined to grant defendants' application for a partial new trial. I nevertheless briefly consider the particular grounds asserted.

### B.   Particular Grounds

#### 1.   Aviles

Aviles recasts his JMOL argument as a contention that the jury's finding of supervisory liability is against the weight of the evidence:

> Here, the trial record provides no evidential support for the jury's finding th[at] Aviles should be held liable for Edwards' denial of Plaintiff's request to attend a training class. In order to establish a claim of supervisory liability, a plaintiff must show that the person acted "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [a] constitutional harm," or "participated in

26

violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

(Def. JMOL Br. 11) To be sure, the standard for a new trial is lower than that for JMOL. The considerations here, however, are similar; what was an argument that the evidence is insufficient is now an argument that the evidence weighed against the verdict. Such a challenge, absent legal error, will be granted only when "the great weight of the evidence cuts against the verdict and ... a miscarriage of justice would result if the verdict were to stand." *Leonard v. Stemtech*, 2016 WL 4446560 at *4, cited at Section II.C, *supra*.

There is no contention here that the jury was not properly instructed. Nor is there any indication that it failed to deliberate, or permitted itself to be swayed by irrelevant considerations. As to Aviles, the jury sifted through the allegations, found him liable for a small portion of them, and found him 10% responsible for a fairly modest award of emotional damages. In short, there are no indicia of a miscarriage of justice.

For the reasons similar to those expressed in Section IV, *supra* (JMOL), I cannot find that the verdict was against the weight of the evidence. Aviles's motion for a new trial on those grounds is therefore denied.

### 2. The County

A County cannot be held liable under § 1983 based on *respondeat superior. See Polk County v. Dodson*, 454 U.S. 312, 325, 102 S. Ct. 445 (1981). Rather, the plaintiff must show that any violation of her constitutional rights "implement[ed] or execute[d] a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978)). "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (internal citations omitted). "Custom" is a course of conduct which, although not formally

27

authorized by law, is "so permanent and well-settled" as to virtually constitute law. *Andrews*, 895 F.2d at 1480 (internal citations omitted). It may inhere in poor training or failure to train employees, where that failure evidences deliberate indifference, despite actual or constructive knowledge of violations. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1205 (1989); *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1360 (2011). To demonstrate such notice, a plaintiff may prove "a pattern of similar constitutional violations by untrained employees." *Id.* at 62, 131 S. Ct. at 1360. As to the County's liability, the jury was properly instructed. (Jury Instruction, pp. 27–29, ECF no. 247) The jury found the County liable based on "failure to adequately train, supervise and enforce its policies as to Krusznis, Aviles, and or their subordinates." (Question 12)

The County, narrowing the focus, urges that this verdict involved sex discrimination only. The evidence of County policies, however, related to the distinct areas of sexual harassment and retaliation. For example, the four co-employee witnesses testified that they had been harassed (or worse), and that the County's response had been inadequate. Ford's expert Michelle Paludi, PhD, testified that the County's policies and training programs regarding sexual harassment and retaliation were inadequate. Finally, says the County, Edwards's particular act of discrimination here was not shown to have been caused by any County custom or policy.

Fundamentally, the County is wrong in saying that the verdict bespeaks only discrimination, and excludes retaliation. The *Monell* question itself—Question 12—asked whether Ford was "retaliated against (suspended and terminated in 2006 or for her complaints in 2009, 2010 and 2011)." The jury answered "Yes." The denial of Microsoft training, although discriminatory, could easily have had a retaliatory motive as well.[21] Discriminators do not necessarily draw such fine distinctions.

---

[21]   As to Aviles, the jury found no retaliation at all. *See* Section IV.A, *supra.* Not so, however, as to the County.

At any rate, the evidence of County policy and custom cannot so easily be confined to harassment and retaliation. Sexism is not so divisible.[22] A jury could easily conclude that the same attitudes that would cause an employer to ignore sexual harassment and retaliation would also tend to foster an attitude of impunity toward sex discrimination. The issue is not one of legal categories, but of permissible inferences about the springs of human behavior.

As to the County, too, then, the motion for a new trial is denied.

## VI.   CROSS-MOTIONS OF DEFENDANTS AND PLAINTIFF FOR NEW TRIAL ON DAMAGES

Both sides move in the alternative under Fed. R. Civ. P. 59(a), urging that if their other requested relief is not granted, the Court should grant a new trial on the issue of damages. Ford finds it anomalous that she was awarded only part of what she requested; Defendants find it anomalous that Ford was awarded anything at all. The jury's damages award, however, was sufficiently grounded in the evidence and will not be disturbed.

A partial new trial on damages, as on liability, must be considered in light of the "distinct and separable" standard. Thus, in *Gasoline Products* itself, the Supreme Court held that "the question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial." 285 U.S. at 500, 51 S. Ct. at 515. And the U.S. Court of Appeals for the Third Circuit has "interpreted the *Gasoline Products* standard to prevent determination of damages separate from liability when there is a complex or tangled fact situation. *Stanton v. Astra*

---

[22]    It is instructive that Title VII and the NJLAD, for example, both treat sexual harassment as a *form* of gender discrimination. *See, generally Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S. Ct. 2399, 2404 (1986) (In Title VII case, "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex."); *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 453 (D.N.J. 2009) (NJLAD hostile environment harassment case requires a showing that plaintiff's "gender was a substantial factor in the harassment, and that if the plaintiff had been [male] she would not have been treated in the same manner.").

*Pharmaceutical Products, Inc.*, 718 F.2d 553, 576 (3d Cir.1983); *Vizzini v. Ford Motor Co.*, 569 F.2d [754, 761 (3d Cir. 1977)]." *Simone v. Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1040–41 (3d Cir. 1988). In *Vizzini*, for example, the court believed that the nominal damages award of $1.00 was "affected by the liability issues in the case," as to which the evidence was "very thin." 569 F.2d at 761. A new trial as to damages only, it held, would thus be unfair to the defendant.[23] So too here.

The defendants' proposal—that a second jury reassess the damages that flowed from the Microsoft training incident—is not fair or workable. The facts were highly tangled, complex, and interrelated. The relatively modest damages award was influenced, if only indirectly, by the jury's exposure to the whole factual picture. To permit the defense a second opportunity to train all of its artillery on this small corner of the case would be to give it an unfair procedural advantage.

The plaintiff's proposal is likewise unfair and unworkable. Ford believes that she is entitled to an award of damages based on her retaliatory suspension/termination in 2006. For the reasons expressed above, that is not what the first jury found. It follows that a second jury could not validly be instructed to base a damages-only verdict on that nonexistent liability finding.

Nothing else about the evidence suggests that the damages award must be revisited by a second jury. The economic damages of $9338.75, discussed at pp. 18–19, *supra*, were well documented. The $30,000 in psychological damages were based on ample evidence, however, that Ms. Ford did suffer serious physical and emotional symptoms, and that a preexisting psychological

---

[23] An alternative route to a new trial on damages is by remittitur, which is not sought by defendants here. Where the court finds no rational relationship between the injury and the damages, such that the judicial conscience is shocked, it may offer a litigant the choice between a lowered award and a new trial on damages. *See generally Meals v. Port Auth. Trans-Hudson*, No. CIV.A. 12-2628 JLL, 2014 WL 2619843, at *2 (D.N.J. June 12, 2014), *aff'd*, 622 F. App'x 121 (3d Cir. 2015). Additur, although available in New Jersey state court, is not available in federal court, where it is seen as a usurpation of the Seventh Amendment right to a jury trial. *Hayes v. Cha*, 338 F. Supp. 2d 470, 498 (D.N.J. 2004) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433, 116 S. Ct. 2211, 2222 (1996)).

condition made her more fragile than the average person. (*E.g.,* 2/3 Tr. 130–31, ECF no. 271-3 at 52–53; 2/4 Tr. 19, ECF no. 271-3 at 56) The jury's attribution of 10%, or $3000, of that total to Aviles represented a reasonable estimate; there is no reason to think a second jury's estimate would be more or less valid.

At any rate, the parties do not point to new or additional evidence or arguments that a second jury would hear; they just ask for a second chance. Where, as here, there is no way to know whose ox has been gored, that is no basis to order a new trial on damages.

The cross motions for a new trial on damages are denied.

## CONCLUSION

For the reasons stated above, both sides' post-trial motions (ECF nos. 250, 255) are DENIED.

Dated:  Newark, New Jersey
        October 25, 2016

HON. KEVIN MCNULTY, U.S.D.J.