## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HELEN FORD,** | Civ. No. 07-5002 (KM) (SCM) |
| **Plaintiff,** | |
| | **OPINION** |
| **v.** | |
| **COUNTY OF HUDSON, HUDSON COUNTY DEPARTMENT OF CORRECTIONS, OSCAR AVILES, and DAVID KRUSZNIS,** | |
| **Defendants.** | |

### KEVIN MCNULTY, U.S.D.J.:

A jury awarded the plaintiff, Helen Ford ("Ford"), $39,338 in damages on a small portion of the claims asserted. Now, as a prevailing party, she moves for an award of attorney's fees in the amount of $702,303, plus a 40% contingency enhancement. Ford also seeks $94,337 in litigation costs, $15,070 in prejudgment interest, and post-judgment interest.

For the reasons set forth below, the Court awards Ford attorney's fees (including a 5% contingency enhancement) in the amount of $262,540, costs in the amount of $46,787, and prejudgment interest in an amount to be determined. Post-judgment interest shall accrue at the statutory rate. *See* 28 U.S.C. § 1961(a).

### I.    BACKGROUND

Because I write for the parties, I summarize the facts and history of the case only briefly. Ford, who was employed by the Hudson County Correctional Center, was suspended and terminated in March 2006 based on disciplinary charges. Ford appealed that 2006 suspension and termination within the Civil Service ("CSC") system. The State ALJ found that the 2006 disciplinary charges leading to Ford's suspension/termination were not supported by sufficient

1

evidence, awarded approximately $78,000 in backpay, and required that Ford be restored to her position. (*See* Trial Ex. P-19, ECF no. 271-4 at 27)

On October 17, 2007, Ford filed her original complaint in this action. (ECF no. 1, referred to herein as the "Complaint")[1] She sued two supervisors and Hudson County (the "County") for retaliation and workplace gender discrimination under the federal Civil Rights Act, 42 U.S.C. § 1983; the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(a)(1); and the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1. The original complaint was based on Ford's March 2006 suspension and termination. It also contained more general allegations of discrimination in the workplace.

Ford returned to work, pursuant to the ALJ's order of reinstatement, in September 2009. On November 16, 2010, Ford filed a Supplemental Pleading (ECF no. 47) which added allegations dating from the period after her reinstatement in September 2009. Her supervisors and the County, she alleged, bore responsibility for a series of discriminatory or retaliatory acts, including those of nonparties Lt. Ronald Edwards and Officer Brian Coyne.

This protracted case was thoroughly and vigorously litigated, through the discovery process and beyond. The allegations were both broad and detailed, covering a decade; they ranged from the serious to the fairly minor.

---

[1]    Record items cited repeatedly will be abbreviated as follows:

| | |
|---|---|
| "Pl. Mot." = | Plaintiff's Motion for Attorney's Fees and Costs to be Awarded to Plaintiff (ECF no. 258) |
| "County Opp." = | Brief in Opposition to Plaintiff's Motion for Attorneys' Fees and Costs (ECF no. 270) |
| "Aviles Opp." = | Defendant Oscar Aviles' Brief in Opposition to Plaintiff's Application for Attorney's Fees (ECF no. 268) |
| "Pl. Reply" = | Plaintiff's Reply Brief in Support of Motion for Attorney's Fees and Costs to be Awarded to Plaintiff (ECF no. 276) |

Trial commenced on January 19, 2016, and lasted over five weeks. The jury, after a day and a half of deliberations, returned its verdict on February 25, 2016. Exercising its fact-finding role to assess the credibility of evidence and witnesses, including plaintiff herself, the jury rejected outright most of Ford's claims. As to Deputy Warden David Krusznis, the jury denied all claims. As to Director Oscar Aviles, the jury found only that he was liable as supervisor for Edwards's discriminatory denial of Ford's request to attend a Microsoft training seminar, while permitting a male officer to attend, and that he was accountable for 10% of the emotional damages assessed. As to the County, the jury imposed *Monell* liability for failure to train, supervise, or enforce its policies. The jury handed down a damages award totaling $39,338.75.

On March 14, 2016, judgment was entered in accordance with the jury's verdict. (ECF no. 248) Because defendant Krusznis was not found liable on any claim, a no-cause judgment was entered as to him. Because Aviles had been found liable only for 10% of the $30,000 in emotional damages, judgment was entered against him in the amount of $3000. Because the County was found liable for the remaining 90% of the emotional damages ($27,000), plus 100% of the economic damages ($9338.75), judgment was entered against the County in a total amount of $36,338.75. The damages award thus totaled $39,338.75.

## II.   ATTORNEY'S FEES

### A. Ford's Entitlement to Attorney's Fees

The usual American Rule is that the parties shall bear their own attorney's fees. Several federal and state fee-shifting statutes, however, authorize courts to award a "reasonable attorney's fee" to the "prevailing party" in civil rights and discrimination actions.[2]

---

[2]     *E.g.*, 42 U.S.C. § 1988 ("[T]he court, in its discretion, may allow the prevailing party [in a § 1983 action] . . . a reasonable attorney's fee as part of the costs."); 42 U.S.C. § 2000e-5(k) ("In any action or proceeding under [Title VII] the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs."); N.J. Stat. Ann. § 10:6-2(f) ("[T]he court may award the prevailing party reasonable attorney's fees and costs."); N.J. Stat. Ann. § 10:5-27.1 ("In any action or proceeding brought under [the New Jersey Law Against

A plaintiff is a "prevailing party" entitled to an attorney's fee where she "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1937 (1983). Although Ford did not succeed on most of her claims, the jury did find defendant Aviles liable as a supervisor for a subordinate's discriminatory act, and found the County liable for failure to train, supervise, or enforce policies. To that extent, then, Ford is a prevailing party entitled to reasonable attorney's fees under (1) Title VII, 42 U.S.C. § 2000e-5(k); (2) Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988; (3) the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-27.1; and (4) the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2(f).[3]

## B. Reasonable Attorney's Fees and Costs

*Hensley v. Eckerhart* sets a generous standard for determining whether the plaintiff will be awarded an attorney's fee at all. The next step, however, is for the district court to determine what fee amount is "reasonable" under the circumstances. *Id.* "Federal and state law on attorney's fee awards is generally similar, with the major exception of the contingency enhancement [discussed below in Section II.B.3], which is only available under state law." *Blakey v. Cont'l Airlines, Inc.*, 2 F. Supp. 2d 598, 602 (D.N.J. 1998).

"The starting point for determining the amount of a reasonable fee is the lodestar, which courts determine by calculating the 'number of hours

---

Discrimination], the prevailing party may be awarded a reasonable attorney's fee as part of the cost.").

[3]      Aviles argues that because the jury awarded Ford only nominal damages, she is not truly a prevailing party, and is entitled to only a minimal attorney's fee or none at all. (Aviles Opp. 18 (citing *Robb v. Ridgewood Bd. of Educ.*, 269 N.J. Super. 394 (Ch. Div. 1993); *Tarr v. Ciasulli*, 181 N.J. 70 (2004); *Farrar v. Hobby*, 506 U.S. 103 (1992)). Although an award of $39,000 in damages may be small in relation to the amount sought, it is not nominal. The jury's verdict did more than just symbolically acknowledge that Ford was wronged—it compensated Ford for specific harm. The extent to which Ford's limited success at trial limits the amount of the fee award is discussed below.

reasonably expended on the litigation multiplied by a reasonable hourly rate.'"
*McKenna v. City of Philadelphia*, 582 F.3d 447, 455 (3d Cir. 2009) (quoting
*Hensley*, 461 U.S. at 433); *Rendine v. Pantzer*, 141 N.J. 292, 334–35, 661 A.2d
1202, 1226 (1995) (discussing NJLAD and other state fee-shifting statutes).
However, the circumstances, especially the "results obtained," may warrant
upward or downward adjustment.[4] *Hensley,* 461 U.S. at 434. I consider first
the hourly rate, and second, the number of hours reasonably expended in
achieving the result.

### 1.    Reasonable Hourly Rate

"In determining a reasonable hourly rate, the court should assess the
skill and experience of the prevailing attorneys and compare their rates to the
rates in the community for similar services by lawyers of reasonably
comparable skill, experience and reputation." *Blakey*, 2 F. Supp. 2d at 602
(citing *Rendine,* 141 N.J. at 337, 661 A.2d 1202). "Furthermore, to take into
account delay in payment, the hourly rate should be based on current rates
rather than the rates in effect when the services were performed." *Id.* (same).

Ford's attorney, D. Gayle Loftis, Esq., seeks an award of fees for herself
and another attorney at the following hourly rates:

|                                    | Requested Rate |
| ---------------------------------- | :------------: |
| D. Gayle Loftis (Lead Counsel)     | $450           |
| Timothy J. Foley[5]                | $150           |

The defendants do not maintain that $450/hour is excessive in relation
to prevailing rates.[6] Rather, they note that this is not Loftis's *actual* rate; she is

---

[4]    "The district court cannot decrease a fee award based on factors not raised at
all by the adverse party." *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 150 (3d
Cir. 2009) (quoting *Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir. 1990)).
However, "[o]nce the adverse party raises objections to the fee request, the district
court has a great deal of discretion to adjust the fee award in light of those objections."
*Rode*, 892 F.2d at 1183.

[5]    Loftis engaged Foley to engage in per diem work on post-verdict applications.
The defendants do not object to the requested hourly rate for Mr. Foley's work, nor do
they object to the hours billed by Foley.

not entitled, they say, to charge them an hourly rate in excess of the $400/hour that she actually charges clients, as reflected in her billing records. (County Opp. 4 n.2) Loftis concedes that her current hourly rate is $400, not the requested $450. (Pl. Mot. 8) Loftis will not be awarded fees at a rate higher than the one she billed in this case, or the one she currently bills paying clients.

Further, the defendants contend that Loftis's maximum rate should apply only to her appearances for trial and motion hearings; a lesser rate, they say, should apply to "work that was more appropriately performed by an associate or a paralegal." (Aviles Opp. 8–9)[7] Loftis first responds that the defendants have not suggested any alternative hourly rate schedule for less complex tasks. Second, she contends that this Court should not penalize her for handling the case on her own. Hiring temporary staff, she notes, would have been an out-of-pocket expense, incurred in a case where she was at risk of recovering nothing. Further, she says, "civil rights and employment litigation requires a specific knowledge of federal and state statutory law and federal procedural law that is not easily obtained or likely to be found in temporary staff." (Pl. Reply 6–7)

I agree that I may not fault a solo practitioner for being a solo practitioner. And although a solo attorney is not compelled to charge her full rate for all tasks, I must concede that it is common for attorneys to charge a blanket hourly rate.

---

[6]     The County does not contend that Loftis's requested rate is an excessive one for "similar services by lawyers of reasonably comparable skill, experience and reputation." (County Opp. 4)

[7]     Aviles cites *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001) ("A claim by a lawyer for maximum rates for telephone calls with a client, legal research, a letter concerning a discovery request, the drafting of a brief, and trial time in court is neither fair nor reasonable. Many of these tasks are effectively performed by administrative assistants, paralegals, or secretaries. As such, to claim the same high reimbursement rate for the wide range of tasks performed is unreasonable.").

Ultimately, however, I am moved to apply a $400 rate across the board to Ms. Loftis's hours because the defendants have not suggested any concrete alternative. "[O]nce a prevailing party has produced 'sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered in order to make out a prima facie case[,] . . . the opposing party bears the burden of producing record evidence that will contest this rate.'" *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 150 (3d Cir. 2009) (quoting *Lanni v. New Jersey,* 259 F.3d 146, 149 (3d Cir. 2001)). Ford has produced sufficient evidence demonstrating that the rate she actually charges, $400/hour, is a reasonable one for her services. Even assuming that the defendants' objection is sound in theory, they have not met their burden to produce record evidence establishing a reasonable alternative rate.

I will adopt Ms. Loftis's $400/hour rate in calculating the lodestar amount, and apply it to all hours that she reasonably expended in achieving the result at trial. I turn to that issue.

### 2.    **Reasonable Hours**

"The Court is not obligated to accept an attorney's representation of the time expended as time 'reasonably' expended." *Blakey*, 2 F. Supp. 2d at 604 (citing *Rendine,* 141 N.J. at 335, 661 A.2d 1202). "No compensation is due for 'nonproductive' time, for example, or for hours that are 'excessive, redundant, or otherwise unnecessary.'" *Id.* (quoting *Hensley,* 461 U.S. at 434). "The Court may also deduct hours that are inadequately documented." *Id.* (citing *Rendine,* 141 N.J. at 335, 661 A.2d 1202). Hours may also be discounted to the extent that they were expended on unsuccessful claims. "[W]hile there is no requirement that the fee award be proportional to the damages recovered in the litigation, *Szczepanski v. Newcomb Medical Center,* 141 N.J. 346, 366, 661 A.2d 1232 (1995), limited success may limit the fees awarded." *Blakey*, 2 F. Supp. 2d 598, 605.

Ford's application seeks a fee award for 1593 hours of work performed up to April 11, 2016. Of that total, 1544.14 hours are attributable to Loftis,

7

and 49.60 hours to Foley. At Loftis's hourly rate of $400 and Foley's hourly rate of $150, those 1593 hours would yield a lodestar figure of $625,096.[8]

The defendants argue, however, that it is unreasonable to include all of those hours in the lodestar calculation. No compensation is due, they say, for time spent litigating unsuccessful claims. Although the defendants' argument is overstated, it is not without basis.

Where a prevailing party has succeeded on only some of her claims, "the court must address (1) whether the unsuccessful claims were unrelated to the successful claims; and (2) whether the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Blakey*, 2 F. Supp. 2d at 605 (citing *Hensley*, 461 U.S. at 434); *see also Boles v. Wal–Mart Stores, Inc.*, 650 F. App'x 125, 130 (3d Cir. 2016) (citing *Blakey*). I first consider the "relatedness" question, and then the "success" question.

### a. Relatedness of successful and unsuccessful claims

The "relatedness" question may be viewed initially as one of severability. "[W]ork on an unsuccessful claim that is based on distinctly different facts and theories cannot be compensated," *id.*, because in such a case it is clear that the work was not "expended in pursuit of the ultimate result achieved." *Hensley*, 461 U.S. at 435 (citing *Davis v. Cty. of Los Angeles*, 8 E.P.D. ¶ 9444, at 5049 (C.D. Cal. 1974)). Claims are not always easily severable, however. Where the plaintiff's claims "involve a common core of facts, or [are] based on related legal theories," the hours may not be divisible by claim. In such a case, the district court need not undertake a fruitless effort to isolate hours expended only on successful claims. *Hensley*, 461 U.S. at 435–36. Rather, the court may opt for an alternative approach: it may "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*

---

[8]    The Court's calculations will round to the nearest dollar; no legitimate interest is served by *faux* precision.

The County attempts to sever the claims and segregate the corresponding attorney hours. Defendants identify ten categories of attorney work which, they say, are unrelated to Ford's successful gender discrimination claim relating to Microsoft training.[9] I find, however, that the work cannot be so neatly divided. For example, the jury imposed *Monell* liability on the County for failure to train, supervise, or enforce policies. To that extent, Ford's successful and unsuccessful claims share a common core of facts relating to the County's overall conduct. Nor can I fully accept the defense's bright-line distinction between sexual harassment and sexual discrimination for *Monell* purposes. As I noted in an earlier Opinion in this case, the *Monell* policy-and-custom evidence required a more holistic look at County procedures and processes:

---

[9]    Specifically, the County identifies the following hours of work that should be excluded:

(1)    Legal work performed before Plaintiff sought leave to file the Supplemental Pleading (313.25 hours);

(2)    Legal work developing evidence of allegations of sexual harassment by other female correction officers (30.45 hours);

(3)    Legal work requesting, reviewing, and using at trial the County policies related to harassment, retaliation, firearms training, the fraternization policy, and the procedures for internal investigations;

(4)    Legal work related to paper discovery unrelated to the claim against Edwards, including nearly 90,000 pages of discovery (of these, only Ford's three-page complaint of gender discrimination related to Ford's successful claim, says the County);

(5)    Virtually all the time devoted to taking depositions;

(6)    All work related to the expert reports, depositions and testimony because no expert offered any opinion that related to the Microsoft discrimination claim (84.65 hours);

(7)    Time spent on the Summary Judgment, In Limine Briefs and Final Pretrial Order not devoted to the successful claim;

(8)    All time entries to vague and ambiguous to determine for which claims the work was actually done (Ex. H5, 273.05 hours);

(9)    Time expended in alleged misconduct; and

(10)   Time expended on unsuccessful claims against Edwards.

(County Opp. 8–15)

9

> [T]he evidence of County policy and custom cannot so easily be
> confined to harassment and retaliation. Sexism is not so divisible.
> A jury could easily conclude that the same attitudes that would
> cause an employer to ignore sexual harassment and retaliation
> would also tend to foster an attitude of impunity toward sex
> discrimination.

*Ford v. Cty. of Hudson*, No. 07-5002 (KM), 2016 WL 6304436, at *17 (D.N.J.
Oct. 25, 2016), filed at ECF no. 287. In addition, it is unrealistic in a complex
case to expect an attorney to somehow anticipate a mixed jury verdict, some
years in the future, and categorize her billing accordingly.

I find myself unable to sequester hours expended only on successful
claims. Instead, I will adopt the alternative approach identified by *Hensley*.

### b. Plaintiff's level of success

That alternative *Hensley* approach requires me to "focus on the
significance of the overall relief obtained by the plaintiff in relation to the hours
reasonably expended on the litigation." 461 U.S. at 435–36. For these
purposes, success is a relative term.

*Hensley* directs the court to focus on the "significance of the overall
relief." 461 U.S. at 434. If the plaintiff "obtained excellent results, [her] attorney
should recover a fully compensatory fee." *Id.* at 435–36.

> If, on the other hand, a plaintiff has achieved only partial or limited
> success, the product of hours reasonably expended on the
> litigation as a whole times a reasonable hourly rate may be an
> excessive amount. This will be true even where the plaintiff's
> claims were interrelated, nonfrivolous, and raised in good faith.
> Congress has not authorized an award of fees whenever it was
> reasonable for a plaintiff to bring a lawsuit or whenever
> conscientious counsel tried the case with devotion and skill. Again,
> the most critical factor is the degree of success obtained.

*Id.* at 436.

The court must not be simplistic in assessing whether the time expended
is proportional to the value of the results achieved. Thus, where full relief was
awarded, it should not be significant that a court "reject[ed] or fail[ed] to reach
certain [alternative] grounds" the plaintiff raised in good faith. *Id.* at 435. And

10

even where the plaintiff did not receive all the relief she requested, full compensation may be awarded "if the relief obtained justified that expenditure of attorney time." *Id.* at n.11 (offering example of "a plaintiff who failed to recover damages but obtained injunctive relief, or vice versa"). Thus "success" encompasses more than a large award of damages. It may take the form of injunctive relief or institutional reform, relief that is "particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions." *Id.* at 436.

All that being said, "the district court may choose to reduce the award if a full compensatory fee would be unreasonable in consideration of the degree of success obtained." *Mancini v. Northampton Cty.,* 836 F.3d 308, 321 (3d Cir. 2016) (citing *id.*); *see also Rendine,* 141 N.J. at 336, 661 A.2d at 1227. And that principle holds true even where "the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Hensley,* 461 U.S. at 436.

"How to measure the degree of success is left to the district court's discretion." *Mancini, supra* (citing *Hensley,* 461 U.S. at 436–37). That discretion, although broad, is constrained by precedent.[10] Courts in this circuit

_____

[10]     Certain simplistic approaches have been disapproved. In particular, district courts should avoid applying rigid proportionality criteria. For example, "the Supreme Court has rejected a fee calculation approach that compares the total number of issues in the case with the number of issues on which the plaintiff prevailed." *Mancini,* 836 F.3d at 321 (3d Cir. 2016) (citing *Hensley,* 461 U.S. at 435 n.11). Similarly, the Third Circuit has noted that "decreasing the fee proportionally based on the number of defendants" is also inappropriate, particularly where counsel's work on the case was probably not evenly distributed among the defendants. *See McCutcheon v. Am.'s Servicing Co.,* 560 F.3d 143, 151 (3d Cir. 2009). In addition, the Third Circuit has distinguished between two kinds of proportionality: proportionality between damages sought and awarded, and proportionality between fees and damages awarded. In short, this is not a strict dollar-for-dollar cost/benefit analysis: "Although a court may consider the amount of damages awarded compared to the amount of damages requested as one indication of a plaintiff's degree of success, it 'may not diminish counsel fees [in a civil rights action] to maintain some ratio between the fees and the damages awarded.'" *Spencer v. Wal-Mart Stores, Inc.,* 469 F.3d 311, 318 (3d Cir. 2006) (quoting *Washington v. Philadelphia County Court of Common Pleas,* 89 F.3d 1031, 1041–42 (3d Cir. 1996)); *see also Szczepanski v. Newcomb Med. Ctr.,* 141 N.J. 346, 366, 661 A.2d 1232, 1243 (1995) (declining to "construe New Jersey's fee-shifting

11

have appraised a plaintiff's litigation success by (1) comparing the amount of damages actually awarded with the sum initially requested,[11] or (2) considering the extent to which claims or defendants were dismissed from the action.[12]

---

statutes to require proportionality between damages recovered and counsel-fee awards").

[11]   As Judge Wolfson explained in *Roccisano*:

> The first measure [used by courts to determine whether a plaintiff's success was limited] is the amount of damages received. Although a court may not reduce a fee award based on a proportionality analysis between the damages awarded and the fees requested, '[t]he amount of damages *awarded,* when compared with the amount of damages *requested,* may be one measure of how successful the plaintiff was in his or her action, and therefore may be taken into account when awarding attorneys' fees to a civil rights plaintiff." *Washington v. Philadelphia Cnty. Court of Common Pleas,* 89 F.3d 1031, 1042 (3d Cir. 1996).

*Roccisano,* 2015 WL 3649149, at *19. "Accordingly, courts have limited the amount of fees significantly in cases where a plaintiff obtained small damage awards from juries in comparison to amount sought." *Id.* (citing *Posa v. City of East Orange,* 2005 WL 2205786 at *7 (D.N.J. Sept. 8, 2005) (reducing fee award by 62%, i.e., from $104,000 to $40,000, where plaintiff sought several million dollars in damages but was awarded only $3066); *Sheffer v. Experian Info. Solutions, Inc.,* 290 F. Supp. 2d 538, 551 (E.D. Pa. 2003) (reducing the fee award by 75% where plaintiff sought $300,000 in damages but was awarded the nominal amount of $1,000); *Hall v. Am. Honda Motor Co.,* 1997 WL 732458 at *4 (E.D. Pa. Nov. 24, 1997) (reducing award by 10% from $3,384 to $2,707 where plaintiff sought damages in excess of $50,000.00 and received final judgment of $4,000.00)). Similarly, "courts have . . . reduced the lodestar where a plaintiff settled for a significantly reduced amount." *Id.* (citing *D'Orazio v. Washington Twp.,* 501 F. App'x 185, 188 (3d Cir. 2012) (upholding finding of "limited success" where, *inter alia,* "Appellant settled for only 4.6 percent of damages originally sought.")).

[12]   "The second measure of success is whether some of the claims or one or more defendants were dismissed from the case." *Roccisano,* 2015 WL 3649149, at *19 (citing *Dinizo v. Twp. of Scotch Plains,* No. 07–cv–05327, 2010 WL 2880171, at *1 (D.N.J. July 19, 2010) *aff'd,* 421 F. App'x 173 (3d Cir. 2011) (reducing fees on the basis that, *inter alia,* "Plaintiff only prevailed on one of four claims at trial"); *McDonnell v. United States,* 870 F. Supp. 576, 588–89 (D.N.J. 1994) (reducing award by 60% where "plaintiff did not succeed on the majority of his claims"); *Warner v. Twp. of S. Harrison,* No. 09–cv–6095, 2013 WL 3283945, at *16 (D.N.J. June 27, 2013) (reducing fee award by 35% because multiple claims, and three of six defendants, were dismissed from the case)). "The Third Circuit has stated that considering claims which were dismissed before trial is an appropriate a factor in determining a plaintiff's limited success." *Id.* (citing *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 414, 423 (3d Cir. 1993)).

*Roccisano v. Twp. of Franklin,* No. CIV.A. 11-6558 FLW, 2015 WL 3649149, at *19 (D.N.J. June 11, 2015) (collecting cases).

Finally, the court must explain itself. Although "[t]here is no precise rule or formula for making these determinations," and the "[district] court necessarily has discretion in making this equitable judgment . . . [i]t remains important . . . for the district court to provide a concise but clear explanation of its reasons for the fee award." *Hensley,* 461 U.S. at 436–37. In particular, when a party requests an adjustment based on "the limited nature of the relief obtained by the plaintiff," the district court must state how it has weighed the relevant considerations. *Id.*

Here, Ford achieved only limited success. That much is obvious, whether I compare the damages requested to those awarded, or consider the extent to which claims or defendants were dismissed from the action.

First, according to the defendants (County Opp. 8), Ford at one point requested a sum of $844,052.88 in damages, and she does not contest that figure in her Reply. In her 2008 Rule 26 disclosures, Ford sought $2 million, exclusive of attorney's fees. (*See* ECF no. 270-2 at 18) At trial, she recovered only $39,338.75. The jury's award amounts to only 4.7% of the $844,000 figure, and less than 2% of the $2 million figure.

Second, the jury's answers to interrogatories clearly establish that it rejected all claims against defendant David Krusznis, all but one fairly minor claim against defendant Aviles, and most of the allegations against the County. (*See* Verdict Sheet, ECF no. 246) Institutional policies and practices were surely implicated, but the case did not result in injunctive relief or the implementation of reforms, so I give that factor only limited weight.[13] Ford's

---

[13]     There is good reason to doubt whether this was primarily an "institutional reform" action of the kind referred to in *Hensley, supra.*  It is true, of course, that airing allegations of sexism in the State prison system is in the public interest; indeed, institutional shortcomings under the prior administration had been the subject of settled litigation and an investigative report. (*See* Opinion on *in limine* motions, ECF no. 138 at 13–14) Here, institutional issues were implicated, but they tended to be subordinate to Ford's quest for damages based on particularized workplace grievances.

slight success—as evidenced by the recovery of only a sliver of the damages sought and the jury's denial of most of her claims—cannot justify an award based on the full amount of time spent on this protracted case.

I conclude that an attorney's fee award based on a lodestar amount of $625,096[14] would be excessive. Indeed, a simplistic view of the percentage of claimed damages recovered, or the percentage of claims proven, might suggest a massive discount in the 95%-plus range. But I eschew that simplistic analysis. Given the setting of a public institution, and the plaintiff's need to put on an overarching *Monell* case to recover anything against the County, I find it appropriate to adjust the lodestar amount downward by 60%. Taking 40% of $625,096 yields a reduced lodestar figure of $250,038.[15]

### 3.    Contingency Enhancement

Ford also requests that her claimed lodestar amount be enhanced by 40%. "The United States Supreme Court has held that contingency enhancements are not available under federal fee-shifting statutes." *Blakey*, 2 F. Supp. 2d at 607 (citing *City of Burlington v. Dague,* 505 U.S. 557, 566–67, 112 S. Ct. 2638 (1992)). "The New Jersey Supreme Court, however, has explicitly disagreed with *Dague* and instructed trial courts making fee awards under [NJ]LAD to 'consider whether to increase [the lodestar] fee to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome.'" *Id.* (quoting *Rendine v. Pantzer*, 141 N.J. 292, 337, 661 A.2d 1202).

---

[14]    That figure, calculated above, represents the full number of hours claimed at hourly rates of $400 (Loftis) and $150 (Foley). ($400 x 1544.14 hours) + ($150 x 49.60 hours) = $625,096.

[15]    The County argues that the Court should exercise its discretion to deny Ford's request in its entirety on the grounds that it "is so outrageously excessive that it 'shocks the conscience of the court.'" (County Opp. 24 (citing *Hall v. Borough of Roselle*, 747 F.2d 838, 841 (3d Cir. 1984); *M.G. v. E. Reg'l High Sch. Dist.*, 386 F. App'x 186, 188 (3d Cir. 2010))) Although excessive, Ford's request for attorney's fees does not rise to a level that is "simply absurd," thereby disentitling her to any fee at all. *See Hall*, 747 F.2d at 841 (discussing *Brown v. Stackler*, 460 F. Supp. 446 (N.D. Ill. 1978), *aff'd*, 612 F.2d 1057 (7th Cir. 1980).

"The New Jersey Supreme Court has stated that contingency enhancements should ordinarily range between 5% and 50% of the lodestar award, with the typical enhancement being 20%–35%." *Id.* However, *Rendine* does "not mandate fee enhancements in every [NJ]LAD contingency case." *Saffos v. Avaya Inc.*, 419 N.J. Super. 244, 277, 16 A.3d 1076, 1096 (App. Div. 2011) (*Gallo v. Salesian Soc'y, Inc.,* 290 N.J. Super. 616, 660, 676 A.2d 580 (App. Div. 1996)).

In selecting an appropriate enhancement, I consider the relevant factors, as summarized in *Blakey*:

> In deciding whether to enhance the lodestar award, *Rendine* states that consideration must be given to whether the case was taken on a contingent basis, whether the attorney was able to mitigate the risk of nonpayment in any way, and whether other economic risks were aggravated by the contingency of payment. *Id.* at 339, 661 A.2d 1202. The strength of the plaintiff's case is also a factor. *Id.* at 340–41, 661 A.2d 1202. Attorneys may mitigate their risk of nonpayment by accepting some payments regardless of outcome, for example. *Id.* at 340, 661 A.2d 1202. The Court may consider the contingent fee agreement in determining whether attorneys have mitigated their risk of nonpayment. The risk of nonpayment may be "somewhat offset by the prospect of substantial compensation, independent of the court-awarded fee, in the event of a large recovery." *See id.* at 344–45, 661 A.2d 1202. Attorneys who pursue a suit seeking substantial damages significantly reduce their risk because they obtain, in exchange for the acceptance of risk of nonpayment, the prospect of compensation greater than the prospective lodestar amount. *Id.* Nevertheless, the risk of nonpayment may remain substantial despite these factors because of specific problems in proof, the hazards inherent in all litigation and the vigorous defense of an adversary. *Id.*

*Blakey*, 2 F. Supp. 2d at 607–08 (D.N.J. 1998).

Here, Ford's attorney, Ms. Loftis, took the case on a contingent basis and took on the economic risks associated with vigorous and protracted litigation. However, the County argues that Loftis did mitigate her risk in some ways, and declined additional opportunities to do so. First, they say, Ford herself "made substantial payments to [Loftis] for costs to offset" her out-of-pocket investment in the case. (County Opp. 17) Additionally, several offers of

settlement afforded Ford and Loftis multiple opportunities to cash out and avoid further litigation.[16] In fact, Aviles says, if Ford had "accepted the Defendants['] final offer prior to the trial, [she] would have received substantially more money" than was awarded her by the jury. (Aviles Opp. 22–23) Further, in 2011 (prior to expensive responses to pre-trial motions), the defendants offered Ford more than five times her ultimate recovery. (*Id.*) The County also notes that Ford's substantial settlement demands offered "the prospect of compensation greater than the prospective lodestar amount." (County Opp. 17–18)

I must add an observation as to the risk factors in this case. In some instances, a case is "difficult"—*i.e.*, unpredictable in terms of eventual recovery—because the legal issues are difficult and complex. The attorney who takes on such a case may be entitled to an enhancement premium. In other instances, however, the case is "difficult" because its merits are dubious.[17] Here, I believe, the second kind of litigation risk was pervasive.

The plaintiff had already received some $78,000 in back pay in the administrative process, based on a finding that her 2006 suspension/termination was based on insufficient evidence. Her original, 2007 complaint was a second trip to the well, in which she recast the same injury as a case of discrimination or retaliation. At trial, the defense put on a convincing case that, whatever the outcome, the 2006 investigation was not discriminatory or retaliatory, but justified by the facts then known. (*See, e.g.*, Trial Transcript, ECF no. 215, pp. 55–118)[18]

---

[16]   The parties' positions on attorney's fees—plaintiff proposing a figure approaching $1 million, and defendants counter-proposing a figure approaching $0—is emblematic of their disparate views throughout this case.

[17]   I make an exaggerated statement to illustrate a point: The litigation risks of suing to prove the earth is flat are great indeed, but persisting in such a case should not entitle an attorney to an enhancement.

[18]   I gave the plaintiff great leeway to bring in evidence of unrelated incidents in order to establish her *Monell* case that the County did not enforce its policies. And to be sure there was such evidence. But much of the most dramatic *Monell* evidence, too,

In the 2010 Supplemental Pleading, plaintiff added claims based on a series of workplace grievances. Viewed as examples of discrimination or retaliation, these, too, were shredded by the defense. All but one were explicitly rejected by the jury.

For example, Ford claimed that Kruznis "retaliated" against her by denying her request to reclassify a vacation day as a sick day. At trial, however, Ford acknowledged that Kruznis followed policy and that she had not been entitled to the requested change.[19] Similarly, Ford alleged that Operations Lieutenant Edwards "retaliated" against her by wrongfully denying a requested vacation day based on her failure to get approval 72 hours in advance. (Supplemental Pleading, ECF no. 47, ¶ 13) At trial, however, Ford admitted that Edwards was simply unaware that she had obtained approval from another officer, who was unable to enter it into the computer system before the weekend. When the other officer confirmed that she had done so, Edwards approved the vacation day. (Trial Transcript, ECF no. 215, 126:15–22). Aviles and Kruznis, Ford alleged, were ultimately responsible for Edwards's initial denial of her vacation day request. (*See id.* at 123:15–18) On cross-examination, however, Ford admitted that she had "no facts" to support her

---

fell flat, based on facts that were surely known to plaintiff long before trial. Testimony of sexual discrimination or even abuse, for example, gave way to proof that the person responsible was fired and referred for criminal prosecution.

[19]    The cross-examination transcript reads:

> Q     So, even though Krusznis followed policy, even though you weren't entitled to change the vacation day to a sick day, even though you admitted under oath that you weren't entitled to that, you still claim that he retaliated against you; right?

> A     Yes.

> Q     And the reason you gave when you were deposed for the evidence that he retaliated was because you sent him a memo asking him for your assignment, and who to report to. That was the reason you said he retaliated against you by not giving you this sick day; right?

> A     Yes.

(Trial Transcript, ECF no. 215, 121:15–25)

allegation that Aviles and Kruznis knew about, were involved in, or encouraged Edwards's initial denial of the vacation request. (*Id.* at 127:21–25, 128:1–10)[20] Indeed, defense counsel took Ms. Ford through her list of allegedly discriminatory or retaliatory acts, and in virtually every instance, she admitted that her request was properly denied based on County policy, or that she had "no facts" to connect her complaints to Aviles or Krusznis.[21]

I am cognizant that less serious episodes may contribute to a larger picture, or pattern, of discrimination. Nevertheless, claims of discrimination or retaliation based on these episodes had severe defects that could and should have been recognized early on. It is difficult to consider resources spent litigating such claims to an unsuccessful conclusion as having been well spent.

---

[20]   Q   [W]hat facts do you have that Aviles and Krusznis were involved in the decision initially to deny your vacation day?

   A   I don't have any facts.

   Q   Or that Aviles or Krusznis encourage Edwards to deny the vacation day that he eventually gave you, what facts?

   A   No facts.

(Trial Transcript, ECF no. 215, 128:4–10)

[21]   Regarding training class assignments, Ford admitted she had no facts to connect Edwards's decisions to Aviles or Krusznis. *Id.* 135:22–136:3. Regarding the failure to inform her of the cancellation of a class, Ford admitted that she had no facts to support an allegation of discrimination or retaliation, and also that she had no facts connecting her complaint to Krusznis or Aviles, but that she had put it in her lawsuit anyway. (*Id.* at 138:23–139:18) Regarding a claim that Coyne had failed to notify her that she failed her firearms proficiency testing she alleged retaliation because Coyne was given administrative "favors" and admitted she "d[id]n't have any evidence" of involvement by Aviles or Krusznis. *Id.* at 143:6–144:10. As to related claims that Coyne did not give her extra training or reschedule her thereafter, Ford repeated her nonspecific claim of administrative "favors" and retaliation. But asked "what facts" she had connecting her allegations against Coyne to Aviles or Krusznis, she again admitted she had none. *Id.* at 152:24–153:1. Ford claim that Edwards retaliated against her by refusing to retroactively convert vacation days already taken to furlough days, and add the restored vacation days to current sick leave. She could not remember whether Edwards had cited his inability to do so under regulations or that it would require payment of overtime. Asked what facts she had indicating that Krusznis or Aviles even knew about this, she answered "none." *Id.* at 155:17–24.

Ford seeks a 40% enhancement.[22] That figure is toward the top of the range of 5%–50% that "ordinarily" applies, and above the range of 20%–35% that is "typical" in a successful case. *See* p. 15, *supra*. Given the level of success here, that enhancement request is not in the realm of reasonableness.

I do not say that this was a wholly meritless case, or one in which the plaintiff received purely nominal damages. Nevertheless, the merits were thin and the return meager. I therefore do not deny an enhancement altogether, but award an enhancement at the low end of what is ordinary. Under NJLAD and *Rendine*, I will grant Ford a 5% enhancement to the $250,038 lodestar, amounting to $12,502. Thus, the Court will award Ford an attorney's fee adjusted for lack of success and enhanced by 5% to reflect litigation risk, in a total amount of **$262,540**.[23]

## III.   COSTS

Here, Ford has sought to recover her litigation costs in two ways. The first method is typically available under Fed. R. Civ. P. 54 to prevailing parties whether or not they are entitled to an attorney's fee award. The second is available only to prevailing parties also entitled to attorney's fees. Thus Ford has made two overlapping applications. Factoring out duplication between the two, the entire amount of costs sought is $94,337.

I have disallowed or discounted costs as follows. My rulings are summarized in a chart in the Conclusion of this Opinion.

### A.   Standards

There are two potential bases for an award of costs of litigation. The first is taxation of costs by the clerk under Civil Rule 54; the second is an award of costs as part of the plaintiff's prevailing-party fee application.

---

[22]   Applied to the lodestar $625,096, calculated on the basis of all claimed hours at a rate of $400/hour, a 40% enhancement would produce an award of $937,644. Applied to the court's reduced lodestar of $250,038, calculated in the section immediately preceding, it would yield an award of $350,053.

[23]   $250,038 x 105% = $262,540.

Under Fed. R. Civ. P. 54 and Local Rules 54.1 and 54.2, the Clerk may tax costs—but not attorney's fees—in favor of a prevailing party on 14 days' notice. Fed. R. Civ. P. 54(d)(1). Local Civil Rule 54.1(g) states ten general rules for the Clerk to follow in taxing costs. On appeal from the Clerk's taxation of costs, the Court may uphold, reduce, or reverse the award pursuant to Fed. R. Civ. P. 54 and Local Civil Rules 54.1 and 54.2. *See Reger v. The Nemours Foundation, Inc.*, 599 F.3d 285, 288 (3d Cir. 2010) ("[I]f a district court, within its discretion, denies or reduces a prevailing party's award of costs, it must articulate its reasons for doing so."); *In re Paoli R.R. Yard PCB Litigation*, 221 F.3d 449, 458 (3d Cir. 2000) ("Given the district court's discretionary equitable power to award costs under Rule 54(d)(1), taxation of costs is reviewed only for abuse of discretion."). Rule 54 costs will not be discounted based on the extent of the plaintiff's success.[24]

---

[24]   Defendants, here did not request a reduction of the Rule 54(d)(1) taxable costs based on plaintiff's partial success. Although the matter is not free from doubt, the implied concession is sound. *See Mancini v. Northampton Cty.*, No. CV 14-963, 2015 WL 12806509, at *1 (E.D. Pa. July 28, 2015) ("The Court thus cannot reduce costs to reflect Mancini's overall success, as Northampton County requests."), *aff'd,* 836 F.3d 308 (3d Cir. 2016). Quoting Third Circuit precedent, *Mancini* explains that under Rule 54(d)(1):

> "[U]nless a federal statute, these rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1); *Institutionalized Juveniles v. Sec. of Pub. Welfare*, 758 F.2d 897, 926 (3d Cir. 1985) ("[A] district court may not deny costs to the prevailing party unless it supports that determination with an explanation." (citation omitted)). "Moreover, the losing party bears the burden of making the showing that an award is inequitable under the circumstances." *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 462-63 (3d Cir. 2000). Limited success does not justify the denial of costs. *See Institutionalized Juveniles*, 758 F.2d at 926. Rather, a court may only consider "the prevailing party's unclean hands, bad faith, dilatory tactics, or failures to comply with the process during the course of the instant litigation or the costs award proceedings," and "the losing part[y's] potential indigency or inability to pay the full measure of costs award levied against [it]." *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d at 468.

*Id.* Other circuits however, have allowed it. *See Barber v. T.D. Williamson, Inc.*, 254 F.3d 1223, 1234 (10th Cir. 2001) (quoting 10 C.A. Wright & A.R. Miller, Federal

Where, as here, a prevailing party is entitled to an attorney's fee, both federal and New Jersey law allow the court to award litigation costs that would typically be separately billed to a client. Such costs may be awarded even if not otherwise eligible for taxation by the Clerk under Rule 54. *See Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995). As the Supreme Court has held, "'Clearly, a 'reasonable attorney's fee' cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must . . . take account of other expenses and profit.'" *Id.* (quoting *Missouri v. Jenkins*, 491 U.S. 274, 109 S. Ct. 2463 (1989)). Like attorney's fees, costs awarded pursuant to a fee application may be discounted to account for the plaintiff's rate of success. *See* Section III.B.6.ii at p. 28, *infra*.

### B.    Analysis

On March 3, 2016, Ford filed a motion pursuant to Fed. R. Civ. P. 54 and Local Civil Rule 54.1 for taxation of costs, seeking $46,710. (ECF no. 249) The Clerk partially granted Ford's motion, taxing $31,156 against the defendants. (ECF no. 279) Both Ford and the defendants have appealed from adverse portions of the Clerk's Order. Ford has separately moved the Court to award her a total of $94,337 in litigation costs as part of her prevailing-party fee application.[25] This sum overlaps the amounts taxed by the clerk. The defendants respond that Ford should be awarded only a fraction of the claimed $94,337 in litigation costs.

---

Practice and Procedure § 2667 in the context of the trial court's "discretion to act under Rule 54(d)(1)").]

[25]    Ford's moving brief inadvertently requested an award of only $88,347 for litigation costs. (Pl. Mot. 20) However, Exhibit J to the accompanying certification contains both an itemized list of "Advances" totaling $88,347, and another itemized list of "Expenses" totaling $5990. (ECF no. 258-2, Ex. J) The basis for the distinction is unclear. However, it is clear from the defendants' objection to expenses included in "Expenses" list that the defendants understood Ford's request for costs to include both the "Advances" and the "Expenses." Ford's counsel clarified by letter (ECF no. 294) that the omission of the $5990 in expenses was inadvertent, and Ford in fact seeks $94,337 in litigation costs.

As noted, the Court is presented with overlapping applications under different standards. I therefore have not disallowed any item merely because it was disallowed by the clerk under Rule 54; it might nevertheless be properly awarded as part of a prevailing party's fee. My analysis considers both.

### 1. Trial transcript (50% deducted)

The defendants moved this Court to reverse the Clerk's decision to tax costs incurred by Loftis for obtaining daily copy of the transcript at trial ($14,598). (ECF nos. 281, 282;[26] *see also* County Opp. Ex. H8) Loftis opposed this motion, arguing that the Clerk did not err. (ECF no. 285)

Local Civil Rule 54.1(g)(6) provides as follows:

(6) The cost of a reporter's transcript is allowable only (A) when specifically requested by the Judge, master, or examiner, or (B) when it is of a statement by the Judge to be reduced to a formal order, or (C) if required for the record on appeal. Mere acceptance by the Court of a submitted transcript does not constitute a request. Copies of transcripts for an attorney's own use are not taxable in the absence of a prior order of the Court. All other transcripts of hearings, pretrials and trials will be considered by the Clerk to be for the convenience of the attorney and not taxable as costs.

Loftis does not establish that these expedited transcripts fall within the three categories permitted by the Rule: *i.e.*, that they were requested by the Judge, were needed to reduce an oral ruling to an order, or were required for appeal. Nor were transcripts, let alone daily copy, authorized by "prior order of the Court." For these reasons alone, the cost would not be taxable under Local Rule 54.1(g)(6).

Nevertheless, the Clerk taxed the costs of the transcripts in full, in light of 28 U.S.C. § 1920, which more broadly allows for the taxation of "[f]ees for . .

---

[26] The defendants also moved this Court (ECF nos. 281, 282) pursuant to Fed. R. Civ. P. 62(b)(3) to stay the proceedings to enforce the judgment pending the disposition of a motion for judgment as a matter of law or for a new trial. (ECF no. 250) On October 25, 2016, I denied the motion for judgment as a matter of law and for a partial new trial (ECF no. 288), thereby mooting the defendants' motion to stay the proceedings.

. transcripts necessarily obtained for use in the case." 28 U.S.C. § 1920(2)
(emphasis added). The Clerk was persuaded by Loftis's assertion that the daily
transcripts were essential to the smooth functioning of the trial. (ECF no. 279
at 7) Loftis cites no example of the transcripts' direct use at trial—*e.g.,* for
cross-examination or quotation in motions. Rather, she urges that daily copy
was necessary because she did not have an associate to take notes, and needed
the transcript to coordinate testimony of witnesses "taken out of turn or
piecemeal." I am skeptical of such generalities, even setting aside counsel's
noncompliance with Local Rule 54.

However, I will in part overlook counsel's noncompliance and exercise my
broader discretion under 28 U.S.C. § 1920 to determine whether the transcript
was "necessarily obtained for use in the case," I find that transcription of the
proceedings was justified in part. The claims of plaintiff's counsel to have used
the transcript at trial are quite thin, although not wholly implausible. As I say,
counsel did not use the transcript in the usual fashion, to assist the Court or
aid in the presentation of evidence—*e.g.,* for cross-examination, or for motions
at trial. The need to keep track of the odd witness called out of turn does not
justify ordering daily copy for the entire trial; surely it could have been ordered
as needed for those purposes. The trial transcript (if not daily copy purchased
at a premium rate) did prove useful in connection with post-trial motions. True,
Ford's post-trial motion contains not a single citation to the transcript, but her
opposition to the defendants' post-trial motion does cite and attach transcript
excerpts. (*See* ECF no. 271-1 (Ford opposition to defendants' post-trial motion,
attaching transcript excerpts).) Given the plaintiff's minimal use of the
transcripts, I will discount the $14,598 amount claimed by 50%, for a
reduction of $7299. *See United Rubber, Cork, Linoleum & Plastic Workers of
Am., AFL-CIO v. Lee Nat. Corp.,* 62 F.R.D. 194, 196 (S.D.N.Y. 1974) (permitting
taxation of transcript cost at regular rate, but rejecting expedited rate); *Virginia
Panel Corp. v. Mac Panel Co.,* 887 F. Supp. 880 (W.D. Va. 1995) ("The cost of
daily copies of trial transcripts is recoverable if the daily transcript is

indispensable, rather than merely for the convenience of the attorney") (citing *Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 233–34, 85 S. Ct. 411 (1964) (noting that daily transcripts were not used for briefs or preparation of proposed findings required by the court)).

In the alternative, I consider whether the disallowed $7299 should be awarded as part of the prevailing party fee, *i.e.,* as a charge customarily billed to a client. I think that an attorney who did not use the transcript for the usual litigation purposes (*e.g.,* cross-examination) would not simply leave the meter running, but would prudently minimize the expense to her client. I find that daily copy for the whole trial would not have been a reasonable client charge. I therefore will not award the disallowed $7299 as part of the fee award.

### 2. Status conference expense (typo) ($1287 deducted)

Ford concedes that her request for $1300 for "Transportation costs-parking/tolls - attend Status conference w/ Judge McNulty and attys" on February 11, 2014 (ECF No. 258-2, p. 127), is an obvious typographical error. It should have read $13.00; the net reduction, then, is $1287.[27]

### 3. Secretarial overtime (disallowed)

The defendants object to allowance of $4,569 in overtime charges paid to Ms. Loftis's secretarial staff for preparation of briefs in opposition to two summary judgment motions. Defendants argue that such charges were not necessarily incurred, and in any event are not customarily billed to clients.[28] Defendants point out that their summary judgment motions were filed in April 2011 (ECF nos. 64, 65), but that overtime work on the plaintiff's opposition briefs did not take place until March 2012. As of then, they argue, Loftis had already had nearly a year to work on the responses; there was no need for last-

---

[27]     $1300 – $13 = $1287.

[28]     I observe in passing that in the case of multiple clients, it may be difficult to allocate the regular hours to one and the overtime hours to another. Either could plausibly assert a prior claim on the secretary's regular hours.

minute overtime. Loftis replies that she delayed working on the briefs because of the possibility that the case might be resolved.

I will endeavor to supply some omitted context from my reading of the docket. (The events precede the assignment of the case to me.) The summary judgment motions were filed in April 2011 but administratively terminated pending a settlement conference. I agree with Ford that it would not have been reasonable to incur time charges in opposing the motions during that period. The motions were refiled, however, in November 2011, so presumably settlement talks had failed by then. (ECF nos. 81, 82) Ms. Loftis then requested and obtained multiple extensions of her time to respond. (ECF nos. 83–87) Those requests cite the press of other business, including briefs to other courts; they do not indicate that further settlement negotiations were in progress during the period from November 2011 to March 2012. Under those circumstances, I cannot find that overtime was necessary; this $4569 cost is disallowed.

### 4. Video conference (allowed)

Ford moved this Court (ECF no. 283) to reverse the Clerk's denial of $2,657 for the cost of renting a video teleconferencing room for a March 31, 2011 deposition of Ford's expert witness, Michele Paludi, Ph.D., who is located in Albany, New York. I have reviewed Defendant Aviles's opposition (ECF no. 286) and the Clerk's Order itself (ECF no. 279). I agree with the Clerk's reasoning, and find that this item was appropriately denied under Rule 54(d)(1) and 28 U.S.C. § 1920.

I will, however, allow the room rental cost as part of the fee award. It is possible that traveling to Ms. Paludi's location some 150 miles away, would have been more economical, but the winter weather in Albany was severe and the trip would have entailed expenses of its own. For purposes of the fee award standard—whether such charges are ordinarily billed to a client—I will not micromanage counsel's decision. This cost is reasonably awarded in lieu of travel expenses, given that Paludi is located out of state.

25

### 5.    Trial exhibits (allowed)

The defendants object to any allowance for the cost of having plaintiff's trial exhibits prepared by an outside vendor ($2730). Ford counters that the trial exhibit books and discs were "made to facilitate the trial for all participants, all counsel and the Court included. They were used extensively during the course of trial and were not merely a convenience for Plaintiff." (Pl. Reply 12) I accept that these charges were legitimately incurred for the purpose of presentation of evidence at trial; they will be allowed as part of a fee award.

### 6. Subtotals

The total amount of costs claimed (whether under Rule 54 or as part of a fee award) was $94,337. The total of amounts disallowed is $13,155.[29] Those two figures yield a subtotal of $81,182 in net cost items allowed.[30] That is not a final figure, however. I must differentiate between items taxed by the Clerk (which will not be discounted for lack of success) and items awarded solely by the Court as part of a fee award (which will be discounted).

As to the Clerk's taxed costs and those awarded by the Court, I have calculated the following subtotals. Again, it may be helpful to refer to the chart in the Conclusion of this Opinion.

### i.    Net items taxed by the Clerk

The Clerk originally taxed $31,156 in costs. Only one of the deductions above relates to that total: $7299, representing 50% of the transcript fees taxed. (Section III.B.1, *supra*). That leaves a subtotal of $23,857 in allowed items taxed by the Clerk.[31]

---

[29]    $7299 (50% of transcript) + $1287 (conference expense typo) + $4569 (overtime) = $13,155 in total deductions.

[30]    $94,337 - $13,155 = $81,182.

[31]    $31,156 - $7299 = $23,857.

### ii.   Net items awarded by the Court, discounted for lack of success

Plaintiff's fee application sought enumerated items, plus any costs disallowed as part of the application to the Clerk. The remainder, then—*i.e.*, the total sought ($94,337) minus the net items taxed by the clerk ($23,857)—equals $70,480.[32] That figure represents the subtotal of cost items the plaintiff seeks as part of a fee award by the Court. To that subtotal, I have applied $13,155 in deductions of disallowed items (*See* Sections III.B.1–3, *supra*), yielding an adjusted subtotal of $57,325.[33]

That $57,325 represents the total of items permitted as part of the Court's fee award, but not awarded as Rule 54 costs. Unlike the Rule 54 costs, these costs are subject to being discounted for lack of overall success. As in the case of attorney's fees, there are two alternative approaches. *See* Section II.B.2, *supra*.

The first approach is an allocation of costs between successful and unsuccessful claims. The defendants point out, for example, that just three sentences of Ford's brief in opposition to the summary judgment motions related to the successful Microsoft training claim. They make similar objections to the reimbursement of costs of photocopies and scanning, depositions, expert witnesses, and other items, to the extent they cannot be associated firmly with the successful claim. The result of this approach, say defendants, would be the allowance of a minuscule fraction of the costs claimed.

As discussed above, however, the successful claims are broader and more interrelated with the unsuccessful claims than the defendants recognize. I cannot easily find, for example, that a particular exhibit, or an expert's testimony, is divisible by legal claim or issue.

---

[32]   $94,337 - $23,587 = $70,480

[33]   Claimed as part of the fee award were $7299 (the 50% of transcript fees disallowed as Clerk's costs) + $1287 (conference expense typo) + $4569 (overtime). I have disallowed those claims, which total $13,155. $70,480 - $13,155 = $57,325.

Alternatively, however—as in the case of attorney's fees—I may apply an overall discount to the costs awarded to account for the plaintiff's limited success on the merits. *See J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, No. 3:07CV585, 2014 WL 1321116, at *13 (M.D. Pa. Mar. 31, 2014) (reducing both attorney's fees and electronic research cost award by 10% to account for the lack of success on a particular count); *Estate of Schultz v. Potter*, No. CIV.A.05-1169, 2010 WL 2597697 (W.D. Pa. June 24, 2010) (applying lodestar downward adjustment of 85% to the costs as well); *Watcher v. Pottsville Area Emergency Med. Serv., Inc.*, 559 F. Supp. 2d 516, 539 (M.D. Pa. 2008) ("[A]s attorneys' fees incurred up through the end of 2002 were apportioned by fifty percent (50%) to account for Plaintiff's limited success, so will costs for this portion of the litigation.").

As I did in the lodestar adjustment, I discount the fee application costs by 60%—*i.e.*, I permit 40% of that subtotal. The net allowed subtotal of $57,325, discounted by 60%, yields a figure of $22,930.[34]

That $22,930 in costs awarded by the Court, added to the Clerk's net taxed costs of $23,857, yields a total cost award of **$46,787**.

### IV.   Interest and Miscellaneous

#### A. Prejudgment Interest

Prejudgment interest on a pendent state law claim is governed by state law. *Abrams v. Lightolier, Inc.*, 841 F. Supp. 584, 599 (D.N.J. 1994), *aff'd*, 50 F.3d 1204 (3d Cir. 1995). "Prejudgment interest in [NJ]LAD cases is *mandated* by New Jersey Court Rule 4:42–11(b), which states that a court 'shall, in tort actions . . . include in the judgment simple interest . . . from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later.'" *Blakey*, 2 F. Supp. 2d at 609. "A prejudgment interest award compensates the plaintiff for the defendant's use of her money after the cause of action accrued." *Id.* (citing *Hurley v. Atlantic City*

---

[34]    $57,325 x 40% = $22,930.

*Police Dept.,* 933 F. Supp. 396, 431 (D.N.J. 1996)). "It is an equitable remedy intended to make a plaintiff 'whole.'" *Id.* (citing *Davis v. Rutgers Casualty Ins. Co.,* 964 F. Supp. 560, 575 (D.N.J. 1997)).

The plaintiff seeks prejudgment interest running from the filing of the original complaint on October 17, 2007. The defendants argue that prejudgment interest accrues only from the filing of the Supplemental Pleading on November 16, 2010. Ford, they say, did not prevail on any claim filed prior to that.

As to the County, the jury's verdict rested on a *Monell* theory of failure to supervise and enforce its policies. The award against the County consisted of $27,000 in emotional damages, as well as $9338 in actual damages consisting of lost benefits from the period of suspension in 2006-09, a period that straddles the filing date of the original complaint. The failure to enforce policies and the resulting emotional damage were presumably ongoing. Although the claims against the County in the original Complaint are largely severable from the jury's finding of liability, I cannot conclude that they are entirely so.[35] Accordingly, prejudgment interest against the County will accrue from October 17, 2007.

As to Aviles, it is clear that the verdict rests solely or primarily on discrimination by Lt. Edwards in 2010 regarding the Microsoft training seminar. That event, of course, had not yet occurred in 2007, when the original Complaint was filed. It is true that Aviles shared in the emotional damage

---

[35]    As I previously noted, with respect to the *Monell* verdict:

Fundamentally, the County is wrong in saying that the verdict bespeaks only discrimination, and excludes retaliation. The *Monell* question itself— Question 12—asked whether Ford was "retaliated against (suspended and terminated in 2006 or for her complaints in 2009, 2010 and 2011)." The jury answered "Yes." The denial of Microsoft training, although discriminatory, could easily have had a retaliatory motive as well. Discriminators do not necessarily draw such fine distinctions.

*Ford v. Cty. of Hudson,* No. 07-5002 (KM), 2016 WL 6304436, at *16 (D.N.J. Oct. 25, 2016), filed at ECF no. 287.

award, albeit to the tune of only $3000. Nevertheless, I cannot clearly identify
any clear basis for his liability that predates the Supplemental Pleading. The
prejudgment interest as to Aviles, then, shall accrue as of the filing of the
Supplemental Pleading on November 16, 2010.

In accordance with these rulings, Ford shall submit a new calculation of
prejudgment interest under New Jersey Court Rule 4:42–11(b), current as of
the date of filing of a proposed amended judgment.

### B. Post-judgment Interest

Ford requests post-judgment interest pursuant to 28 U.S.C. § 1961(a).
Section 1961 states:

> Interest shall be allowed on any money judgment in a civil case
> recovered in a district court . . . . Such interest shall be calculated
> from the date of the entry of the judgment, at a rate equal to the
> weekly average 1-year constant maturity Treasury yield, as
> published by the Board of Governors of the Federal Reserve
> System, for the calendar week preceding[] the date of the
> judgment. The Director of the Administrative Office of the United
> States Courts shall distribute notice of that rate and any changes
> in it to all Federal judges.

28 U.S.C. § 1961(a). Post-judgment interest runs from the date of entry of
judgment. *See Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 174
(3d Cir. 2010) ("[P]ost-judgment interest on an attorney[s'] fee award runs from
the date that the District Court enters a judgment quantifying the amount of
fees owed.") (quoting *Eaves v. County of Cape May*, 239 F.3d 527, 542 (3d Cir.
2001)). Judgment was entered on March 14, 2016, and, according to Ford, the
index rate for the week prior was 0.62%. The defendants do not object to the
award of post-judgment interest on the amount of the judgment.

Post-judgment interest accrues as to an award of costs as well. *See Amba
v. Rupari Food Servs., Inc.*, No. CV104603MASTJB, 2016 WL 6471019, at *5
(D.N.J. Oct. 31, 2016) (citing *Devex Corp. v. Gen. Motors Corp.*, 749 F.2d 1020,
1026 (3d Cir. 1984). As to costs, however, post-judgment interest shall run
from the date of entry of the final amended judgment implementing this
Opinion.

### C.    Supplemental Certification

Ford indicated in her motion for attorney's fees that her motion covers "all attorney's fees and costs incurred through April 10, 2016." (Pl. Mot. 20) She expressed her intent to "provide a Supplemental Certification with her Reply to address additional attorney's fees and expenses incurred after April 10, 2016." (*Id.*) Ford may do so within 10 days. If she opts not to do so, she shall submit a proposed final and amended judgment including the award of fees and costs provided for in this Opinion.

## IV.    CONCLUSION

The rulings above as to fees and costs are summarized in this chart:

| Description | Amounts and adjustments | % Discount/ Enhancement | Total |
|---|---|---|---|
| Lodestar | 625,096 | .40 | 250,038 |
| Enhancement (+5%) | 250,038 | .05 | 12,502 |
| **(a) TOTAL FEES AWARDED** | | | **$ 262,540** |
| | | | |
| Costs sought by plaintiff | 94,337 | | |
| **(b) SUBTOTAL Costs allowed by clerk, with 50% of transcript cost deducted ($31,156 - $7299)** | 23,857 | (none) | 23,857 |
| Remaining costs sought as part of fee application | 70,480 | | |
| - Conference expense (typo) | -1287 | | |
| - Overtime | -4569 | | |
| - 50% of Transcript cost | -7299 | | |
| **(c) SUBTOTAL Cost items allowed as part of fee application, discounted for lack of success** | 57,325 | .40 | 22,930 |
| **(d) TOTAL COSTS  AWARDED ((b) + (c))** | | | **$ 46,787** |
| **TOTAL FEES + COSTS ((a) + (d))** | | | **$ 309,327** |

For the foregoing reasons, the Court awards Ford attorney's fees (including a 5% contingency enhancement) in the amount of $262,540. The costs taxed by the clerk are reduced to $23,587. As part of the fee award, the Court awards additional costs of $22,930, resulting in a total cost award of $46,787.

Prejudgment interest shall be calculated in accordance with the discussion above. As to the County, it shall run from October 17, 2007. As to defendant Aviles, it shall run from November 16, 2010.

Post-judgment interest on the damages awarded by the jury shall run from March 16, 2016. Post-judgment interest on fees and costs shall run from the date of the final and amended judgment.

Within 10 days, Ford shall either (a) submit a supplemental certification claiming fees and costs since March 16, 2016; or (b) submit a proposed form of final and amended judgment in accordance with this Opinion,

Dated: March 8, 2017

HON. KEVIN MCNULTY, U.S.D.J.